IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PETER F. PAUL,

Plaintiff,

v.

JUDICIAL WATCH, INC., *ET AL*.

Defendants.

Civil Action No. 1:07-cv-00279-RCL
Honorable Royce C. Lamberth

**DEFENDANTS' MOTION TO DISQUALIFY OPPOSING COUNSEL**

Defendants Judicial Watch, Inc. and Paul Orfanedes, by undersigned counsel and pursuant to Rules 1.6, 1.7, 1.9 and 3.7[1] of the Rules of Professional Conduct of the District of Columbia hereby move to disqualify opposing counsel, Larry E. Klayman and the Klayman Law Firm, P.C. The grounds for this Motion are more fully set forth in the accompanying Memorandum of Points and Authorities in Support of Defendants' Motion to Disqualify Opposing Counsel.

WHEREFORE, for all of the forgoing reasons, and for those set forth in the accompanying Memorandum of Points and Authorities, Defendants Judicial Watch, Inc. and Paul Orfanedes respectfully requests that the Court GRANT this Motion and disqualify opposing counsel from this case.

1 The Local Rules of Civil Procedure for the United States District Court for the District of Columbia state that attorneys shall follow the Rules of Professional Conduct as adopted by the District Columbia Court of Appeals. L.Cv.R. 83.15.

Respectfully submitted,

/s/ *Richard W. Driscoll*

Richard W. Driscoll (436471)
Terence J. Everitt (492139)
DRISCOLL & SELTZER, PLLC
600 Cameron Street
Alexandria, Virginia 22314
703.340.1625 Telephone
703.997.4892 Facsimile

*Counsel for Defendants Judicial Watch, Inc., and Paul Orfanedes*

Dated: April 22, 2008

**CERTIFICATE OF GOOD FAITH**

On April 16, 2008, undersigned counsel provided a draft copy of this Motion to Larry E. Klayman by, together with email text stating that the Motion would be filed on Monday, April 21, 2008, unless counsel for the Plaintiff contacted Defendants' counsel to indicate his willingness to withdraw. At no time did counsel for Plaintiff contact Defendant's counsel to discuss the relief requested herein. Not hearing from Plaintiff's counsel, Defendants are now compelled to file this Motion to obtain the relief necessary to protect their rights.

/s/ *Richard W. Driscoll*

Richard W. Driscoll

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 22nd day of April 2008, a copy of the foregoing Motion, Memorandum in Support and proposed Order were served by electronic filing upon counsel listed on the Notice of Electronic Filing.

/s/ *Richard W. Driscoll*

Richard W. Driscoll

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PETER F. PAUL,

Plaintiff,

v.

JUDICIAL WATCH, INC., *ET AL*.

Defendants.

Civil Action No. 1:07-cv-00279-RCL
Honorable Royce C. Lamberth

**ORDER**

Upon consideration of the Defendants' Motion to Disqualify Opposing Counsel, opposition thereto, and the entire record herein, it is this ___ day of ___________________ 2008,

ORDERED that the motion is hereby GRANTED, and it is further

ORDERED that Larry E. Klayman, Esquire and the Klayman Law Firm, P.C. are hereby disqualified from representing Plaintiff Peter Paul in this litigation.

_______________________________
Honorable Royce C. Lamberth
Judge, United States District Court

cc: Copies to all counsel

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PETER F. PAUL,<br><br>Plaintiff,<br><br>v.<br><br>JUDICIAL WATCH, INC., *ET AL*.<br><br>Defendants. | Civil Action No. 1:07-cv-00279-RCL<br>Honorable Royce C. Lamberth |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION DISQUALIFY LARRY E. KLAYMAN AS COUNSEL**

Defendants Judicial Watch, Inc. ("Judicial Watch") and Paul J. Orfanedes ("Orfanedes"), by undersigned counsel and pursuant to D.C. Rules of Professional Conduct 1.6, 1.7, 1.9 and 3.7, hereby submit the following Memorandum of Points and Authorities in Support of their Motion to Disqualify Larry E. Klayman and the Klayman Law Firm, P.C. ("Klayman") as Counsel for Plaintiff Peter Paul ("Paul").

**INTRODUCTION**

Plaintiff's counsel, Klayman, must be disqualified from representing Paul as a result of ethical violations arising from Klayman's prior relationship with Judicial Watch and the conflicts that arise from his representation of Paul and himself in litigation against Judicial Watch. Klayman represents the Plaintiff, Paul, who is suing Judicial Watch in this action. Klayman is the for General Counsel for Judicial Watch. He is also representing himself in litigation against Judicial Watch in a separate matter. In light of his prior relationship to Judicial Watch, Klayman possesses confidential information regarding Judicial Watch. By representing Paul, Klayman is now in a position to disclose such information to Paul under circumstances that cannot be monitored, and to use that information to gain an improper advantage in litigation against

Judicial Watch.

Klayman's representation of Paul presents a conflict of interest because Klayman is bound by ethics to maintain the confidentiality of information obtained while acting in the fiduciary capacity of Judicial Watch's General Counsel. In this position, Klayman was directly involved with the matters that now form the basis of Paul's Complaint. (*See* Compl. at ¶¶ 2 and 3; *see also* Legal Services Agreement, attached hereto as Ex. 1). As counsel to Paul, Klayman is obligated to use any information he possesses to assist Paul in his suit against Judicial Watch. Therefore, Judicial Watch is effectively without means to monitor the flow of information between Klayman and Paul, because such communications can be masked by the attorney-client relationship.[1] Moreover, the concern regarding Klayman's ability to maintain the integrity of Judicial Watch's confidential information is heightened by his active animosity toward Judicial Watch. Finally, Klayman will be a witness in this case as he was involved in the circumstances from which this claim arises. Therefore, Klayman's representation of Paul violates Rules 1.6, 1.7, 1.9 and 3.7of the Rules of Professional Conduct of the District of Columbia.

By virtue of this representation, Klayman is able to provide Paul with access to confidential information belonging to Judicial Watch, the integrity of which Judicial Watch otherwise would be able to protect under Rule 1.6 and the attorney-client privilege. As such, the only recourse to ensure that Judicial Watch's confidential information is not wrongfully used against it, is disqualification of Klayman from representing Paul in this action. Judicial Watch has no other option to maintain the ethical standards established by the Rules of Professional Conduct.

---

1 Indeed, during Klayman's deposition in a separate action, he was asked regarding conversations with Paul. In response, Klayman refused to answer, citing the attorney client privilege.

**STATEMENT OF FACTS**

This action arises out of an agreement between Paul and Judicial Watch that relates to legal services. Judicial Watch is a not-for-profit educational organization that, on occasion, provides legal services and/or legal assistance without cost to clients. Judicial Watch assisted Paul with obtaining counsel in criminal matters and represented him on civil matters relating to alleged wrongs by former President William Jefferson Clinton and Hillary Rodham Clinton. (*See* Ex. 1).

Plaintiff Paul is a self-described whistle blower in connection with Hillary Rodham Clinton's 2000 Senate Campaign and alleges that he is "a leading figure in connection with allegations of the Clinton's illegal campaign fundraising." (*See* Compl. at ¶ 88). He also alleges that Judicial Watch agreed to provide unlimited legal services to him without cost or obligation. (*Id*. at ¶ 17.) In the spring of 2005, the relationship between Paul and Judicial Watch ended. On February 5, 2007, this action was filed against Defendants with SGR representing the Plaintiff.

On April 12, 2006, prior to the commencement of this action, Klayman sued Judicial Watch and it President regarding a dispute based on his separation from the organization.[2] (*See Klayman v. Judicial Watch*, Civil Action No. 1:06-cv-00670, D.D.C. 2006 ("Klayman I"); *see also* Second Am. Compl., attached hereto as Ex. 2). Klayman is representing himself *pro se* in Klayman I, which is currently pending before Judge Kollar-Kotelly. Notwithstanding his prior representation of Judicial Watch, Klayman undertook representation of Paul in this action.

By way of background, Klayman was a founder of Judicial Watch and held the positions of General Counsel, Treasurer and Chairman during his tenure with the organization. As

2 Klayman joined Paul Orfanedes and Christopher Farrell as defendants in his Second Amended Complaint.

General Counsel, Klayman was exposed to an array of privileged and proprietary information regarding the organization. In particular, Klayman possesses confidential information regarding Judicial Watch's formation and management of the Legal Representation Agreement with Paul, which is the document from which this case arises. Indeed, it was Klayman who accepted Paul as a client of Judicial Watch. After that, Klayman negotiated and executed the Legal Representation Agreement with Paul. (*See* Ex. 1; *see also* Declaration in the Superior Court of the State of California at ¶ 10, attached hereto as Ex. 3). The agreement was executed by Klayman on March 20, 2001. From then until his separation from Judicial Watch on September 19, 2003, Klayman managed and directed Judicial Watch's representation of Paul. (*See* Ex. 10 at ¶¶ 4-6; Exhibit 1). During that time, Klayman was Paul's chief counsel and responsible for the representation that is at issue in this case. *Id.*

Paul's Complaint seeks damages allegedly caused by Judicial Watch's representation arising from claims of negligence, breach of fiduciary duty and breach of contract (as construed in the Court's February 6, 2008, Memorandum Opinion and Order). Defendants have always known that Klayman would be a fact witness in this litigation due to his involvement in the underlying cases. As Judicial Watch's General Counsel, Klayman negotiated, executed and managed the Legal Representation Agreement with Paul. In addition, Defendants have recently assembled evidence that indicates Klayman: (a) is in an attorney-client relationship with Paul; (b) assisted in drafting the Complaint; and (c) represents Paul as counsel in this litigation.

In fact, Klayman admitted the level of his involvement when he wrote to Defendants and asked for the contact information for the appropriate insurance carriers given the threats by Peter Paul against JW, including filing suit. (*See* Copy of E-Mail Correspondence dated January 19, 2006, attached hereto as Ex. 12). In this email correspondence, Klayman specifically asked for

the carrier information so that he could defend himself:

> "Finally given the threats by Peter Paul against JW, its current officers and me, and his published statement that he was filing suit and taking other legal actions, I ask again that you provide any and all relevant correspondence concerning Peter Paul to me and report these matters to the appropriate insurance carriers.  I also need the name and contact information so I can myself be in touch with them. The confidential severance agreement provides explicitly that I am entitled to this information immediately, so I can defend myself."
> *See Id.*

Nonetheless, at this point, Klayman freely admits that he is Paul's attorney.  In Klayman I, Judicial Watch served document requests on Klayman that requested "All communications between [Klayman] and Peter F. Paul."  (*See* Resp. to Req. for Produc. of Docs., Req. No. 12, attached hereto as Ex. 4).  In response, Klayman objected by asserting the "attorney-client and attorney work product privileges."  (*See Id*.)  Similarly, in an Opposition to one of the several Motions to Compel that Defendants were required to file in Klayman I, Klayman affirmatively states that he has been Paul's counsel since 2005.  (See Pl.'s Mem. of Points and Authorities in Opp'n to Defs.' Mot. to Compel Resp. to Defs.'s Req. for Produc. of Docs., p. 11, attached hereto as Ex. 5).  If there was any question, all doubt was eliminated by Klayman's appearance as counsel for Paul in this case.  (*See* Docket No. 15).

The allegations of Paul's Complaint are carefully drafted to omit reference to Klayman.  This fact indicates that Klayman even participated in drafting the Complaint.  For example, in a Declaration filed in the Superior Court of the State of California, Paul states under oath that Klayman was principally responsible for his extended incarceration in Brazil and New York.  (See Ex. 3 at ¶¶ 10 – 11).  There are, in fact two entire paragraphs in the Declaration, both

leveling an array of accusations directly at Klayman, which do not appear in the Complaint.[3] (*See Id.)* As drafted, the Complaint refers to "Klayman" as "the Judicial Watch's lawyer." Paul's Complaint is carefully drafted to omit any allegation of wrongdoing on the part of Klayman, by not mentioning Klayman by name and by referring to conduct that occurs only after the date of Klayman's departure from Judicial Watch. (*See, e.g.*, Compl. at ¶¶ 3, 4, 14, 24 and 26).

While Defendants deny any wrongdoing on the part of Klayman towards Paul, the "Klayman Free" nature of the allegations show that the Complaint was carefully drafted to eliminate reference to Klayman. Further proof of efforts to cleanse references to Klayman is demonstrated by an article written by Paul that originally contained extensive allegations against Klayman and was later revised to eliminate any reference to Klayman. *Compare* "Judicial Watch – A Watchdog that Bites the Hands that Feed it," as posted on *hillcap.org* with "Judicial Watch – A Watchdog that Bites the Hands that Feed it," as posted on *www.peterfpaul.com*. (*See* Ex. 6 and Ex. 7, respectively).[4]

---

3 "In September, 2003, around the time I was finally returned to New York from Brazil by U.S. federal agents, Klayman was dismissed by Judicial Watch, like a thief in the night, by the very yes men he installed to rubberstamp his every whim. His loyal minions discovered major unanswered questions about Klayman's personal use of thousands of the millions in donated funds that were received from thousands of donors."

"Seemingly, for their own protection, they forced their founder and leader to quietly disppear [sic] from the tax exempt trough that he created to fatten them all. So unheralded was Klayman's departure from Judicial Watch in September, 2003, that until 2005 most people I have encountered were not aware that Klayman had in fact departed. Klayman never notified me that he withdrew as my counsel when he left Judicial Watch in September, 2003. To this date, my former Chief Counsel has never advised me that he no longer represents me. He literally abandoned the representation of his client with no notice whatsoever!"

4 Interestingly, Defendants were recently approached by Paul regarding settlement in which one of the offered elements was that "Mr. Paul will cooperate with Judicial Watch against

Klayman coordinated this litigation with Paul. Klayman eliminated all doubt as to the cooperative effort in an April 30, 2007, letter authored by Klayman to raise money for Klayman I in which he announced that "Peter Paul joins me in taking on Tom Fitton and Judicial Watch." [5] (*See* April 30, 2007 Fundraising Letter, attached hereto as Ex. 9). In addition, before Paul's Complaint was served on Defendants or available for viewing on the Court's PACER site, a full copy of the Complaint, together with exhibits was posted on Klayman's anti-Judicial Watch site at the domain *www.savingjudicialwatch.com*.

Despite his obvious duties to Judicial Watch, Klayman has expended significant effort over the past few years to harm the organization. Since his September 19, 2003, separation from Judicial Watch, Klayman engaged in constant disputes with Judicial Watch, including the filing of more than five lawsuits against Judicial Watch, its current Board of Directors and outside general counsel. Klayman's animosity toward Judicial Watch includes an extensive campaign of distortion and misrepresentation that is published on websites and in direct mail, email and national publications. Without question, Klayman's objective is to harm Judicial Watch at all costs. Klayman has made no effort to maintain Judicial Watch's secrets and confidences. Indeed, Klayman has gone so far as to represent individuals against Judicial Watch regarding subject matters over which Klayman provided legal services to Judicial Watch as its General Counsel.

---

Larry Klayman in regard to Klayman's lawsuit." February 15, 2008, Email from Colette Wilson, attached hereto as Ex. 8. This offer demonstrates the conflicting nature of representation currently faced by Klayman. Further, it evidences the shifting nature of alliance such that there is no assurance regarding the integrity of Judicial Watch's confidential information.

5    In this same letter, Klayman also makes extensive reference to the *Cobas* and *Benson* matters, further confirming that Klayman has been the driving force behind all three lawsuits against his former client.

As a result of Klayman's participation in the underlying representation of Paul, Klayman will also be a witness at the Paul trial. While Klayman is not specifically named in the Complaint, certain allegations allude to the alleged conduct of Klayman. (*See* Compl. at ¶¶ 3 and 21). To make matters worse, Klayman recently indicated to Judicial Watch that he now represents Paul and therefore refuses to disclose any communications with Paul following his separation from Judicial Watch. (*See* Ex. 4 at Req. No. 12; *see also* Ex. 5 at 11). As such, Klayman is an adverse witness to Paul in this litigation. Complicating these various relationships even more is the ongoing ethical duties of Klayman in favor of his former client, Judicial Watch.

Of vital concern to Judicial Watch is Paul's access to confidential information concerning Judicial Watch, which Klayman obtained during his representation of Judicial Watch as its General Counsel. If Klayman is allowed to represent Paul, Judicial Watch will be forced to face an opponent who has improper access to Judicial Watch's confidences and secrets through Klayman. This harm to Judicial Watch is concrete and particularized. Given Klayman's enmity toward Judicial Watch, the potential for disclosure of Judicial Watch's confidences and secrets is actual and imminent. Defendants' concern regarding these ethical violations is neither conjectural nor hypothetical.

**LEGAL ARGUMENT**

Klayman is legally and ethically barred from representing Paul in the present matter. Rules 1.6, 1.7 and 1.9 of the D.C. Rules of Professional Conduct preclude his acting as counsel for an individual, such as Paul, whose interests are materially adverse to his former client,

Judicial Watch.[6] D.C. Rule of Professional conduct 1.6 prohibits Klayman from knowingly revealing a confidence or secret of his former client.[7] D.C. Rule of Professional Conduct 1.7 prohibits Klayman's representation in a matter that involves Paul, and a position to be taken by Paul in that matter that is adverse to a position taken or to be taken by his former client, Judicial Watch, in the same matter, even though Judicial Watch is represented by different counsel.[8]

---

6 The Local Rules of Civil Procedure for the United States District Court for the District of Columbia state that attorneys shall follow the Rules of Professional Conduct as adopted by the District Columbia Court of Appeals. L.Cv.R. 83.15.

7 Rule 1.6 (Confidentiality of information) reads, in relevant part, as follows:

(a) Except when permitted … a lawyer shall not knowingly:

(1) Reveal a confidence or secret of the lawyer's client;

(2) Use a confidence or secret of the lawyer's client to the disadvantage of the client;

(3) Use a confidence or secret of the lawyer's client for the advantage of the lawyer or of a third person.

(b) "Confidence" refers to information protected by the attorney-client privilege under applicable law, and "secret" refers to other information gained in the professional relationship that the client has requested be held inviolate, or the disclosure of which would be embarrassing, or would be likely to be detrimental, to the client.

8 Rule 1.7 (Conflict of interest: General rule) reads, in pertinent part, as follows:

(a) A lawyer shall not advance two or more adverse positions in the same matter.

(b) Except as permitted by paragraph (c) below, a lawyer shall not represent a client with respect to a matter if:

(1) That matter involves a specific party or parties, and a position to be taken by that client in that matter is adverse to a position taken or to be taken by another client in the same matter, even though that client is unrepresented or represented by a different lawyer;

(2) Such representation will be or is likely to be adversely affected by representation of another client;

(3) Representation of another client will be or is likely to be adversely affected by such representation; or

(4) The lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property, or personal interests.

(c) A lawyer may represent a client with respect to a matter in the circumstances described in paragraph (b) above if:

(1) Each potentially affected client provides informed consent to such

Moreover, unless Klayman intends to admit that he breached his fiduciary duty and committed professional negligence, it is unlikely that he can pursue Paul's claims with any diligence since he was the attorney involved in the subject matter over which Paul litigates. Klayman violates D.C. Rule of Professional Conduct 1.9 by representing one client against a former client in substantially the same subject matter.[9] This prohibition is especially applicable where the subject matter of the lawsuit relates to a matter that Klayman handled while he was General Counsel for Judicial Watch. In addition, Klayman is precluded from acting as counsel in this matter pursuant to Rule 3.7 of the D.C. Rules of Professional Conduct because Klayman is a necessary witness. Finally, Klayman's disqualification from this matter would in no way prejudice Paul as it is yet early in the litigation and Paul has other counsel at his disposal.

I.    STANDARD OF REVIEW

This Court recognizes that disqualification of counsel is appropriate "when [1] the conduct is in violation of the rules of professional conduct to the point of undermining the court's confidence in the vigor of counsel's representation of his client or [2] where the attorney is in a position to use confidential information concerning his client's opponent gained from a prior representation." *Steinbuch v. Cutler*, 463 F. Supp. 2d 4, 7-8 (D.D.C. 2006) (*citing Koller v. Richardson-Merrell Inc.*, 237 U.S. App. D.C. 333, 737 F.2d 1038 (D.C. Cir. 1984), vacated on

---

representation after full disclosure of the existence and nature of the possible conflict and the possible adverse consequences of such representation; and
(2) The lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client.

9    Rule 1.9. Conflict of interest: Former client.
A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent.

other grounds, 472 U.S. 424 (1985)). *See also Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-46, 111 S. Ct. 2123 (1991) (stating that "a federal court has the power to control admission to its bar and to discipline attorneys who appear before it"); *Cauderlier v. Zambrana*, 2006 U.S. Dist. LEXIS 85969, (D.D.C. Oct. 6, 2006); *Pigford v. Veneman*, 355 F. Supp. 2d 148, 166-167 (D.D.C. 2005) (*citing Pigford v. Veneman*, 217 F. Supp. 2d 95, 99-100 (D.D.C. 2002)). In limited circumstances, an opposing party may move to disqualify counsel when "the continued representation by opposing counsel threatened the non-client with immediate and actual harm by creating the substantial risk to [its] right to a fair and just determination of [its] claims." *Cauderlier*, 2006 U.S. Dist. LEXIS 85969 at *4 (D.D.C. Oct. 6, 2006). Under the circumstances of this case, Klayman must be disqualified.

Klayman's representation of Paul clearly satisfies the standard for disqualification as set forth in *Steinbuch*. Klayman's representation provides Paul with an unfair advantage over Judicial Watch by providing him with access to confidential information acquired by Klayman in his role as General Counsel to Judicial Watch. To fulfill his duty of loyalty to Paul, Klayman must disclose to Paul any information concerning Judicial Watch learned through his representation of the organization. In this way, confidences and secrets of Judicial Watch that are in the possession of Klayman can easily be transferred to Paul under the protection of the attorney-client relationship.

Not only are Judicial Watch's confidences and secrets at risk, but Judicial Watch is now hampered in its ability to coordinate with Klayman in connection with defending against Paul's allegations. Therefore, to ensure a fair trial for all parties, Klayman must be disqualified as counsel. At this early stage of the case, there is little if any prejudice to Paul. Indeed, no scheduling order has been issued at this point.

## II. RULE 1.7 PROHIBITS KLAYMAN FROM REPRESENTING PAUL BECAUSE IT COMPELS THE ADVANCEMENT OF ADVERSE POSITIONS

Klayman's joint representation of Paul and himself creates conflicts of interest. His role as counsel for both Paul and himself presents a direct conflict of interest under Rule 1.7. To diligently and competently represent himself and Paul, Klayman will be required to take contradictory positions in this case. Similarly, vigorous cross-examination will require him to challenge his own credibility and that of Paul's. In addition, by cooperating with Paul, Klayman participates in a relationship designed to violate the legal rights of Judicial Watch through unfair discovery methods.

### 1. Rule 1.7 prohibits Klayman from advancing contradictory positions in this case

Rule 1.7 of the Rules of Professional Conduct "is intended to provide clear notice of circumstances that may constitute a conflict of interest." Rule 1.7, Comment [1]. In certain circumstances, a lawyer may never represent a client where a direct conflict of interest exists. Those limited circumstances are set out in Rule 1.7(a), which reads: "A lawyer shall not advance two or more adverse positions in the same matter." There is no exception to the prohibition of Rule 1.7(a), even if all affected clients waive the conflict. All other conflicts of interest will not bar representation provided that all affected clients give informed consent and the lawyer reasonably believes competent and diligent representation can be provided to each affected client. Rule 1.7(c).

Additional considerations for evaluating Klayman's conflicts of interest include the effect on confidentiality of information and the duty to use all known information for the benefit of one's client. Comment [15] to Rule 1.7 reads, in relevant part:

> A particularly important factor in determining the appropriateness of common representation is the effect on client-lawyer

> confidentiality and the attorney-client privilege. **With regard to the attorney-client privilege, the prevailing rule is that, as between commonly represented clients, the privilege does not attach.**

(Emphasis added.) In light of Klayman's former role as General Counsel of Judicial Watch, he possesses extensive confidences and secrets relating to Judicial Watch's relationship with Paul. Armed with this information, Klayman has no alternative but to use it for Paul. Similarly, Comment [16] to Rule 1.7 reads:

> As to the duty of confidentiality, continued common representation will almost certainly be inadequate if one client asks the lawyer not to disclose to the other client information relevant to the common representation. **This is so because the lawyer has an equal duty of loyalty to each client, and each client has the right to be informed of anything bearing on the representation that might affect that client's interests and the right to expect that the lawyer will use that information to that client's benefit**. See Rule 1.4.

(Emphasis added).

2. Paul and Klayman are adverse in this litigation

By examining the remaining Counts in this case, together with sworn allegations regarding Klayman, it is clear that Paul and Klayman are adverse. Count One alleges a breach of contract premised on the Legal Representation Agreement between Paul and Judicial Watch. Among the issues to be litigated will be the intent and meaning of this document. Klayman assisted in the preparation of the agreement and executed it on behalf of his former client, Judicial Watch. Following execution of the agreement, Klayman supervised implementation of the Agreement for Paul. (*See* Ex. 10 at ¶ 6). One need only peruse the Motion for Status Conference filed by Klayman on behalf of Paul to ascertain the contradictory nature of his current positions. (*See* Docket No. 18).

Count Two alleges that Judicial Watch and Mr. Orfanedes breached a fiduciary duty owed to Paul "in the provision of faithful, competent and vigorous legal representation to Plaintiff." (*See* Compl at ¶ 63). Klayman was Paul's chief counsel until his departure from Judicial Watch in September of 2003. (*See* Ex. 10 at ¶ 6). Klayman managed the relationship between Judicial Watch and Paul. *Id.* Indeed, it was Klayman who assisted Paul with his extradition efforts and the negotiations with the U.S. Justice Department *Id.*

Finally, Count Three, as interpreted by this Court, alleges a claim for professional negligence by failing to "diligently pursue [Paul's] goals". (See Compl. at ¶ 73). Paul alleges that he spent approximately 27 months in pre-trial detention in Brazil before being extradited to the United States. (*See Id*. at ¶ 4). During this entire time, Klayman represented Judicial Watch as its General Counsel. (*See* Ex. 10 at ¶ 3).

While Paul fails to expressly name Klayman in the Complaint, Klayman's roles as counsel to Paul, and Paul's dissatisfaction with Klayman's services, are inescapable. However, it is not necessary to assume adversity between Paul and Klayman, the Court need only read the sworn testimony of Paul as set out in a Declaration that was filed in the Superior Court for the State of California. (*See Id.* at ¶¶ 10 and 11). Indeed, Paul states that, but for the actions of Klayman, he would have been able "to voluntarily return to the U.S. immediately, without any extradition proceedings (as was my desire)". (*See* Ex. 3 at ¶ 10). Counts Two and Three will necessarily involve Paul's allegations regarding representation by Klayman while he was Chairman and General Counsel of Judicial Watch, as will Paul's alleged damages and the causes thereof. (*See Id; see also* Exhibit 6). Moreover, even if Paul maintains that Klayman did not breach any duty to him, Klayman's representation during the extradition process is relevant to considerations of causation and damages.

3. Klayman cannot competently and diligently represent himself and Paul without taking contradictory positions

Although Klayman's position in this lawsuit is unique, it presents a classic Rule 1.7(a) situation – the advancement of one client's position will necessarily be at the expense of the other. Klayman is not able to competently and diligently represent Paul without taking a position adverse to himself, which in turn will violate his fiduciary duty to Judicial Watch. To pursue Paul's allegations regarding breach of fiduciary duty and professional negligence, Klayman will need to challenge his own representation of Paul.

Similarly, Klayman cannot competently and diligently represent himself without taking a position adverse to the allegations in Paul's Complaint. If Klayman disputes that he breached a fiduciary duty or that his practice fell below the applicable standard of care, then he is technically faced with the obligation to discredit himself and prove that he breached duties of care to Paul. In fact, this will be necessary in any event as Judicial Watch intends to confront all of Paul's allegations and defend its representation of Paul.

4. Klayman is not capable of effective cross-examination without impeaching himself

Further conflict will arise for Klayman when he takes the witness stand during this case. He cannot effectively represent Paul without impeaching himself. Klayman cannot fulfill this obligation when simultaneously defending his actions and attempting to inculpate the organization he was acting for at that time. As this Court recognized, an attorney cannot zealously impeach an opposing party witness, if that witness is a former client to whom the attorney owes a duty of confidentiality. *United States v. Davis*, 780 F. Supp. 21 (D. D.C. 1991) (stating that attorney should not be inhibited because of a potential breach of confidentially toward a former client). In this case, Klayman will be required to zealously impeach Judicial

Watch in order to represent Paul. Moreover, Klayman cannot effectively cross-examine Judicial Watch without relying on confidences and secrets shared within the bounds of their attorney-client relationship, especially communications that arguably include the disclosure of Judicial Watch's privileged information.

## III. RULE 1.9 OF THE RULES OF PROFESSIONAL CONDUCT PROHIBITS KLAYMAN'S REPRESENTATION OF PAUL IN THIS LITIGATION BECAUSE THE SUBJECT MATTER IS SUBSTANTIALLY RELATED TO KLAYMAN'S ACTIVITIES AS GENERAL COUNSEL FOR JUDICIAL WATCH

The prohibition of Rule 1.7(a) is applied in the context of a former client by Rule 1.9, which prohibits a lawyer from representing "another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent." Rule 1.9. Recognizing the harm that may result when an organization's former attorney represents an individual against the organization, Comment [3] to Rule 1.9 cautions that "knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation".

As General Counsel and Chairman of Judicial Watch, Klayman was exposed to all of Judicial Watch's confidential and privileged information. Klayman also participated in the formation and fulfillment the Legal Representation Agreement at issue in this litigation. (See Ex. 10 at ¶¶ 4 and 5). He is cooperating with Paul and admits that he is counsel for Paul. (*See* Ex. Nos. 4 and 5; *see also* Docket No. 15). This relationship violates Rule 1.9 because it directly relates to Klayman's position while he was General Counsel at Judicial Watch. Under his duty of loyalty, Klayman is obligated to use all of his knowledge for the benefit of Paul. However, under his duty of confidentiality to Judicial Watch, Klayman is obligated to maintain the secrecy

of this knowledge.  In addition, Klayman's conduct implicates Rule 4.4 because he is using discovery methods that violate Judicial Watch's legal rights, namely, the integrity of its confidences and secrets.

Rule 1.9 of the D.C. Rules of Professional Conduct prohibits a lawyer from representing "another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent." D.C. Bar Appx. A, Rule 1.9.  "When a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests clearly is prohibited."  D.C. Bar Appx. A, Rule 1.9, Comment [2].  Comment [3] to Rule 1.9 is particularly relevant to these circumstances as it counsels that if a lawyer has knowledge of specific facts that were obtained in the prior representation, which are now relevant to the current litigation, the lawyer may not represent an adverse party.  Comment [3] reads, in relevant part:

> In the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; **on the other hand, knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation**.

(Emphasis added.)

As General Counsel and Chairman of Judicial Watch, Klayman was exposed to all of Judicial Watch's confidential and privileged information.  Klayman also participated in the formation and fulfillment of the Legal Representation Agreement at issue in this litigation.  (*See* Ex. 10 at ¶¶ 4 and 5).  Indeed, until his departure from Judicial Watch on September 19, 2003, Klayman managed and directed the organization's representation of Paul and acted as chief counsel.  (*See Id.* at ¶ 6).  This litigation is directly related to Klayman's efforts as Judicial

Watch's General Counsel in relation to Paul. Therefore, Klayman may not now represent Paul, who is an obviously adverse party to Klayman's former client, Judicial Watch.

Under Rule 1.9, the only ethical means by which Klayman could proceed with his representation of Paul is for Judicial Watch to provide its informed consent. To be clear, Judicial Watch *does not* consent to Klayman's representation of Paul, nor has Judicial Watch ever given such consent previously.

## IV. UNDER RULE 1.6 OF THE RULES OF PROFESSIONAL CONDUCT, KLAYMAN CANNOT ETHICALLY REPRESENT PAUL WITHOUT DISCLOSING CONFIDENCES AND SECRETS HE IS BOUND TO MAINTAIN

In connection with his role as General Counsel to Judicial Watch, Klayman was exposed to an array of confidential information regarding the organization. Of particular interest to this matter was Klayman's exposure to confidential information concerning Judicial Watch's provision of legal services to Paul.

A fundamental principal of the lawyer-client relationship is that the lawyer will hold inviolate that client's confidences and secrets. This obligation is imposed on the Bar by Rule 1.6 of the Rules of Professional Conduct, which provides that, except when specifically permitted under the Rule**,** a lawyer shall not knowingly reveal a confidence or secret of the client. As the Rule further explains, "confidence" refers to information protected by the attorney-client privilege under applicable law, and "secret" refers to other information gained in the professional relationship that the client has requested be held inviolate, or the disclosure of which would be embarrassing, or would be likely to be detrimental, to the client. D.C. Bar Appx. A, Rule 1.6(b). These definitions, along with Rule 1.6(g),[10] make it clear that a lawyer's ethical duty to preserve

[10] Rule 1.6(g) reads, in part: "The lawyer's obligation to preserve the client's confidences and secrets continues after termination of the lawyer's employment."

a client's confidences and secrets is broader than the attorney-client privilege. Moreover, a lawyer's obligation to preserve a client's confidences and secrets continues after termination of the lawyer's employment. The objectives of the obligations under Rule 1.6 are to encourage individuals to seek early legal assistance and to facilitate a full development of facts essential to proper representation of a client. D.C. Bar Appx. A, Rule 1.6, Comment [2].

Although Klayman is no longer employed as Judicial Watch's General Counsel, he retains an ethical responsibility under Rule 1.6 to safeguard the information he acquired while employed as its General Counsel. His attempt to represent Paul illustrates a patent disregard for the ethical obligations conferred on him by Rule 1.6 as an attorney admitted to practice in the District of Columbia. Further, Klayman cannot zealously represent Paul, as he is obliged to do under D.C. Rule of Professional Conduct 1.3, and simultaneously maintain Judicial Watch's confidences under Rule 1.6. Klayman cannot erase from his mind what he learned as Judicial Watch's General Counsel. Moreover, within the bounds of his attorney-client obligations to Paul, Judicial Watch is unable to monitor or confine Klayman's disclosures to non-confidential information. As a result, Judicial Watch is severely prejudiced by Klayman's abdication of ethical responsibility in favor of his zealous advocacy for Paul, whether as plaintiff's counsel or merely as a cooperating witness.

## V. D.C. RULE OF PROFESSIONAL CONDUCT 3.7 PROHIBITS KLAYMAN'S REPRESENTATION OF PAUL BECAUSE HE IS A FACT WITNESS

Despite extraordinary efforts to conceal his obvious involvement, Klayman will certainly be a necessary fact witness in this action. Klayman negotiated and executed the Legal Representation Agreement with Paul. Further, from March 20, 2001, until his separation from Judicial Watch on September 19, 2003, Klayman managed and directed the organization's

representation of Paul.

Aside from certain exceptions that do not apply in this case, Rule 3.7 provides that: "A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness." In this case, there is no doubt. Klayman will be a witness. Therefore, under Rule 3.7, Klayman cannot simultaneously act as a necessary fact witness and as an advocate for Paul.

The prohibition against a lawyer testifying as a fact witness is established to "avoid conflicts that arise when an attorney puts his or her own credibility at issue in litigation. Such conflicts . . . may prejudice the opposing party, when the attorney's testimony is given undue weight by the fact fact-finder as a result of his dual role." *S.S. v. D. M.*, 597 A.2d 870, 877 (D.C. 1991). As the Rule contemplates, witnesses are expected to testify from personal knowledge while attorneys are expected to comment and analyze evidence. When the attorney of record testifies, a fact-finder is prone to confusion regarding whether the attorney is providing facts for evidence or merely commenting on facts. In this case, the potential for confusion is compounded by the added potential for prejudice because the attorney in question is Judicial Watch's former General Counsel.

## VI. KLAYMAN'S REPRESENTATION OF PAUL IS CAUSING IMMINENT AND ACTUAL HARM TO JUDICIAL WATCH AND THE INTEGRITY OF ATTORNEY ETHICS

The relative positions of Judicial Watch, Paul and Klayman present a unique set of circumstances that requires this Court to apply a heightened review. *See Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 754 (D. Md. 1997) (recognizing that dual representation in circumstances similar to this action greatly intensifies the potential that "confidential information will be disclosed in the ex parte setting"). Judicial Watch's former General Counsel is currently representing an individual who is suing Judicial Watch for professional negligence in a

relationship that was managed by the former General Counsel.  Klayman, as the former General Counsel, owes Judicial Watch a duty of confidentiality under Rule 1.6.  However, due to the scope and nature of Klayman I, as well as Klayman's admitted attorney-client relationship with Paul, Klayman has undoubtedly used confidential information regarding Judicial Watch that results in an unfair advantage in this case.  Moreover, Klayman's hostility toward Judicial Watch raises a question of whether he entered into his current relationship to Paul to pursue his vendetta against Judicial Watch by using confidences and secrets under the cloak of his attorney-client relationship.  Under these circumstances, neither Judicial Watch nor the Court is in a position to police the appearance of impropriety currently existing.

It is difficult to imagine a greater breach of ethical integrity than for Paul to be represented by Judicial Watch's former General Counsel in a relationship that is engineered to preclude any manner of oversight to guard against the use of Judicial Watch's privileged information.  This circumstance is patently unfair and unethical.  Judicial Watch did not consent to Klayman's relationship with Paul or the disclosure of any information.  In fact, Klayman's Confidential Severance Agreement with Judicial Watch expressly requires that he not disclose trade secrets or other proprietary information.  Exhibit 11 at ¶ 4.

Klayman's representation of Paul also undermines this Court's confidence in the vigor of the representation of Paul by Klayman (who is actually an unnamed defendant in this action).  *See Steinbuch*, 463 F. Supp. 2d at 7-8.  Under any objective standard, Klayman cannot reasonably believe that a direct conflict does not exist.  *See* Rule 1.7, Comment [7] (stating that the belief a lawyer will be able to provide competent and diligent representation to the affected clients is judged by objective, and not subjective, reasonableness).  In this action, Klayman's representation of Paul results in clear and direct conflicts of interest.  Moreover, the apparent

transfer of Judicial Watch's confidential information demonstrates immediate and actual harm to Judicial Watch that cannot be cured.

## VII. PAUL WILL SUFFER NO PREJUDICE AS A RESULT OF KLAYMAN'S DISQUALIFICATION

Given that it is still early in the litigation, Paul will suffer no prejudice by the disqualification of Klayman. Indeed, discovery has not yet begun and no scheduling order has been issued. Moreover, as evidenced by a February 15, 2008 e-mail, Paul is currently being represented by another attorney, D. Colette Wilson. (*See* Ex. 8). Ms. Wilson's e-mail proposes a settlement wherein one of the offered elements is that "Mr. Paul will cooperate with Judicial Watch against Larry Klayman in regard to Klayman's lawsuit." Clearly, Paul does not rely on Klayman's representation so much that he cannot afford to make him his adversary.

In contrast, historical protections provided by the attorney-client relationship will be eroded and Judicial Watch will be severely prejudiced if its former General Counsel is allowed to represent the adverse party, Paul, in this matter. As General Counsel, Klayman was privy to confidential information regarding the subject matter of this case. Not only is this information retained in Klayman's memory, but given his open hostility toward the Defendants, it is unlikely that he will refrain from using it, regardless of his ethical duties. Indeed, one need only review the Motion for Status Conference to confirm Klayman's intent to trade on his former client's confidential information. (*See* Docket No. 15).

## **CONCLUSION**

WHEREFORE, for all of the forgoing reasons, Defendants Judicial Watch, Inc. and Paul J. Orfanedes respectfully request that the Court GRANT this Motion and disqualify Larry E. Klayman and the Klayman Law Firm, P.C. as counsel for Plaintiff Peter Paul.

Respectfully submitted,

/s/ *Richard W. Driscoll*

______________________________

Richard W. Driscoll (436471)
Juli Z. Haller Simonyi (466921)
DRISCOLL & SELTZER, PLLC
600 Cameron Street
Alexandria, Virginia 22314
703.340.1625 Telephone
703.997.4892 Facsimile
Email: rdriscoll@driscollseltzer.com
*Counsel for Defendants Judicial Watch, Inc. and Paul J. Orfanedes*

Dated: April 22, 2008

**CONFIDENTIAL**

**LEGAL REPRESENTATION AGREEMENT**

WHEREAS Mr. Peter F. Paul (hereinafter "the Client") undertakes to retain the public interest legal services of Judicial Watch, Inc. (hereinafter "JW"), and JW undertakes to represent the Client;

IT IS HEREBY AGREED this 20th day of March, 2001 as follows:

1. The Client authorizes JW to evaluate potential legal claims and defenses available to the Client and to pursue mutually agreed-upon legal action to protect the Client's rights and interests. This agreement runs only for the period of Client's consultation and discussion with the U.S. Attorney's office in New Jersey and other appropriate law enforcement authorities. Upon the conclusion of any such consultation and discussion, JW and Client shall determine what, if any, future legal representation is required.

2. JW shall not invoice the Client for any attorneys fees or expenses incurred in defending the Client, prosecuting a lawsuit or any other legal action taken on behalf of the Client. Rather, only in the event that the Client receives an award of attorneys' fees at the conclusion of any lawsuit or other mutually agreed-upon legal action, JW shall be entitled to receive any such court-awarded attorneys' fees as a donation for its public interest legal services. JW shall also be entitled to reimbursement, out of any recovery by the Client, of any and all costs and expenses incurred by JW in prosecuting any lawsuit or any other mutually-agreed upon legal action. Should the Client

**CONFIDENTIAL**

receive an award of costs, the award shall be credited to the costs and expenses reimbursable to JW.

3. Both the Client and JW shall keep any and all communications between them in the strictest confidence. The Client shall not undertake any public appearance or other communication or contact with the media concerning the Client's legal defense, any lawsuit or any other legal action by JW on his behalf, without advising and consulting with JW in advance, within a reasonable period of time. Likewise, JW shall advise and consult with the Client in advance and obtain Client's approval concerning any and all public appearances or other communications or contacts JW may have with the media concerning the Client's legal defense, any lawsuit, or any other mutually agreed-upon legal action undertaken by JW on his behalf.

4. This legal representation agreement may be modified only on the written consent of the parties. In the event that this legal representation agreement must be modified to reflect any other mutually agreed-upon legal action, the Client shall not unreasonably withhold consent to any such modification.

JUDICIAL WATCH, INC.

By: ______________________
Larry Klayman
Chairman and General Counsel

By: ______________________
Thomas J. Fitton
President

THE CLIENT

By: ______________________
Peter F. Paul

**CONFIDENTIAL**

**FIRST MODIFICATION TO LEGAL REPRESENTATION AGREEMENT**

WHEREAS Mr. Peter F. Paul (hereinafter "the Client") undertakes to retain the public interest legal services of Judicial Watch, Inc. (hereinafter "JW"), and JW undertakes to represent the Client;

IT IS HEREBY AGREED this 21st day of April, 2001 as follows:

1. The Client has previously authorized JW to evaluate potential legal claims and defenses available to the Client and to pursue mutually agreed-upon legal action to protect the Client's rights and interests. This agreement initially ran only for the period of Client's consultation and discussion with the U.S. Attorney's office in New Jersey and other appropriate law enforcement authorities. Now, upon the conclusion of consultation and discussion, JW agrees to provide legal representation to the Client for alleged securities and related violations of law, since this representation is in the public interest due to its relationship to illegal conduct by high government officials. Civil litigation concerning this may also be pursued.

2. JW shall not invoice the Client for any attorneys fees or expenses incurred in defending the Client, prosecuting a lawsuit or any other legal action taken on behalf of the Client. Rather, only in the event that the Client receives an award of attorneys' fees at the conclusion of any lawsuit or other mutually agreed-upon legal action, JW shall be entitled to receive any such court-awarded attorneys' fees as a donation for its public interest legal services. JW shall also be entitled

CONFIDENTIAL

to reimbursement, out of any recovery by the Client, of any and all costs and expenses incurred by JW in prosecuting any lawsuit or any other mutually-agreed upon legal action. Should the Client receive an award of costs, the award shall be credited to the costs and expenses reimbursable to JW.

3. Both the Client and JW shall keep any and all communications between them in the strictest confidence. The Client shall not undertake any public appearance or other communication or contact with the media concerning the Client's legal defense, any lawsuit or any other legal action by JW on his behalf, without advising and consulting with JW in advance, within a reasonable period of time. Likewise, JW shall advise and consult with the Client in advance and obtain Client's approval concerning any and all public appearances or other communications or contacts JW may have with the media concerning the Client's legal defense, any lawsuit, or any other mutually agreed-upon legal action undertaken by JW on his behalf.

4. JW has been authorized to obtain such publicity for Client as may serve the Client and the public interest, including but not limited to an appearance on "60 Minutes."

5. This legal representation agreement may be modified only on the written consent of the parties. In the event that this legal representation agreement must be modified to reflect any other mutually agreed-upon legal action, the Client shall not unreasonably withhold consent to any such modification.

JUDICIAL WATCH, INC.

By: ______________________
Larry Klayman
Chairman and General Counsel

THE CLIENT

By: ______________________
Peter F. Paul

MAR-10-2005 08:51AM FROM-PITA 3056708666 T-287 P.008/008 F-333

CONFIDENTIAL

By: ______________________
Thomas J. Fitton
President

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Larry Klayman,
540 Brickell Key Drive
Miami, FL 33131;

Louise Benson,
5779 Rolling Road
Woodland Hills, CA 91367

*Plaintiffs,*

v.

Judicial Watch, Inc.
501 School Street, S.W.
Suite 500
Washington, D.C. 20024;

Thomas J. Fitton
5245 42nd Street N.W.
Washington, D.C. 20015;

Paul Orfanedes
1050 North Stuart Street
Unit 515
Arlington, VA 22201; and

Christopher Farrell
501 School Street, S.W.
Suite 500
Washington, D.C. 20024

*Defendants.*

Civil Action No. 1:06-CV-00670

Honorable Colleen Kollar-Kotelly

**Jury Trial Demanded.**

**SECOND AMENDED COMPLAINT**

Plaintiffs, Larry Klayman ("Klayman"), and Louise Benson ("Benson"), complain against the Defendants as follows:

**Introduction**

1. This is an action by the founder and former Chairman of Judicial Watch, and a high value donor and volunteer to Judicial Watch to remedy defendants' breach of various agreements and laws, and to ultimately restore ethics and honesty to Judicial Watch. Since Klayman left Judicial Watch to run for the United States Senate, Judicial Watch has failed to honor its commitments to Klayman, Benson and other donors. Moreover, Judicial Watch, at the direction of its President, Thomas J. Fitton, has failed to respect its severance agreement with Klayman by engaging in a pattern of fraud, disparagement, defamation, false advertising and other egregious acts against Klayman. Regrettably, this complaint was filed because the Defendants failed to correct their conduct and remedy the damage, despite repeated demands.

2. In 1994, Klayman conceived of, incorporated and founded Judicial Watch to restore and promote ethics in the government and in the legal profession and he was the first to use the trademark "Judicial Watch" in commerce. The mark has a double meaning, as Judicial Watch was not only intended to help ensure that the court system acts ethically and correctly, but also to use the judiciary to oversee and police the executive and legislative branches of government.

3. Klayman conceived of Judicial Watch to serve as a private Justice Department for the people, in effect a "True Independent Counsel," free from the influences of politics he had seen as a trial attorney at the U.S. Justice Department. It was a novel concept to form an innovative group to advocate on behalf of its members and the public through concrete and forceful legal actions and educational endeavors, including but not limited to the use of the courts and the media.

4. During the approximately ten (10) years since Klayman founded and lead Judicial Watch, the organization grew from one office with a volunteer staff to, by the year 2000, a $28

million dollar plus, per annum, foundation with headquarters in Washington, D.C. and regional offices in Los Angeles, California; Chicago, Illinois; Dallas, Texas; Miami, Florida; and Norfolk, Virginia. By the year 2003, Judicial Watch had about 50 employees with plans to expand not only domestically, but also internationally. It also had nationally syndicated radio and television shows called "The Judicial Watch Report," expanding the group's prestige and influence. Moreover, under Klayman's leadership, Judicial Watch achieved many notable successful verdicts or findings in courts throughout the United States.

5. In 2003, a seat in the United States Senate (the "Senate") opened in Klayman's home state of Florida. After representing many Florida citizens in legal matters, Klayman decided that he could be even more effective in his fight against corruption by being elected to the Senate.

6. Though Judicial Watch had become a substantial organization, Klayman believed that the most effective way to effectuate a <u>non-partisan</u> "clean-up" of government was to transition Judicial Watch to a suitable successor while he was elected to the Senate. Klayman intended to take his "Judicial Watch" style of advocacy inside the government, while Judicial Watch continued its work as an independent non-profit organization.

7. Accordingly, Klayman decided to enter into severance negotiations with Thomas J. Fitton, then President of Judicial Watch ("Fitton") and the Judicial Watch board members, including Paul Orfanedes ("Orfanedes") and Christopher Farrell ("Farrell"), to begin the transition of leadership. Ultimately, Klayman entered into a detailed severance agreement (the "Severance Agreement").

8. Shortly before Klayman left Judicial Watch, he discovered that, contrary to Fitton's representations he made when Klayman hired him, Fitton had not obtained his undergraduate

degree. Klayman pressed, and Fitton agreed (a) to obtain his college degree, and (b) to continue the process to find a qualified individual with a legal background to lead Judicial Watch, particularly in light of Fitton's lack of qualifications.

9.     Before departing Klayman discussed the position with and interviewed highly respected and qualified candidates to become Chairman of Judicial Watch.

10.    As a condition to his signing the Severance Agreement and stepping down from Judicial Watch, Klayman insisted, and Fitton agreed, to have Judicial Watch hire a qualified person to become Chairman.  Klayman discussed with Fitton possible candidates that were suitable to lead Judicial Watch.

11.    Instead of taking the steps he promised to find a distinguished and qualified Chairman to run Judicial Watch, Fitton has solely acted to entrench himself as head of Judicial Watch.

12.    Even today there is no Chairman, and Fitton controls Judicial Watch.

13.    Fitton mislead Klayman and others to promote his personal agenda, interests, and political ideology to the detriment of Judicial Watch, Klayman, and Judicial Watch's donors and supporters.

14.    Fitton viewed Klayman's departure as an opportunity to take complete control of the organization to the detriment of Judicial Watch's donors, and employees, including many attorneys and staff that were hired by Klayman.  Since Klayman's departure, Fitton has mismanaged Judicial Watch and closed regional offices or eliminated the staff of the regional offices to the point that the remaining offices are shells that perform virtually no service.  On information and belief, many of the employees were wrongfully terminated by Fitton, for reasons that include age, sex and national

origin discrimination.

15. Moreover, upon information and belief, since Fitton took control of Judicial Watch, Fitton purchased two resort properties in Belize by using numbered accounts and limiting disclosure of his name on the sale documents to hide the fact that Fitton was involved in the purchases (the "Belize Properties"). Fitton's attempt to "hide" his purchase of the Belize Properties raises an inference that he has committed similar acts at Judicial Watch, secreting his potentially improper or questionable conduct that is detrimental to donors, supporters, Klayman and others.

16. From the time Klayman stepped down from his posts at Judicial Watch, Fitton, Orfanedes and Farrell, directly and through other agents of Judicial Watch defamed, disparaged and cast Klayman in a false light to denigrate Klayman, and in an effort to undermine Klayman's ability to return to the helm of Judicial Watch or compete with Judicial Watch in the future.

17. As plead more fully below, Judicial Watch, through Fitton, Orfanedes and Farrell and other agents and representatives breached the Severance Agreement and have mislead donors, including but not limited to Louise Benson, the media, and the public with their false advertisements, and other publicity, and solicitations and their continued defamation and disparagement of Klayman.

**Parties**

18. Larry Klayman ("Klayman") is an individual citizen and resident of the State of Florida. Klayman practices law and bases his legal practice in Florida.

19. Louise Benson ("Benson") is an individual citizen of California and was at all times material to the allegations made in the complaint a supporter and donor to Judicial Watch.

20. Judicial Watch, Inc. ("Judicial Watch") is a 501(c) (3) organization formed under laws of the District of Columbia with its headquarters in the District of Columbia. Klayman founded Judicial Watch in 1994 as a public interest government watchdog to investigate and prosecute government corruption and abuse. He not only conceived of and was the first to use the trademark, "Judicial Watch" in commerce, but Klayman also gave Judicial Watch the motto "Because No One is Above the Law!"

21. Thomas J. Fitton ("Fitton") is President of Judicial Watch. At all times material to the allegations made in this complaint, Judicial Watch was controlled by Fitton.

22. Paul J. Orfanedes ("Orfanedes") is the Secretary and a Director of Judicial Watch. At all times material to the allegations made in this complaint, Orfanedes was the Secretary of Judicial Watch, a director, and the attorney managing cases at Judicial Watch.

23. Christopher J. Farrell ("Farrell") is a Director of Judicial Watch. At all times material to the allegations made in this complaint, Farrell was a director of Judicial Watch and acted as its lead investigator.

**Jurisdiction And Venue**

24. The court has jurisdiction under 42 U.S.C. § 1332 because the matter is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Jurisdiction is also proper pursuant to 15 U.S.C. §§ 1125(a), *et. seq.* and 18 U.S.C. §§ 1962, *et. seq.* This court has supplemental jurisdiction over the claims in this complaint that arise under state law, because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from the same operative facts.

25. Venue is proper pursuant to 28 U.S.C. § 1391. The actions occurred in whole or in

part in this jurisdiction, and Klayman and Judicial Watch have agreed venue is appropriate in this jurisdiction.

**Statement of Facts**

26. Klayman is an honors graduate of Duke University, and Emory University School of Law, former U.S. Justice Department prosecutor and civil trial attorney. Klayman was the founder and former Chairman and General Counsel of Judicial Watch and in 2004 he was a candidate for the Senate from Florida.

27. Judicial Watch has acted in a variety of matters ranging from challenges to the President and Mrs. Clinton's Legal Defense Fund, he is credited with uncovering "Chinagate" or campaign finance scandal with John Huang, a suspected Chinese agent; lawsuits over the theft of nuclear codes at Los Alamos Nuclear Laboratories; political misuse of the Internal Revenue Service; fraud and/or corruption at the United Nations, the pre- and post September 11 cover-up of incompetence and other misconduct at the Federal Bureau of Investigation and a number of government agencies; the resignation of House Speaker Newt Gingrich when he admitted to having brought disgrace on the House of Representatives; various ethics complaints; a lawsuit to open Vice-President Cheney's Energy Task Force – a suit that was ultimately heard by the United States Supreme Court; and complaints against former House Majority Leader Tom Delay and other Republican Congressmen and Senators for selling access to government. The prestigious "National Journal" has called Klayman a "major force in Washington" and "the major public interest litigator at this time." National Journal, June 24, 2002.

A. Klayman's Departure from Judicial Watch and the Severance Agreement

28. In 2003, Klayman decided to step down from Judicial Watch and run for the Senate

from Florida as long as a suitable replacement could be found for him as Chairman of Judicial

Watch. Accordingly, Klayman decided to enter into severance negotiations with Fitton and the

Judicial Watch board members to begin the transition of leadership. Ultimately, Klayman entered

into a detailed severance agreement (the "Severance Agreement").

29.     During the severance negotiations, Klayman discovered that Fitton had not obtained

his undergraduate degree. Shocked that Fitton had misrepresented his educational background to

Klayman when he was hired years earlier, Klayman pressed and Fitton agreed (a) to obtain his

college degree, and (b) to continue the process to find a qualified individual, with a legal

background to lead Judicial Watch, particularly in light of Fitton's lack of qualifications.

30.     Fitton also deliberately misrepresented that he would find a suitable successor for

Klayman as Chairman. Instead of taking steps that he promised, to find a successor to run Judicial

Watch, Fitton has acted to entrench himself in control of Judicial Watch and run it as his own

partisan operation for his own personal gain.

31.     During the negotiation of the severance agreement, Fitton and two other directors of

Judicial Watch, Orfanedes and Farrell, acted in secret to remove persons loyal to Klayman from

Judicial Watch in order to take over and completely change the nature of Judicial Watch after his

departure.

32.     The Severance Agreement was signed on September 19, 2003. The Severance

Agreement provides, in pertinent part, as follows:

A.      Judicial Watch would pay Klayman, *inter alia*: (i) all compensation due to

him through his last day of work, (ii) a severance payment, (iii) compensation for agreeing not to

compete with Judicial Watch for two (2) years; (iv) health insurance benefits for himself and his

family, for one (1) year; and (v) the monies Klayman had expended for or on behalf of Judicial Watch.

B. Klayman would have continued access to Judicial Watch documents and information in the event that he ever needed it to defend himself against accusations or legal actions;

C. Judicial Watch would advise and permit Klayman to comment in advance concerning any information about him that Judicial Watch intended to submit to the Internal Revenue Service.

D. Judicial Watch would return Klayman's personal property and assets to him, including those belonging to Klayman and Associates, his law firm;

E. Judicial Watch would work in good faith to remove Klayman as a personal guarantor of the multi-million dollar lease of the headquarters space at 501 School Street, S.W., Washington D.C.;

F. Judicial Watch and its officers and directors would not, in any way, disparage, denigrate or defame Klayman;

G. On or before September 27, 2003, Judicial Watch was to issue a press release announcing Klayman's departure that was to state as follows:

> Judicial Watch announced today that Larry Klayman has stepped down as Chairman and General Counsel of Judicial Watch, to pursue other endeavors. Tom Fitton, who is President of Judicial Watch, said:
>
> Larry conceived, founded and helped build Judicial Watch to the organization it is today, and we will miss his day to day involvement. Judicial Watch now has a very strong presence and has become the leading non-partisan, public interest watchdog seeking to promote and ensure ethics in government, and Larry leaves us well positioned to continue

our important work."

H. Judicial Watch agreed that Klayman shall be permitted to use, publish and otherwise disseminate to third parties the following additional statement of Judicial Watch:

> Larry was the creator and founder of Judicial Watch, and helped build it to be a stable, successful and widely respected organization. We thank him for his service.

I. Judicial Watch agreed that Klayman would be permitted to comment on Judicial Watch activities after the separation date;

J. Judicial Watch and Klayman agreed to limit any statements to third parties regarding Klayman's leaving Judicial Watch to be consistent with the Press Release and statements set forth above in subparagraphs G and H.

B. Breach of the Severance Agreement – The Disparagement and Portrayal of Klayman in a False Light

33. Commencing almost immediately upon Klayman's departure, Fitton caused Judicial Watch to breach the Severance Agreement, to further Fitton's efforts to entrench himself in power at Judicial Watch to pursue his own personal interests, as well as to take Judicial Watch in a direction wholly inconsistent with Judicial Watch's non-partisan mission -- and to harm Klayman.

34. Fitton breached the Severance Agreement to promote his personal agenda and political ideology.

35. After Klayman announced his candidacy for the Senate from Florida on September 19, 2003, Fitton, in concert with two other directors of Judicial Watch, orchestrated a campaign to disparage, defame and cast a false light on Klayman.

36. Among other things, in breach of the Severance Agreement, Fitton and Judicial

Watch employees and agents concealed from and misrepresented Klayman's location from people that called asking for Klayman.

37.     Furthermore, they affirmatively told callers they could not discuss the "reasons" why Klayman left Judicial Watch, contrary to the express provisions in the Severance Agreement, in order to create the erroneous impression that Klayman was forced to leave Judicial Watch. Moreover, they told callers that they did not know where Klayman could be contacted. This course of conduct has continued up to the present.

38.     Fitton ordered employees in Judicial Watch's headquarters and regional offices not to speak with or contact Klayman.

39.     Shortly after Klayman's announcement that he was a candidate for the Senate, Fitton, in conjunction with Judicial Watch's outside counsel, David Barmak, Esquire, made a frivolous demand on Klayman, purporting to prohibit Klayman from ever mentioning that he was the founder of Judicial Watch and threatening to take legal action against Klayman if he failed to comply with the demand.

40.     Fitton and others caused Judicial Watch to orchestrate an effort to cause media outlets, including radio and television stations and broadcast and cable networks, to shun Klayman and persuade them not to discuss matters of public concern with Klayman.

41.     On information and belief, Fitton, Orfanedes, Farrell and others on behalf of Judicial Watch represented, *inter alia*, that Judicial Watch could and would take legal action against the media outlets if they permitted Klayman to appear and truthfully state he was the founder and former Chairman of Judicial Watch. Such threats, however unfounded, were sufficient to cause the media to shun Klayman and refrain from inviting him to appear or comment to them.

42.     Throughout his tenure at Judicial Watch, Klayman had established a strong relationship with the media.  Klayman, already a well-known lawyer, became a regular guest on many television network, cable and radio programs.  Klayman was so well known and widely recognized that a semi-fictional character, based on Klayman, was created for the television show "West Wing."  Klayman enjoyed celebrity status within the non-profit legal/political community.  In fact, by working under Klayman, Fitton learned that the most powerful tool for finding clients and raising his stature in the legal community was through the media outlets.  During his years at Judicial Watch, Klayman was regularly called to comment on legal or political affairs as Judicial Watch's founder and Chairman.

43.     While at Judicial Watch Klayman was synonymous with Judicial Watch, and his media presence resulted in numerous clients contacting Judicial Watch for legal counsel.

44.     By threatening the media, and directing media outlets that they could no longer refer to Klayman as Judicial Watch's founder and former Chairman, or ever discuss anything that concerned or related to Judicial Watch, Fitton and others breached the Severance Agreement and disparaged, defamed and portrayed Klayman in a false light.

45.     The actions of Fitton Orfanedes, Farrell and other Judicial Watch employees and agents had the desired effect of chilling the media.  Without the ability to freely refer to Klayman as Judicial Watch's founder and former Chairman, or to comment on Judicial Watch's activities, the media would not be able to identify Klayman to its viewers. Instead of calling on Klayman to comment on political and legal affairs -- and have to confront Judicial Watch's threats of retaliation in doing so -- the media sought to avoid injecting themselves into any disputes between Judicial Watch and Klayman by ignoring Klayman and seeking other commentators.

46.     Fitton and Judicial Watch engaged in this pattern of disparagement and portrayal of Klayman in a false light to ensure that Klayman could never compete with Judicial Watch or Fitton himself.

47.     Fitton's improper acts were done to further his own agenda to marginalize Klayman and promote Fitton's status within the media and elsewhere.

C.     Breach of the Severance Agreement – Fraudulent Mailings, Misrepresentation
       False Advertising and Portrayal of Klayman in a False Light

48.     Over one month after Klayman stepped down as Chairman and General Counsel of Judicial Watch, Fitton caused Judicial Watch to send fund raising letter solicitations through the U.S. Mail that falsely represented that Klayman was Chairman and General Counsel of Judicial Watch. This mailing used Klayman's name and image without permission. A sample copy of this fraudulent direct mail piece is attached hereto as Exhibit "A."

49.     This fraudulent fundraising practice created confusion among donors, and they mistakenly sent donations to Judicial Watch believing that Klayman was still there running the organization and using their donations for proper purposes.

D.     Fraud on Louise Benson and the other Building Fund Donors

50.     In November 2002, while Klayman was Chairman and General Counsel of Judicial Watch, Judicial Watch began a campaign to raise funds from the supporters of Judicial Watch to purchase the building that housed their headquarters office space at 501 School Street, S.W., in Washington, D.C (the "Building"). Judicial Watch sent appeals to potential donors, including but not limited to Benson, seeking funds solely for the purpose of purchasing the Building and no other reason. A copy of the solicitation sent to Benson is attached hereto as Exhibit "B."

51.     Benson relied on the representations made by Judicial Watch in the solicitation in

making a pledge for $50,000. She would not have made the pledge, and paid $15,000 up front to purchase Fitton's office space at Judicial Watch, but for the representation in Judicial Watch's solicitation that the money would be used to purchase the Building and provide her with naming rights.

52. Benson made her pledge solely on the condition that Judicial Watch was and would continue to actively pursue the purchase of the Building, as Judicial Watch represented in its solicitation.

53. After Klayman's departure from Judicial Watch, Fitton caused Judicial Watch to cease actively pursuing the purchase of the Building, but concealed that fact from Benson and other similarly situated donors and supporters of Judicial Watch.

54. Fitton and Judicial Watch never contacted the landlord, Robert Wolpe, and owner of the headquarters building to negotiate the purchase of the Building.

55. Fitton caused Judicial Watch to publish a newsletter in February 2005 which concealed the truth and led Benson and other donors to believe Judicial Watch was actively pursuing the sale, and had been consistently maintaining donations from Benson and 3,686 others in a segregated, interest bearing account. A copy of the newsletter is attached as Exhibit "C."

56. On information and belief, the truth was, however, that Fitton caused Judicial Watch to commingle with Judicial Watch's operating funds, or misuse in other ways, the approximately $1.4 million raised from Benson and others. This misuse of funds further demonstrates Fitton's agenda to takeover Judicial Watch for his own personal gain.

57. Fitton caused Judicial Watch to continue to mislead Benson and other donors in a newsletter dated September 2005, which falsely states:

> This fund has been one of the most comprehensive

> fundraising efforts in Judicial Watch history. The long term goal of the fund is to provide financial stability for Judicial Watch through the ownership of an office building.

A copy of the newsletter is attached as Exhibit "D."

58. The truth is that after Fitton took control when Klayman left, he caused Judicial Watch to take little or no action to increase the fund, failed to communicate with donors at all about the Building until Klayman pressed more and threatened to go to appropriate government authorities and the donors themselves.

59. At all material times Judicial Watch had sufficient resources to purchase the Building. Fitton however, chose to deceive donors by failing to even communicate with the owner of the Building.

60. Moreover, when Benson questioned Judicial Watch about the status of her donation and the attempts to purchase the Building, Gregg Mills, Judicial Watch fundraiser, deliberately misrepresented that Judicial Watch was actively attempting to purchase the Building.

61. Robert G. Mills, a/k/a, Gregg Mills, is the high-dollar fundraiser for Judicial Watch. He deliberately mislead Benson to believe that Judicial Watch was engaged in efforts to purchase the Building.

62. Fitton continued to employ Mills on behalf of Judicial Watch even though he knew or should have known that Mills' prior actions exposed Judicial Watch's reputation for non-partisan integrity to injury. For example Fitton knew, and or should have known that:

(a) Mills had been president of U.S. Family Network, found by the Federal Election Commission to have funneled corporate money into attack advertisements against Democrats;

(b)     Mills led a nonprofit group that received millions of dollars from clients of former lobbyist Jack Abramoff;

(c)     Prosecutors recently subpoenaed Mills in connection with the investigation into Congressman Tom DeLay's alleged money laundering and campaign finance scandal case in Texas; and

(d)     Mills' refusal to take a polygraph exam in 2003 after allegations surfaced that he allegedly stole funds from another organization, which he admittedly repaid.

63.     Benson detrimentally relied on Mills', Fitton's, and Judicial Watch's fraudulent misrepresentations.

E.     Defamation, Disparagement of Klayman and Misrepresentation

64.     During the period of Fitton's leadership, Judicial Watch's assets have been reduced almost fifty-percent (50%) percent, based on Judicial Watch's annual submissions to the IRS.  On information and belief, Judicial Watch's assets now are between $8 and 9 million dollars - down from almost about $16 million in actual booked assets as of September 19, 2003, when Klayman left. And, if inheritances and prospective attorneys' fees awards had been booked at that time, Judicial Watch's assets would have been in the $20 million dollar range.

65.     Fitton has caused Judicial Watch to disparage, and defame Klayman in violation of the Severance Agreement by putting false statements on its website in which references in press quotations originally made about Klayman are doctored to refer to Judicial Watch instead.  The effect is to denigrate Klayman by rewriting history, a la the novel 1984, by George Orwell.  Some examples of the "rewrites" Fitton caused Judicial Watch to make are as follows:

compare

**Fitton's Judicial Watch Quote:** "Judicial Watch appears to be the main

public interest litigator at this time, no small feat." *National Journal*, June 24, 2002.

with

**Real Quote:** "He (Klayman) appears to be the major public litigator at this time." *National Journal*, June 24, 2002

compare

**Fitton's Judicial Watch Quote:** "Thanks, in part, to its aggressive litigation, Judicial Watch was recently named one of the top ten most effective government watchdog organizations by *The Hill* newspaper and a force in Washington by the *National Journal*."

with

**Real Quote:** "...through his challenge of secrecy rules, Klayman has become a major force in Washington." *National Journal*, June 24, 2002.

A copy of the Judicial Watch's website, with the false quotations, as well as the reprints from published articles containing the correct quotations attributing Judicial Watch success to Klayman are attached hereto collectively as Exhibit "E."

66.     Fitton also caused Judicial Watch to harm and damage Klayman, in order that they could continue to control and misuse the organization. To further their means and ends, assisted by Barmak, they engaged in the following additional conduct in breach of the Severance Agreement:

A.      Judicial Watch illegally and systematically opened mail sent to Klayman at Judicial Watch and tortiously interfered with another entity funded by Klayman, Freedom Watch, Inc., which is a 501 (c) (3) founded to promote freedom domestically and around the world;

B.      Judicial Watch made false statements on IRS Form 990s, and then published them on Judicial Watch's website, claiming that Klayman owned certain monies to Judicial Watch. Fitton signed the 2003 and 2004 Judicial Watch tax returns and made these false

statements under oath, in violation of 18 U.S.C. §1001. These fraudulent statements were intended to harm and defame Klayman. Despite Klayman's repeated requests for corrections and retraction, Judicial Watch refused and continued to publish these falsehoods throughout November and December, 2005 and continuing until at least August 2005 and beyond;

      C.     Judicial Watch failed to pay Klayman and his family for health care insurance.

      D.     Judicial Watch failed to pay Klayman his last paycheck while employed by Judicial Watch;

      E.     Judicial Watch converted Klayman's personal property and assets, as well as those of Klayman's law firm Klayman & Associates;

      F.     Judicial Watch failed to make a good faith effort to remove Klayman as a personal guarantor from the lease for Judicial Watch's headquarters at 501 School Street, S.W., Washington D.C.;

      G.     Judicial Watch filed false and frivolous legal pleadings to attempt to have Klayman removed as counsel for Sandra Cobas in the Miami Elian Gonzalez litigation concerning the alleged use of excessive force during the Easter, 2000 raid on his uncle's house, fraudulently representing to the court that Klayman was legally barred from representing her;

      H.     Fitton and Judicial Watch failed to forward telephone messages and mail to Klayman, and opened mail that was not addressed to or did not pertain to Judicial Watch;

      J.     On information and belief, Judicial Watch interfered with Klayman's relationships with Klayman's former clients who had offered to help Klayman in his Senate campaign, by disparaging, defaming, holding in a false light and providing false and misleading

information to them to cause them to sever their relationships with Klayman; and

I. Fitton and Judicial Watch defamed Klayman among the media outlets and the general public.

67. Defendants' deliberate wrongful conduct is part of a pattern of abuse that is intended to mislead the public and harm Klayman, Judicial Watch and its donors.

**COUNT ONE – FRAUDULENT MISREPRESENTATION**

Louise Benson v. Judicial Watch and Thomas Fitton

68. Plaintiffs incorporate by reference the allegations of paragraphs 1 through 67 as if fully set forth herein:

69. As alleged above Benson contributed funds to Judicial Watch in reliance on the specific representations made by Judicial Watch that it intended to use them to purchase the Building located at 501 School Street, S.W., Washington, D.C. (the "Building").

70. Since Benson pledged her money, and made her $15,000 payment, Fitton and Judicial Watch have continued to misrepresent that it intends to use her money, and those of other similarly situated donors, to purchase the Building or another property.

71. Upon information and belief, since Fitton has taken over Judicial Watch, Fitton and Judicial Watch have not intended to, taken no steps to and is not, now, because of the dissipation of Judicial Watch assets, in a position to purchase the Building.

72. Greg Mills, fundraiser for Judicial Watch, deliberately mislead Benson by fraudulently representing that the funds were being used to purchase the Building.

73. Benson justifiably relied to her detriment on the misrepresentations of Fitton, Mills and Judicial Watch.

74. These misrepresentations were calculated to placate Benson and stop her and other similarly situated donors from filing suit and/or seeking a return of the donations.

75. Defendants' representations since October 2003 are false and fraudulent, and Fitton and others who caused those representations to be made in, inter alia, Judicial Watch newsletters sent to Benson and others in February and September 2005, knew they were false at the time they were made.

76. Judicial Watch, Fitton, and Mills made those misrepresentations to induce Benson and the other 3,864 donors who gave money to buy the Building to refrain from demanding a refund of their donations so Judicial Watch could retain the benefit of their donations.

77. The fraud and deceit of Judicial Watch, Fitton, and Mills was knowing and intentional and has damaged Benson.

78. The actions of Judicial Watch in retaining Benson's money under false pretense is so outrageous as to shock the conscience, thereby entitling Benson to an award of punitive damages.

**COUNT TWO – BREACH OF CONTRACT**

Louise Benson v. Judicial Watch

79. Plaintiffs incorporate by reference the allegations of paragraphs 1 through 78 as if fully set forth herein.

80. As alleged above Benson contributed funds to Judicial Watch in response to a direct solicitation and in reliance on the specific representations made by Judicial Watch that it intended to use her contribution to purchase the Building located at 501 School Street, S.W., Washington, D.C. (the "Building").

81. Benson entered into a contract with Judicial Watch to obtain the naming rights to a

particular space in the Building, specifically the office of Fitton.

82.   Specifically, Benson was induced to pledge $50,000 and pay $15,000 in return for the naming rights of the either Chairman's Office, the President's Office, Guest Reception Area, or the Lounge and Key Witness Room.

83.   As consideration for her $50,000 pledge, and $15,000, payment Judicial Watch agreed to name the President's (Fitton's) Office after Louise Benson.  Judicial Watch agreed that after purchasing the Building it would recognize her generous pledge by placing a plaque on the President's Office.

84.   Since Benson pledged her money, Judicial Watch has continued to misrepresent that it intends to use her money, and those of other similarly situated donors, to purchase the Building or another property.

85.   Since Fitton has taken over Judicial Watch, Judicial Watch has not intended to, taken no steps to, and is not now, due to the dissipation of Judicial Watch assets, in a position to purchase the Building.

86.   Greg Mills, fundraiser for Judicial Watch, deliberately mislead Benson by fraudulently representing that the funds were being used to purchase the Building.

87.   Benson relied to her detriment on the misrepresentations of Fitton, Mills and Judicial Watch.

88.   Judicial Watch has not purchased the Building and is in breach of the agreement that offered Benson the naming rights to the President's Office in consideration for her pledge and contribution.

**COUNT THREE – UNJUST ENRICHMENT**

Louise Benson v. Judicial Watch

89. Plaintiffs incorporate by reference the allegations of paragraphs 1 through 88 as if fully set forth herein:

90. As alleged above Benson contributed funds to Judicial Watch in response to a direct solicitation and in reliance on the specific representations made by Judicial Watch that it intended to use her contribution to purchase the Building located at 501 School Street, S.W., Washington, D.C. (the "Building").

91. As set forth herein, the Judicial Watch accepted, used and enjoyed the benefits of Benson's $15,000 payment made in the belief that Judicial Watch would purchase the Building and provide her naming rights.

92. As set forth herein, Benson conferred a valuable benefit upon Judicial Watch by pledging $50,000 and making payment of $15,000 in consideration of Judicial Watch's promise to purchase the Building and provide Benson naming rights for the President's Office.

93. Judicial Watch has not purchased the Building and is misusing Benson's payment.

94. As set forth herein, because of the relationship between the parties, Benson is entitled to receive the reasonable value of the benefits conferred upon Judicial Watch, which is $15,000 plus interest.

95. In addition, Benson conferred a substantial benefit upon Judicial Watch in an amount in excess of $65,000 through the services that she provided by working at Judicial Watch's San Marino, CA office, and through the services she provided to Judicial Watch's "Judicial Monitoring Project," with the expectation that Fitton and others would act honestly and ethically toward her

and to the public generally.

96. Because Fitton and Judicial Watch have not acted properly by deliberately misleading donors and improperly converting Judicial Watch into a partisan organization, Benson is entitled to receive the value of the services she provided.

**<u>COUNT FOUR – Violation of Section 43(a) of the Lanham Act</u>**

<u>Klayman v. Judicial Watch and Thomas Fitton, Paul Orfanedes, and Christopher Farrell</u>

97. Plaintiffs Klayman incorporates by reference paragraphs the allegations of paragraphs 1 to 96 as if fully stated herein.

98. By placing in the U.S. mails and on the Internet letters, newsletters and other solicitations that misrepresented that Klayman was the Chairman and General Counsel of Judicial Watch, and using these published misrepresentations to raise money for Judicial Watch, Judicial Watch engaged in false designation of origin, false and misleading descriptions, false and misleading representations, false and misleading advertising and other illegal acts of unfair competition which are likely and did cause confusion, mistake, and/or deception and misrepresented the nature, characteristics and qualities of plaintiffs' products, services, and activities in violation of 15 U.S.C. §1125(a)(1)(A) and (B). These illegal acts were perpetrated and occurred both nationally and internationally.

99. Defendants deliberately misrepresented and falsely advertised that Klayman was Chairman and General Counsel of Judicial Watch after he left Judicial Watch to run for the Senate.

100. The misuse of Klayman's name and likeness were calculated to confuse donors into believing that Klayman was soliciting their donations and that he was still running Judicial Watch.

101. Klayman is a celebrity within the non-profit legal/political community. Klayman is

widely recognized, both nationally and internationally, as the leading figure in the world of government and judicial oversight and pubic "watchdog" groups.

102. Fitton and Judicial Watch knew that donors that received the misleading fundraising publications would be confused by the publication and use of Klayman's name and likeness.

103. Fitton Orfanedes, Farrell and Judicial Watch deliberately used Klayman's image and name to confuse donors into thinking that Klayman was still affiliated with Judicial Watch.

104. Fitton's Orfanedes', Farrell's and Judicial Watch's false portrayal of Klayman was used to misrepresent the status of Judicial Watch to entice donors to continue giving donations to Judicial Watch.

105. As a result of the foregoing, plaintiff has been damaged in an amount that will be ascertained at trial. In addition to plaintiff's actual damages, he is entitled to receive Defendants' profits pursuant to 15 U.S.C. § 1117(a). These damages and profits should be enhanced to achieve justice pursuant to 15 U.S.C. § 1117(a) and/or trebled pursuant to 15 U.S.C. § 1117(b) because defendants conduct was willful.

106. The activities of defendants have caused and will cause irreparable harm to Plaintiff's personal and business relationships and good will for which he has no adequate remedy at law.

## COUNT FIVE

### Violation of Florida Statute 540.08 – Unauthorized Publication of Name or Likeness

Klayman v. Judicial Watch Thomas Fitton, Paul Orfanedes, and Christopher Farrell

107. Plaintiff Klayman incorporates by reference paragraphs the allegations of paragraphs 1 to 106 as if fully stated herein.

108. By placing in the U.S. mails and on the Internet letters, newsletters and other

solicitations that used his image and name, and misrepresented that Klayman was the Chairman and General Counsel of Judicial Watch, where such published misrepresentations sought to raise money for Judicial Watch, Judicial Watch engaged in unauthorized use of the name, portrait, photograph, other likeness of Klayman without the express written or oral consent of Klayman to such use of his name or likeness. These illegal acts were perpetrated and occurred both nationally and internationally and were in violation of Florida Statute 540.08.

109. Defendants deliberately misrepresented and falsely advertised that Klayman was Chairman and General Counsel of Judicial Watch after he left Judicial Watch to run for the Senate.

110. The misuse of Klayman's name and likeness were calculated to confuse donors into believing that Klayman was soliciting their donations.

111. Fitton Orfanedes, Farrell and Judicial Watch knew that donors that received the misleading fundraising publications would be confused by the publication and use of Klayman's name and likeness.

112. As a result of the foregoing, Klayman has been damaged in an amount that will be ascertained at trial. In addition to Klayman's actual damages, he is entitled to recover damages for an amount which would have been a reasonable royalty, and punitive or exemplary damages.

113. Plaintiff is entitled to punitive damages because defendants conduct was willful.

114. The activities of defendants have caused and will cause irreparable harm to Plaintiff's personal and business relationships and good will for which it has no adequate remedy at law.

**COUNT SIX - Breach of Contract – Rescission**

Klayman v. Judicial Watch

115. Klayman incorporates by reference the allegations of paragraphs 1 through 114 as if

fully stated herein.

116.  As alleged above, Judicial Watch breached the Severance Agreement as set forth in above in Paragraph 66.

117.  Fitton's deliberate and calculating steps to breach the Severance Agreement were egregious and were taken to further his personal gain to the detriment of Klayman, Judicial Watch and the public.

118.  By disparaging, defaming, and casting Klayman in a false light to the public and media, Fitton and Judicial Watch breached the Severance Agreement with the malicious intent to eliminate Klayman as a competitive force.

119.  By disparaging, defaming and casting Klayman in a false light to the public and media, Fitton breached the Severance Agreement to ensure that Judicial Watch would no longer be a non-partisan organization and instead become an organization that promoted Fitton's own interests and agenda without regard for the public interest at large.

120.  By filing false statements on its Form 990s, and then posting them on the Judicial Watch website, Fitton and Judicial Watch defamed Klayman—a direct breach of the Severance Agreement.

121.  The false statements on Judicial Watch's IRS Form 990s were intended to and had the effect of suggesting that Klayman defrauded Judicial Watch or improperly withheld certain monies from Judicial Watch.

122.  By actively misrepresenting the reasons for Klayman's departure from Judicial Watch, Fitton and Judicial Watch disparaged Klayman by creating the false impression that Klayman was forced to leave Judicial Watch. This pattern of disparagement is a direct violation of the terms of

the Severance Agreement.

123.  Judicial Watch, through Fitton and other agents and representatives, contrary the expressly negotiated terms of the Severance Agreement, falsely stated that they could not discuss the reasons that Klayman left Judicial Watch.

124.  Judicial Watch, through Fitton and other agents and representatives, falsely instructed the television, cable and the written media that Klayman could not speak on the air about Judicial Watch cases or public events.

125.  On information and belief, Judicial Watch, through Fitton, Orfanedes, Farrell and other agents and representatives, falsely instructed the television, cable, and the written media that Klayman could not be referred to as the "Founder and former Chairman of Judicial Watch."

126.  By failing to pay Klayman the full amount due under the Severance Agreement, and in failing to return all of Klayman's property, Fitton and Judicial Watch breached the Severance Agreement.

127.  By failing to take affirmative steps to purchase the Building and remove Klayman as a guarantor for the Judicial Watch lease, Fitton and Judicial Watch have breached the Severance Agreement.

128.  After Klayman discovered that Fitton had not obtained a college degree, Klayman insisted that Fitton obtain a college degree, and that he find a suitable candidate, one who was distinguished and qualified, to fill the position of Chairman of Judicial Watch.

129.  Fitton assured Klayman that the Chairman position would be filled.

130.  In fact, just prior to Klayman's departure, Klayman had been discussing and consulting with highly qualified and distinguished candidates to lead Judicial Watch.

131. Fitton deliberately misrepresented that he would take steps to find a suitable successor for Klayman as Chairman to induce Klayman to enter into the Severance Agreement. Fitton persuaded Klayman that Fitton would actively work to find a legal/public figure to succeed Klayman and run Judicial Watch.

132. Fitton never intended to find a suitable successor for Klayman, and instead always intended to take over Judicial Watch for his own personal gain. Without a law degree, let alone a college degree, Fitton was not equipped to run a non-profit legal organization.

133. Fitton's deliberate misrepresentations materially induced Klayman to enter into the Severance Agreement.

134. Klayman relied on Fitton's fraudulent misrepresentations to his detriment and the detriment of Judicial Watch.

135. Fitton's and Judicial Watch's breaches of the Severance Agreement are so pervasive and widespread that monetary damages would be inadequate. The Severance Agreement must be rescinded, and the parties must be returned to the status quo anta. Klayman should be restored to his position as Chairman of Judicial Watch.

136. Without rescission of the Severance Agreement, Klayman and Judicial Watch will continue to be harmed.

137. If this Court rescinds the Severance Agreement, Klayman will be restored to his position as Chairman and General Counsel of Judicial Watch.

**COUNT SEVEN - Breach of Contract – Damages**

Klayman v. Judicial Watch

138. Klayman incorporates by reference the allegations of paragraphs 1 through 137 as if

fully stated herein.

139. As alleged above, Judicial Watch breached the Severance Agreement as set forth in above in Paragraph 66.

140. Fitton's deliberate and calculating steps to breach the Severance Agreement were egregious and were taken to further his personal gain to the detriment of Klayman, Judicial Watch and the public.

**COUNT EIGHT - Breach of Contract – Specific Performance**

Klayman v. Judicial Watch

141. Klayman incorporates by reference the allegations of paragraphs 1 through 140 as if fully stated herein.

142. Judicial Watch has failed to pay Klayman and owes him amounts due Klayman under the Severance Agreement.

143. Judicial Watch has failed to return Klayman's personal items property, and artwork, and Klayman & Associates, P.C., property as required by the Severance Agreement.

144. Judicial Watch has failed to remove Klayman as a guarantor for all credit card accounts as required by the Severance Agreement.

145. Judicial Watch has failed to remove Klayman as a guarantor for the Building as required by the Severance Agreement.

146. Judicial Watch has failed to provide Klayman access to documents as required under the Severance Agreement.

147. Despite repeated demands to adhere to and honor the terms of the Severance Agreement, Judicial Watch remains in breach of the agreement and it must be ordered to

specifically perform its obligations.

**COUNT NINE - Defamation**

Klayman v. Judicial Watch, Thomas Fitton, Paul Orfanedes, and Christopher Farrell

148. Klayman incorporates by reference the allegations of paragraphs 1 through 147 as if fully stated herein.

149. Judicial Watch, through Fitton, Orfanedes, Farrell and other agents and representatives, including but not limited to Barmak, have defamed Klayman, by publishing false statements to various persons and entities as alleged above.

150. Judicial Watch, through Fitton, Orfanedes, Farrell and other agents and representatives, published false and misleading statements in Judicial Watch's 2003 and 2004 Form 990 IRS Returns. These false statements were prominently published on Judicial Watch's website and falsely stated unequivocally that Klayman owed a certain amount of monies to Judicial Watch.

151. The false and defamatory publications on the Form 990s and the Judicial Watch website were used by others to attack Klayman. For example, Peter Paul, a former Judicial Watch client republished the defamatory statements on his website and attacked Klayman based, in part, on the false statements published in the Form 990s.

152. Fitton's and Judicial Watch's defamatory publications and statements about Klayman harmed Klayman's business reputation and are damaging per se.

153. Fitton's and Judicial Watch's defamation of Klayman is continuous and ongoing.

154. In response to the filing of the original Complaint, Fitton and Judicial Watch knowingly sent a false statement to all Judicial Watch employees, which stated that Klayman filed his lawsuit because he owed Judicial Watch a significant sum of money.

155. Fitton, Orfanedes, Farrell and Judicial Watch knew that Klayman did not, individually, owe Judicial Watch any money when they published the false and misleading statement.

156. Additionally, beginning on April 13, 2006, Fitton and Judicial Watch published knowingly false statements in the following media outlets: 1) The Washington Post (April 19, 2006); 2) The Washington Times (April 14, 2006); 3) World NetDaily.com (April 13, 2006); 4) Slate.com (April 28, 2006); and elsewhere.

157. With wanton disregard for the truth, Fitton, Orfanedes, Farrell and Judicial Watch falsely told reporters that Klayman filed his suit as a "tactical maneuver designed to distract attention away from the fact that Klayman owes **more than a quarter of a million dollars to Judicial Watch**."

158. When Fitton, Orfanedes, Farrell and Judicial Watch published their defamatory statements they did so with knowledge that 1) Klayman does not owe Judicial Watch any money; and 2) Klayman has a genuine dispute with Judicial Watch that has yet to be resolved.

159. Fitton, Orfanedes, Farrell and Judicial Watch deliberately lied to sully Klayman's name and to imply that, among other things, Klayman filed a frivolous lawsuit.

160. Fitton's and Judicial Watch's defamation of Klayman is part of Fitton's continuing effort to lower Klayman's esteem in the media and public's eye.

161. Fitton Orfanedes, Farrell and Judicial Watch uttered and published false statements about Klayman and they harmed Klayman's reputation in his trade, and profession and had the effect of lowering him in the estimation of the community.

162. As a result of Defendants' malicious conduct, Klayman was damaged in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs request the Court grant judgment in their favor and:

A. **On Counts One, Two and Three** award Louise Benson a sum in excess of seventy-five thousand dollars ($75,000) plus interest, against the defendants jointly and severally;

B. **On Count Three** award Louise Benson an amount of punitive damages to be determined at trial against the defendants, jointly and severally;

C. **On Counts Four and Five** award Larry Klayman a sum in excess of one million five-hundred thousand dollars ($1,500,000) plus interest, a reasonable royalty, and an amount of punitive damages to be determined at trial against the defendants, jointly and severally;

D. **On Count Six** Larry Klayman respectfully prays that this Honorable Court enter a Judgment against Judicial Watch, rescinding the Severance Agreement to preserve the interests of justice and provide such other relief as is just and equitable;

E. **Alternatively, on Count Seven** award Larry Klayman a sum in excess of five-hundred thousand dollars ($500,000), plus interest, against the defendants, jointly and severally;

F. **Alternatively, on Count Eight** Larry Klayman respectfully prays that this Honorable Court enter a Judgment against Judicial Watch and order Judicial Watch to specifically perform the terms of the Severance Agreement by: paying Klayman the remaining amounts due under the Severance Agreement, including reimbursing Klayman for business expenses; returning Klayman's personal items, property and artwork; returning the property of Klayman & Associates, P.C.; removing Klayman as a guarantor of all credit card accounts; removing Klayman as a guarantor for the Building; providing Klayman access to documents; and otherwise complying

with the Severance Agreement as plead herein;

G. **On Count Nine** award Larry Klayman a sum in excess of one million five-hundred thousand dollars ($1,500,000), plus interest, and an amount of punitive damages to be determined at trial against the defendants, jointly and severally;

H. Award Plaintiffs the costs of the action, including attorneys' fees; and

I. Award Plaintiffs such further relief as is just and equitable.

**Jury Trial Demanded**

Plaintiffs hereby demand a trial by jury for all issues so triable.

Respectfully submitted,

**SPECTOR GADON & ROSEN, P.C.**

By: ______________________ (DD 1339)
Daniel J. Dugan, Esquire
1635 Market Street, 7th floor
Philadelphia, PA 19103
215.241.8872
215:241.8844 *fax*
email: ddugan@lawsgr.com

June 14, 2006

*Attorneys for Plaintiffs Larry Klayman and Louise Benson*

Of Counsel:

**SPECTOR GADON & ROSEN, P.C.**
Jason B. Schaeffer, Esquire
1635 Market Street, 7th Floor
Philadelphia, PA 19103
215.241.8887
215.241.8844 *fax*
Email: jschaeffer@lawsgr.com

GARY G. KREEP – SBN 066482
D. COLETTE WILSON – SBN 123112
UNITED STATES JUSTICE FOUNDATION
932 "D" Street, Suite 3
Ramona, California 92065
tel: (760) 788-6624
fax: (760) 788-6414

Attorneys for Plaintiff
PETER F. PAUL

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES – CENTRAL DIVISION

IN A MATTER OF UNLIMITED JURISDICTION

| | |
|---|---|
| PETER F. PAUL,<br>Plaintiff,<br><br>v.<br><br>WILLIAM JEFFERSON CLINTON, HILLARY RODHAM CLINTON, HILLARY RODHAM CLINTON FOR U.S. SENATE COMMITTEE, INC., NEW YORK SENATE 2000, DAVID ROSEN, GARY SMITH, JAMES LEVIN, and AARON TONKEN<br><br>Defendants. | Case No. **BC304174**<br><br>DECLARATION OF PETER PAUL IN SUPPORT OF MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT<br><br>DATE: September 25, 2006<br>TIME: 8:30<br>DEPT: 47<br><br>The Honorable Aurelio N. Munoz<br><br>Original Complaint Filed: 10-14-03<br>1st Amended Cplt. Filed: 2-27-04<br>Discovery Cut-Off: None<br>Trial Date: March 27, 2007 |

I, PETER F. PAUL, declare:

1. I am the plaintiff in this action, I am over the age of 21 years, and I make this declaration in support of my Motion for Leave to File Second Amended Complaint. The following facts are true of my own knowledge and, if called to testify, I could and would competently testify thereto.

2. I was detained in Brazil, for extradition to the U.S., from August 2001 to September 2003, then extradited and held in pre-trial detention in New York from September 2003 until January 2005. Both the original complaint, filed October 14, 2003, and the First Amended Complaint, filed February 27, 2004, were drafted by my former counsel at Judicial Watch (hereafter, "Judicial Watch") while I was in pre-trial detention in New York.

3. My former counsel drafted the original pleadings while I was in Brazil, based on very little consultation with me. This effort was also handicapped by the fact that all of the records necessary to best frame the complaint were unavailable to me in Brazil and later while I was incarcerated. Thus, in recounting to Judicial Watch the very complex set of facts underlying the pleadings in this case, I had to rely almost exclusively on my memory, without reference to supporting documentation or other materials that could refresh my recollection. Communication

with my lawyers was difficult while I was residing in Brazil and almost impossible after my detention in Brazil and on through my continued pre-trial detention in New York for sixteen months, while their offices were located in Washington, D.C., and Los Angeles. Moreover, Judicial Watch did not allow me sufficient time to review the original complaint before it was filed. As for the First Amended Complaint, I never saw a copy of it until after it had already been filed. As a result of all of these factors, numerous, material, supporting allegations were omitted from the complaint, both as originally filed and as amended.

4. In addition, Judicial Watch and I disagreed over what should be the fundamental basis for the complaint. Judicial Watch wished to emphasize the election-law frauds committed by Hillary Clinton's U.S. Senate campaign. This focus eclipsed the business frauds at the heart of the case, and created the misconception by the media, the public and even this court, that I had a political vendetta against the Clintons as a "disgruntled contributor." In fact, I never intended to become Hillary's largest contributor. I was first cajoled and then coerced into that role, all the while being tricked into believing I would be a future business partner of the President if only I continued making sufficient expenditures, at his direction, to benefit him and his wife. Those expenditures are deemed by operation of law to be contributions to a federal election campaign.

5. Through the new amended complaint I could more accurately be characterized as a "disgruntled business associate" complaining of the breach of various fiduciary duties purportedly created between the First Family and me in connection with promises they convinced me they had made to work together after Bill Clinton left the White House. President Clinton's malicious interference in the funding of my company (in the midst of the dot-com meltdown in 2000) by hijacking my Japanese partner and largest investor in my company --Tendo Oto -- and going into business with him, himself, is the real gravamen of my claim.

6. Over my objection, Judicial Watch ignored these claims relating to President Clinton's role in the collapse of my company, resulting in damages of more than $30 million to me, in addition to the out-of-pocket $1.9 million Judicial Watch recited in the complaint. Judicial Watch drafted their pleadings to highlight exclusively my underwriting and producing of three campaign fundraising events for Hillary Clinton (which I did at the request and direction of President Clinton) thereby infecting my tort claims with Judicial Watch's political agenda, not my own.

7. Instead of clearly explaining and describing my real damages, Judicial Watch's pleadings concentrated on the speculative damages of the legal jeopardy I was subjected to by the defendants' efforts to hide my campaign contributions in phony FEC reports.

8. The proposed Second Amended Complaint more accurately presents the gravamen of my grievance against the defendants. In summary, my claims emanate from the deliberate actions of President Clinton and his agents to falsely convince me that he had agreed to a post-White House business arrangement, which enabled President Clinton to secretly usurp my relationship with Tendo Oto, thereby depriving my company, Stan Lee Media, of Oto's promised, and critically needed, operating funds. This malicious interference began the "domino effect" that collapsed my company. My monetary damages exceeded $30 million in stock and option losses, exclusive of consequential damages that ensued. That injury -- much more devastating to me than being duped and coerced into spending close to $1.9 million to benefit Hillary Clinton's Senate campaign -- was buried in the pleadings drafted by Judicial Watch.

9. My conflict with Judicial Watch over the strategy for handling my case persisted and became more onerous over the course of their representation of me. The loss of my previously substantial financial resources, resulting directly from the malicious actions of the defendants, coupled with the lengthy period of pre-trial detention on a two-count indictment for violating SEC Rule 10(b)(5) which was unnecessarily exacerbated by Judicial Watch's malfeasance and misfeasance) made me entirely reliant on their legal services, as subsidized by hundreds of thousands of

concerned Americans who contributed to Judicial Watch specifically for this case.

10. **It was Judicial Watch's incompetent, bad-faith handling of my negotiations with Attorney General John Ashcroft, and his then-Assistant Attorney General Michael Chertoff and the U.S. Attorney's office in the Eastern District of New York, that led to my forty-three-month, pre-trial detention in Brazil and New York. Had Judicial Watch not asserted that U.S. Attorney for the Eastern District of New York, Alan Vinegard, was a "political hack" at a press conference in the National Press Club in Washington on July 16, 2001; had Judicial Watch not attempted to "extort" Attorney General Ashcroft with threats of "exposing corruption" in the Justice Department and the FBI; and had Judicial Watch's chairman and chief counsel not physically assaulted Assistant U.S. Attorney and New York prosecutor Ken Breen during an interview I arranged shortly after my arrest in Brazil in August 2001 to enable me to voluntarily return to the U.S. immediately, without any extradition proceedings (as was my desire), I would have had the wherewithal to obtain new counsel much earlier.**

11. It wasn't until 2005, when I met with a former DOJ attorney Judicial Watch retained for my criminal defense, that I learned the extent of the government's prejudice against me that was created by Judicial Watch's bad-faith and unprofessional conduct during negotiations with the hierarchy of the Justice Department, supposedly on my behalf. He related to me his recent experience at a Washington cocktail party in which my case came up spontaneously in a conversation between government officials who were chuckling over my lawyer's assault on Assistant U.S. Attorney Ken Breen. **During my proffer of information to Assistant Attorney General Michael Chertoff's representative, the Inspector General's investigator and Mr. Breen, my lawyer reached over the interview table we were seated at in my Brazilian dungeon and attempted to grab Mr. Breen by the throat, while hysterically shouting at him, " I am going to eat your ba**s for lunch!!" That inappropriate and ill-timed utterance (at my expense) has been bandied about as a Washington joke ever since.**

12. As soon as I regained my freedom, in January 2005, I immediately challenged Judicial Watch's past actions and litigation strategy herein. As a result, in March 2005, Judicial Watch demanded that I cancel the existing representation agreement with them and enter into a new agreement, which would have released them from any liability for their mishandling of my case. Judicial Watch's legal services to me from 2001-2005 had been funded by the more than 200,000 supporters that had responded to Judicial Watch's fundraising appeals over a four-year period.

13. When I refused to accept the new agreement, which I considered extortionate and unethical, they threatened to appropriate my entire litigation fund if I did not sign a release I was under no obligation to sign. Judicial Watch then withdrew as my counsel before I could obtain replacement counsel, while retaining the entire, multi-million-dollar fund that had been raised to finance this litigation and refusing to apply that fund as contractually required under my representation agreement and as the donors intended. At that point, I was forced to represent myself *in propia persona*, and, alone, deal with the multitude of appeals then pending before the Second District Court of Appeals. It was not until October 2005 that Gary Kreep, of the United States Justice Foundation, agreed to substitute in as counsel of record for the limited purpose of presenting oral argument before the Court of Appeals.

14. Only after December 2005, when Mr. Kreep undertook complete representation in this case, did it begin to become clear that the First Amended Complaint was deficient and inadequate in accurately presenting the gravamen of my case against the defendants. However, in view of the *years* devoted to battling over the pleadings before this case was finally at issue, my counsel and I were very reluctant to risk starting that process all over again by filing yet another amended pleading. It was only after much deliberation, over a period of months, that my new counsel and I resolved in our minds that the benefits of correcting the deficiencies of the existing complaint

sufficiently outweighed the risks of reopening the pleadings to challenge, and we decided to bring the present motion

I declare, under penalty of perjury, that the foregoing is true and correct.  Executed this 23rd day of August, 2006, at Candler, North Carolina.

[faxed signature]

Peter F. Paul

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Larry Klayman, *Plaintiff,* v. Judicial Watch, Inc., *et al.* *Defendants.* | : | Civil Action No. 1:06-CV-00670 Honorable Colleen Kollar-Kotelly **Jury Trial Demanded.** |

***PLAINTIFF'S RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS***

Pursuant to Fed.R Civ.P. 34, Plaintiff, Larry Klayman responds to Defendants' Request for Production of Documents as follows:

***GENERAL OBJECTIONS***

1. Plaintiffs object to each request to the extent that the Definitions and Instructions in the Request exceed the bounds of discovery provided by the Federal Rules of Civil Procedure.

2. Plaintiffs also object to each request to the extent that it seeks to elicit any information that is protected by the attorney-client privilege, the work product doctrine or any other applicable claim of privilege or other legal right. To the extent that Plaintiffs respond to any request, each such response is subject to each of these General Objections as well as the attorney-client privilege, the work product doctrine, or any other applicable claim of privilege and each such response is without waiver of Plaintiffs' right to contest such request at a later date.

3. Each of Plaintiffs' General Objections is applicable to and hereby incorporated into each and every response to each request. Any response by Plaintiffs to any request is made

without waiver of, and is limited by, the General Objections made herein. Plaintiff reserves his right to supplement these responses.

Subject to their general objections above, Plaintiffs respond to the specific requests as follows:

***RESPONSES***

1. All documents reviewed or consulted in preparing responses to Defendants' Interrogatories.

**Response:** Plaintiff objects to this request to the extent it seeks any documents other than those identified in Answers to Interrogatories. Those documents will be produced.

2. All documents that support your claim that Defendants' misused and/or misrepresented your name and/or likeness for fundraising activities.

**Response:** Relevant documents evidencing Plaintiff's calculation of damages will be produced at a mutually agreeable time, date and place. Plaintiff objects to the production of any additional documents on the grounds that the requests seek irrelevant information the production of which would be burdensome and harassing.

3. All documents relating to the calculation of your damages.

**Response:** Relevant non-privileged documents will be produced at a mutually agreeable time, date and place.

4. All documents that support your claim that Defendants disparaged, defamed and/or cast you in a false light to the public and media.

**Response:** Relevant non-privileged documents will be produced at a mutually agreeable time, date and place.

5. All documents relating to the Severance Agreement.

**Response:** Plaintiff objects to this request because other than with respect to the Severance Agreement itself (which is attached to the Complaint in this matter), the request (a) is vague, ambiguous and overly broad, and (b) seeks documents that are protected by attorney client, work product, and other applicable privileges.

6. All documents supporting your claim that Defendant Thomas J. Fitton represented that he would take steps to find a successor for you as Chairman of Judicial Watch, Inc.

**Response:** Any such relevant documents will be produced at a mutually agreeable time, date and place.

7. All documents relating to the calculation of monies owed to you by Judicial Watch.

**Response:** Relevant documents, including without limitation documents relating to personal expenses owed to the plaintiff, are in the possession and control of the defendants, who have refused to provide them to the Plaintiff.

8. All documents relating to your efforts to reclaim your property from Judicial Watch.

**Response:** Relevant documents will be produced at a mutually agreeable time, date and place. Relevant documents are also in the possession and control of the defendants, who have refused thus far to produce them to the plaintiff.

9. All documents relating to ownership of the disputed Artwork.

**Response:** Any such relevant documents will be produced at a mutually agreeable time, date and place. Relevant documents are also in the possession, custody and control of defendants but defendants have thus far refused to produce them

10. All documents relating to your position as guarantor of any Judicial Watch credit cards.

**Response:** Any such relevant documents will be produced at a mutually agreeable time, date and place. Such documents are in the custody, possession and control of the defendants.

11. All documents relating to the calculation of damages in connection to your position as guarantor of the building.

**Response:** Plaintiff objects to this request because it is duplicative of request number three.

12. All communications between you and Peter F. Paul.

**Response:** Plaintiff objects to this request because it (a) is vague, ambiguous and overly broad, (b) seeks documents that are protected by attorney client and work product privileges, and (c) seeks irrelevant information the production of which would be burdensome and harassing.

13. All documents relating to the approval of payment of family health insurance coverage for you by Judicial Watch.

**Response:** Any such relevant documents will be produced at a mutually agreeable time, date and place. Relevant documents, which include, without limitation, those referred to in the Severance Agreement, are within the possession and control of Judicial Watch. Any such relevant documents will be produced at a mutually agreeable date, time and place.

14. All documents relating to your reimbursement of Judicial Watch pursuant to paragraph ten of the Severance Agreement.

**Response**: Relevant documents will be produced at a mutually agreeable date, time and place. Relevant documents are also within the possession and control of Judicial Watch.

15. All documents relating to your repayment of Klayman & Associates, P.C.'s debt to Judicial Watch pursuant to paragraph eleven of the Severance Agreement.

**Response:** Plaintiff objects to this request on the grounds that it seeks irrelevant information the production of which would be burdensome and harassing.

16.    All documents that you have produced subsequent to the severance date which contains the term "Judicial Watch".

**Response:**  Plaintiff objects to this request on the grounds that it is overly broad and seeks documents that are irrelevant to the subject matter of this litigation, the production of which would be burdensome and harassing.

17.    All documents that you have produced subsequent to the Severance Date which contains the phrase "Because No One is Above the Law!"

**Response:**  Plaintiff objects to this request on the grounds that it is overly broad and seeks documents that are irrelevant to the subject matter of this litigation, the production of which would be burdensome and harassing.

18.    Each and every solicitation, fundraising letter and/or mailing you have caused to enter the United States mails from or regarding "Saving Judicial Watch."

**Response:**  Plaintiff objects to this request on the grounds that it is overly broad and seeks documents that are irrelevant to the subject matter of this litigation, the production of which would be burdensome and harassing.

19.    Each and every solicitation, fundraising letter and/or mailing you have caused to enter the United States mails from or regarding "Freedom Watch."

**Response:**  Plaintiff objects to this request on the grounds that it is overly broad and seeks documents that are irrelevant to the subject matter of this litigation, the production of which would be burdensome and harassing.

20.    Each and every press release that you have issued subsequent to the Severance Date.

**Response:** Plaintiff objects to this request on the grounds that it is overly broad and seeks documents that are irrelevant to the subject matter of this litigation the production of which would be burdensome and harassing.

21. All documents regarding your work with RightMarch.com.

**Response:** Plaintiff objects to this request on the grounds that it is overly broad and seeks documents that are irrelevant to the subject matter of this litigation the production of which would be burdensome and harassing.

Objections only,

**SPECTOR GADON & ROSEN, P.C.**

By: *Daniel J. Dugan*

Daniel J. Dugan, Esquire
1635 Market Street, 7th floor
Philadelphia, PA 19103
215.241.8872 --215.241.8844 *fax*
*ddugan@lawsgr.com*
*Attorneys for Plaintiff*

July 23, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23th day of July, 2007, a true and correct copy of Plaintiff's Responses to Defendants' Requests for Production of Documents were served on the following by U.S. Mail, postage pre-paid:

Richard W. Driscoll, Esquire
Driscoll & Seltzer, PLLC
600 Cameron Street
Alexandria, Virginia 22314
*Counsel for Defendants*

*Daniel J. Dugan*
Daniel J. Dugan, Esquire

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Larry Klayman,<br>*Plaintiff,*<br><br>v.<br><br>Judicial Watch, Inc., *et al.*,<br>*Defendants.* | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Civil Action No. 1:06-CV-00670<br><br>Honorable Colleen Kollar-Kotelly<br><br><br>**Jury Trial Demanded.** |

***PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL RESPONSES TO DEFENDANT'S REQUEST FOR PRODUCTION OF DOCUMENTS***

Plaintiff, Larry Klayman ("Klayman"), by undersigned counsel, hereby submits this memorandum of points and authorities in opposition to Defendants' Motion to Compel Plaintiff's Responses to Defendant's Request for Production of Documents and Memorandum of Law (the "Motion"). For the reasons that follow, the Motion must be denied.

## I. INTRODUCTION

### A. Background

Defendants bring the Motion in bad faith. Defendant, Judicial Watch, is a non-profit 501(c)(3) organization whose mission is to investigate and prosecute governmental corruption and abuse. As founder, Chairman and General Counsel of Judicial Watch, Klayman headed the organization until he voluntarily resigned to run for the United States Senate from the State of Florida in September 2003. Defendants, Thomas Fitton, Paul Orfanedes, and Christopher Farrell were the beneficiaries of Klayman's leadership and, however hotly contested, currently run Judicial Watch.[1] Defendant's recent newsletter to donors states that "Judicial Watch Finishes

[1] Klayman's stewardship of Judicial Watch was known for its non-partisanship, even suing Vice President Cheney's Energy Task Force, leading to a Supreme Court review. Under Fitton, Judicial Watch has leaned strongly pro-Bush

2006 on an Upswing" and charts that donations in 2004 were about $8 million and for 2006 were close to $10 million. A copy of an excerpt from the Judicial Watch Newsletter, Verdict, dated June 2007 is attached hereto as Exhibit "A." The Defendants' assets are believed to be in excess of this amount and Plaintiff, Larry Klayman, is an individual with greatly less resources to wage a discovery war of attrition, as is occurring here for tactical purposes.

On September 19, 2003, Klayman and Judicial Watch executed a detailed Severance Agreement. This action arises from Klayman's claims that Judicial Watch violated multiple provisions in the Severance Agreement, that Defendants misused Klayman name and/or likeness for their benefit and to Klayman's detriment, defamed and disparaged Klayman to third parties, including the media and supporters, failed to provide documentation or access to Klayman's personal property and that of his law firm, Klayman & Accosiates, P.C. ("K&A"), and severely harmed Klayman and even his minor children in other ways. On June 14, 2006, Klayman filed the Second Amended Complaint. On or about June 28, 2006, Defendants filed their Answer and Counterclaim, and on December 3, 2007 further to the Memorandum Opinion dated December 3, 2007, Defendants filed an Amended Counterclaim.

Immediately upon Klayman's separation, fearing that Klayman, who founded and whose name was synonymous with Judicial Watch, Defendants breached the Severance Agreement and continue to harass and harm Klayman, in an obvious attempt to keep him from ever competing with or even returning to the public interest group he conceived of, founded, invested in and successfully ran for nearly ten years. Prior to commencing this action, Klayman repeatedly sought access to his property and documentation regarding fraudulent expense claims and other matters, but Defendants unreasonably refused to cooperate. They even refused and failed to

---

administration and has lost its non-partisanship and "legal" punch. At his law firm, Klayman has sued the Administration for illegal wiretaps and other violations of civil liberties.

remove him as the personal guarantor of a multi-million dollar office lease, all the while claiming incredulously that Klayman was a mere employee. Instead, rather than filling the chairmanship with a lawyer of stature like former Congressman, Bob Barr, Defendants, two of which are not lawyers, seized control of Judicial Watch and embarked on a campaign of smears and lies to harm Klayman and his family, for which Klayman sought relief from the Court.

**B. <u>Defendants Bad Faith In Discovery and Procedural History</u>**

Defendants served discovery requests on or about June 13, 2007. Klayman served discovery requests on or about June 29, 2007. Counsel informally reached out by telephone on or about July 13, 2007 to advise that due to scheduling conflicts, responses were still being prepared and would be served promptly, which they were. Opposing counsel did not respond and counsel operated under the assumption that this brief extension was acceptable. Opposing counsel was aware at that time that Klayman was preparing responses and that responses would be provided as soon as possible. Klayman served responses promptly thereafter. Defendants suffered no prejudice, and in fact, there is no claim of prejudice anywhere in the Motion, nor could there be. They acquiesced in what, in effect, was an extension of time to respond.

At the same time, Defendants did not produce any documents and failed to provide any substantive responses. Instead, on October 16, 2007, to try to throw a monkey wrench into discovery, Defendants filed a Motion for Protective Order seeking, *inter alia,* to deem all discovery as confidential and virtually sealed, and sought “attorneys’ eyes only” protection to prohibit Plaintiff, Klayman, an attorney in good standing in the District of Columbia for about 28 years, from seeing any of the discovery in his case. On December 3, 2007, the Court denied in part, Defendants’ Motion for Protective Order, and entered a Protective Order to ensure that the

414627-5

"use of any information obtained during discovery in limited to the strict context of this litigation" (the "Protective Order"). *See Memorandum and Order* at Docket No. 84.

As established below, Klayman seeks discovery from Defendants in order to develop his case. Klayman is an individual, not a multi-million dollar enterprise like Judicial Watch, who was severely harmed by Defendants, a non-profit organization with an admitted $10 million in donations per annum, notwithstanding a Directors and Officers' Insurance policy which finances Defendants's litigation costs. Defendants further damaged Klayman by litigating to hide information necessary to Klayman's claims. While engaging in petty and vexatious motion practice to further harass Klayman to have him "run up the bill," they have again prejudiced Klayman. Despite entry of the Protective Order on December 3, 2007 and Klayman's demands that Defendants comply with their discovery obligations, Defendants purportedly made documents available for inspection and copying only on December 21, 2007, the eve of the Christmas/New Years holiday, after Defendants' counsel advised that his office was already closed and would not be open again until after the holiday, on December 26, 2007. *See* Email correspondence from Defendants' counsel dated December 21, 2007 attached hereto as Exhibit "B." In making inconceivably only two small boxes of documents[2] "available" for inspection at counsel's location on December 21, 2007, Defendants outrageously refused to produce any copies, and glibly advised that if Plaintiff wanted copies, counsel would have to make arrangements to pick up boxes after business hours and have copied at his own expense only after his office had closed for the holiday. This stunt is consistent with the way Defendants have

[2] The assertion that only two boxes are being made available indicates to Klayman the insufficiency of Defendants' response, particularly given Klayman's 10 year role at Judicial Watch and the issues involved in this case. However whether Defendants satisfied their discovery obligation is not only unlikely, but also unknowable until Klayman has had an opportunity to review this production, since substantive responses to discovery requests were also purportedly withheld pending the Court's disposition of the Defendants' Motion for Protective, which was denied in part. *See* Docket Number 84. To date, Klayman has received no documents while Plaintiff has produced documents to Defendants.

litigated this case. *See Id.* As a result, Klayman is prejudiced by Defendants' failures regarding their obligations in discovery as Klayman cannot proceed to develop his case, and was forced to notice depositions within the discovery deadline. Defendants are simply engaged in a one-sided abuse of court process.

The overall discovery deadline in this case is May 15, 2007. On November 26, 2007, based on the current pace of discovery, as no documents had been exchanged by Defendants, since no experts were identified by the parties and no other dates would be affected, the parties filed a Consent Motion to extend the fact discovery deadline to January 31, 2008[3], which was granted by the Court.

Defendants now engage in vexatious and petty motion practice, and in bad faith seek to prejudice Klayman by having the Court sanction their game of one-upsmanship and their fishing expedition for irrelevant discovery, simply because they ask for it. *Minebea Co. v. Papst*, 2005 U.S. Dist. LEXIS 19417 (D.D.C.)(the "mere ipse dixits of counsel will not warrant the ordering a fishing expedition"). Defendants waited four months to raise any alleged deficiency, including the incorrect claim that Klayman waived any objections. Discovery is ongoing, no trial date has been set, and while depositions have been noticed by the parties, none have thus far been taken.

## II. ARGUMENT

### A. Timeliness of Objections and Relevance

As to the timeliness of Plaintiff's objections, Klayman respectfully submits that as explained above, none are waived in this case, and assert the same generally and specifically to the argument as to each request as proffered by Defendants in the Motion.

---

3 Based on the pace of discovery and motions pending at that time, Klayman's counsel suggested consenting to March 1, 2008 as the fact discovery deadline, but Defendants have thus far declined consent beyond January 31, 2008.

In the Motion, Defendants claim that irrelevant information is discoverable. As a threshold matter, Federal Rule of Civil Procedure 26 provides in pertinent part:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is *relevant* to any party's claim or defense--including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter *relevant* to the subject matter involved in the action. *Relevant* information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence

Fed. R. Civ. P. 26(b)(1). Based on the clear language in Rule 26, relevance is a threshold matter and to the extent requests seek other than relevant information, they are objectionable. Klayman maintains his justifiable position that relevant information is responsive to the requests.

**B. Document Requests**

Klayman's arguments in opposition to each request as set forth in Defendants' Memorandum of Law are as follows:

**REQUEST NO. 1**:

This request seeks any documents reviewed or consulted in preparing responses to Defendants' Interrogatories. Klayman did not object to producing documents identified in the Answers to Interrogatories, and has produced those documents. Klayman objected to the request only, out of an abundance of caution based on Defendants conduct in this litigation to harass and harm Klayman by engaging in a fishing expedition, to the extent Defendants seek more. Therefore, the request was answered, and the Motion is gratuitous, vexatious and petty, and only intends to run up Klayman's costs in this litigation.[4]

**REQUEST NO. 2**:

[4] Notwithstanding Defendants' large war chest of funds, they are covered by a Directors and Officers' Insurance policy which is providing the defense cost of this litigation.

This request seeks all documents to support Klayman's claim that Defendants misused and/or misrepresented Klayman's name and/or likeness for fundraising activities, Klayman properly responded that relevant documents evidencing Klayman's calculation of damages will be produced.

Here, in fact, documents were produced. Klayman objected to the request only, out of an abundance of caution based on Defendants conduct in this litigation to harass and harm Klayman by running up the cost of litigation and by engaging in a fishing expedition, especially to the extent the request seeks irrelevant information.

Moreover, discovery is ongoing, no trial date has been set, and while depositions have been noticed by the parties, none have been taken. Now, Defendants are engaged in one-sided discovery, including petty and vexatious motion practice, all the while failing themselves to produce documents, that is not until the eve of Christmas and New Years holidays, although Plaintiff has seen no documents to date. Only then did opposing counsel say Plaintiff could copy their obviously insufficient "production" after their office had closed for the holiday. Information related to Defendants' conduct, which is partly the subject of Request No. 2, to the extent within the possession of Klayman, has been produced. Thus, the Motion as to this request is moot.

**REQUEST NOS. 3 and 4**:

In these requests, Defendants seek all documents relating to Klayman's damages and claim that Defendants defamed Klayman in a false light. Klayman did not object and in fact provided documents in response to these requests pursuant to the Protective Order, and is preparing additional documents for further production. Based on the clear language in Rule 26,

relevance is a threshold matter and to the extent requests seek other than relevant information, they are objectionable. Thus, the Motion as to these requests are moot.

**REQUEST NO. 5**:

In this request, Defendants seek all documents relating to the Severance Agreement. Plaintiff properly objected to this request as vague, ambiguous and overly broad, and because it seeks information protected by the attorney-client privilege and the work product doctrine. The Severance Agreement dated September 19, 2003 is central to the claims of both parties in this case, and neither party has challenged its validity or the contents of what it provides. Moreover, the parol evidence rule applies. In fact, both parties have attached the Severance Agreement itself to its pleadings. By its own terms, the Severance Agreement represents the agreement at that time between the parties. The request is vague and ambiguous because it could be read to encompasses a host of document categories including drafts, communications between the parties' and counsel, notes or other such ancillary documents. Klayman is unable to discern from the request, other than the Agreement itself, what documents it seeks. Clearly, since there is no challenge to the Agreement itself, other than the hard facts that Defendants breached it in numerous ways, documents pertaining to its formation, including privileged communications, to the extent such documents are the intent of this vague request, would not be not relevant. Therefore, the objection is proper and must be sustained.

**REQUEST NO. 6**:

In this request, Defendants seek all documents relating to Klayman's claim that Defendant, Fitton, would find a successor to Klayman as head of Judicial Watch, Klayman did not object and in fact provided documents in response to these requests pursuant to the

December 3, 2007 Protective Order, and is preparing additional documents for further production. Thus, the Motion as to this request is moot.

**REQUEST NO. 7**:

In this request, Defendants seek documents related to the calculation of money owed to "you" by Judicial Watch. Klayman did not object to this request, but pointed out that documents related to the personal expenses owed to Klayman are in the possession and custody of Defendants, and have been improperly withheld under the terms of the Severance Agreement and discovery in this case. As alleged in the Second Amended Complaint, Klayman left Judicial Watch in September, 2003, and subsequently, Judicial Watch denied Klayman access to information, including account statements, receipts and other documentation to substantiate his claim that money was owed to Klayman by Judicial Watch. Klayman served discovery requests on June 29, 2007, which included requests for documents in connection with property owned or purchased by Klayman and his law firm, Klayman & Associates, prior to the separation. Defendats claim to have made documents available only on December 21, 2007, but to date, Klayman has not yet seen any documents. Thus, documents essential and necessary to any computation of damages were not within Klayman's possession or custody. Therefore, Klayman can not, at this time, respond fully to this request, other than as stated.

**REQUEST NO. 8 and 9**:

In this request, Defendants seek all documents relating to Klayman's efforts to reclaim his property, including artwork, from Judicial Watch. Klayman did not object to this request, and in fact provided documents in response to this request pursuant to the December 3, 2007 Protective Order, and is preparing additional documents for further production. Thus, the Motion as to this request is moot.

Additionally, documents related to the Klayman's property and the property itself are "conveniently" in the possession and custody of Defendants. Klayman served discovery requests on June 29, 2007, which included requests for documents in connection with property owned or purchased by Klayman and his law firm, Klayman & Associates, prior to the separation. Defendats claim to have made documents available only on December 21, 2007, but to date, Klayman has not yet seen any documents.

Further, based on the clear language in Rule 26, relevance is a threshold matter for any discovery and to the extent requests seek other than relevant information, they are objectionable. Relevant documents are responsive to discovery requests. Klayman is hardly arrogating to himself any power to determine what is relevant and is producing documents pursuant to the December 3, 2007 Protective Order. Thus, the Motion as to this request is moot.

**REQUEST NOS. 10 and 11**:

In these requests, Defendants seek documents related to Klayman's position as guarantor of any Judicial Watch credit cards and Judicial Watch's headquarters building. Klayman did not object to this request, and in fact provided documents in response to this request pursuant to the Protective Order, and is preparing additional documents for further production. Thus, the Motion as to this request is moot.

Additionally, Klayman served discovery requests on June 29, 2007, which included requests for documents in connection with Judicial Watch's continued refusal to remove Klayman as guarantor of Judicial Watch credit cards and Judicial Watch's headquarters building. Defendants claim to have made documents available only on December 21, 2007, but Plaintiff

has not seen any documents to date.  Klayman needs these documents to assess the risks and
liabilities associated with Defendants' failure.[5]

**REQUEST NO. 12**:

In this request, Defendants seek *all communications* between Klayman and Peter F. Paul.
On its face, the request is objectionable.  The request fails to specify any time frame or scope,
and is vague because it broadly seeks communications.  Moreover, Klayman objected on the
grounds that the request seeks information subject to the attorney client privileged work product
doctrine.  From about 1999, Paul was represented by Klayman and Judicial Watch until
Klayman's separation in September 2003.  Thereafter, Paul was a client Judicial Watch until
April, 2005.  Paul was then represented by Klayman.  In the Motion, Defendants suggest that
Klayman's association with Paul is relevant to their claims of non-disparagement under the
Severance Agreement.  Defendants should not be permitted to engage in such a broad and
specious fishing expedition for all communications.

To the extent Defendants can narrow this request, Klayman will review such a request
and respond accordingly, including providing an appropriate privilege log.  Thus, the objections
to this request are proper and must be sustained.

**REQUEST NO. 13**:

In this request, Defendants seek documents relating to the approval of payment of family
health insurance coverage for Klayman and his family by Judicial Watch.  Klayman did not
object and in fact provided documents in response to these requests pursuant to the December 3,
2007 Protective Order, and is preparing additional documents for production.  Thus, the Motion

---

[5]  Demonstrative of Defendants' dishonest representations to the public and this Court, is the claim that Klayman
was a mere employee.  Does a mere employee guarantee a multi-million dollar lease and credit cards,
notwithstanding Klayman's having conceived of and founded the organization for more than 10 years?

as to this request is moot. Additionally, Klayman incorporates by reference his arguments regarding request number 8.

**REQUEST NO. 14**:

In this request, Defendants seek documents relating to Judicial Watch's obligation to reimburse Klayman pursuant to paragraph 10 of the Severance Agreement. Klayman did not object and in fact provided documents in response to these requests pursuant to the December 3, 2007 Protective Order, and is preparing additional documents for production. Thus, the Motion as to this request is moot. Additionally, Klayman incorporates by reference his arguments regarding request number 8.

**REQUEST NO. 15**:

In this request, Defendants seeks all documents relating to Klayman's repayment of Klayman & Associates, P.C.'s debt to Judicial Watch pursuant to paragraph 11 of the Severance Agreement. Klayman did not object to this request, and in fact provided documents in response to this request pursuant to the Protective Order, and is preparing additional documents for further production. Thus, the Motion as to this request is moot.

**REQUEST NOS. 16 and 17**:

In these requests, Defendants seek all documents that Klayman produced subsequent to the severance date which contains the term "Judicial Watch" and "Because No One is Above the Law!" Klayman properly objected to these requests as grossly overbroad because there is no limitation to the documents that may apply. Also, the term "produced" is undefined, and could apply to not only distributed material that may reference the term Judicial Watch, but any other internal or errant reference in any document.

To the extent Defendants can narrow this request, Klayman will review such a request and respond accordingly. Thus, the objections to these requests are proper and must be sustained.

**REQUEST NOS. 18 and 19**:

In these requests, Defendants seek *each and every* mailing that Klayman caused to enter the United States mails from or regarding "Saving Judicial Watch" and "Freedom Watch." Klayman properly objected to these requests as overbroad and burdensome. In effect, the request fails to identify any time period and is unlimited in scope as to each and every piece of addressed mail that Klayman, or third parties on Klayman's behalf, has ever caused to be sent out from or regarding "Saving Judicial Watch" and "Freedom Watch," and the "issue" of Freedom Watch is irrelevant in any event. Thus, on their face, these requests are patently burdensome and are meant to be harassing.

Defendants waited four months to claim any alleged deficiency while at the same time failing to produce even a single document themselves. Further, Defendants' claims that these records are relevant to Klayman's alleged breach of the non-competition clause of the Severance Agreement is incorrect, and underscores the vastly overbroad scope of Defendants's requests. The non-competition clause expired in September 2005, while the requests are unlimited in time.

Based on the clear language in Rule 26, relevance is a threshold matter for any discovery and to the extent requests seek other than relevant information, they are objectionable. Relevant documents are responsive to discovery requests. Klayman is hardly arrogating to himself any power to determine what is relevant and is, in fact, producing documents pursuant to the December 3, 2007 Protective Order.

Finally, to the extent Defendants can narrow this request to include only exemplars of mailings, Klayman will review such a request and respond accordingly. Thus, the objections to these requests are proper and must be sustained.

**REQUEST NO. 20:**

In this request, Defendants seek each and every press release issued by Klayman subsequent to the severance date. Klayman incorporates by reference his arguments regarding request numbers 19 and 20.

**REQUEST NO. 21**:

In this request, Defendants seek *all* documents regarding Klayman's work with RightMarch.com. Klayman incorporates by reference his arguments regarding request numbers 19 and 20. Klayman's alleged activities concerning RightMarch are irrelevant in any event.

**C. Sanctions Against Klayman Must Be Denied**

Plaintiff promptly responded to the discovery requests raised in the Motion. Defendants' position that Plaintiff waived any objections is incorrect, and unjust. Defendants are not prejudiced by Klayman's response, and indeed no such prejudice is demonstrated anywhere in the Motion. Defendants waited four months to raise any issues of alleged deficiency in Klayman's responses, including with respect to timeliness. Further, Defendants claim to have made documents available for inspection and copying only on December 21, 2007, but Plaintiff has not as yet seen any documents, and depositions have only recently been noticed. The timing of Defendants' claimed production of documents is merely another stunt to further prejudice and harass Klayman by delaying production and review of documents over the December holidays and after depositions were noticed by Klayman for the first week in January. Moreover, Defendants are further harassing Klayman by not returning the professional courtesy of copying

and sending documents, and waiting until late on December 21, 2007, the eve of the Christmas/New Years holiday, and not coincidentally as their counsel's law offices were closing, to so advise. If anyone should be sanctioned, it is Defendants for their wanton and vexatious litigation conduct.

Sanctions under Rule 37 are not applicable where the alleged non-disclosure, response or objection was substantially justified, or other circumstances make an award of expenses unjust. Fed. R. Civ. P. 37(a)(5)(A)(ii) and (iii).

Sanctions pursuant to Rule 37 are hardly warranted in this case against Klayman, and must be denied. To the contrary, Defendants obstructionist and one-sided discovery motion practice is meant to harass and improperly burden Klayman, and it is Defendants who should be sanctioned. As established below, Klayman fulfilled his discovery obligations with respect to the document requests and fully responded or properly objected to each of the requests set forth in the Motion. Klayman also made a good faith effort to address Defendants' purported concerns and supplemented his answers accordingly. Therefore, not only are sanctions against Klayman not warranted, the Motion is itself unnecessary, and meant only to increase the cost of litigation for Plaintiff, an individual without the vast resources of Defendants, in addition to the fact that defense counsel is being paid under a Directors and Officers' Insurance policy. Defendants motion, intended to run up the cost of litigation must be denied.

## III. CONCLUSION

For all the foregoing reasons, Plaintiff, Larry Klayman, respectfully submits that the Motion must be denied.

Respectfully submitted,

s// *Daniel J. Dugan*
Daniel J. Dugan, Esquire
Spector Gadon & Rosen, P.C.
1635 Market Street, 7th Floor
Philadelphia, PA 19103
Ph (215) 241-8888
Fax (215) 241-8844
*Counsel for Plaintiff Larry Klayman*

Dated: December 24, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of December 2007, a copy of the foregoing Memorandum of Points and Authorities in Opposition to Motion to Compel was served by electronic means to:

Richard Driscoll
Driscoll & Seltzer, PLLC
600 Cameron Street
Alexandria, Virginia 22314

s// *Daniel J. Dugan*____________________
Daniel J. Dugan, Esquire

Skip to comments.

# PETER PAUL AND HILLARY: No. 26 - Judicial Watch - A Watch Dog That Bites the Hands that Feed It

peterfpaul.com ^ | 11-14-05 | Peter F. Paul

Posted on 11/15/2005 9:45:09 AM PST by doug from upland

HillCAP.org

INTRO and EPISODES 1-10

11- $2,000 Returned, We Keep the 2 Mil, Meet Bill on AF One with More
12 – Hillary's Laundromat at 88 3rd Avenue, Brooklyn, NY
13 - How Is David Rosen Like Sally Field?
14 - Lying Chart of Sandler Was Like Unwelcome Visiting Relative
15 – If Rosen Didn't Do It, Who Did It?
16 – The Civil Trial Is Coming (in song)
17 - BWAHAHAHAHA! Fidel Castro Thinks Peter Is a Very, Very Bad Man
18 - Are Cher and Dianna Ross Chopped Liver?
19 - Who Else Has Joined FreeRepublic from a Brazilian Prison?
20 - Hey, Howard Wolfson, How Is It that a Mouthpiece Is Suddenly Shy?
21 - David Kendall, Why Won't You Appear in "INDICTING HILLARY"?
22 - They Paint Me As the Single Biggest Threat to Western Civilization
23 - David Kendall in L.A. Appellate Court for Oral Arguments on Friday
24 - Media Cone of Silence
25 - Need Singer and Flash Presentation for Streisand Song

==========================================================================

**NOTE: This is the 26th episode in a series of stories regarding the events surrounding Hillary Clinton's 2000 Hollywood fundraiser, and the business relationship of entrepreneur Peter Paul, the impeached William Jefferson Clinton, and Hillary Rodham Clinton, perpetrator of the largest campaign finance fraud in the history of Western civilization.**

==========================================================================

**NOTE: the following was written by Peter F. Paul and is found on his new site -- peterfpaul.com**

## Judicial Watch - A Watch Dog That Bites the Hands that Feed It

What is a whistleblower to do when he discovers that the "non-profit" law firm that represents him "in the public interest" shows an even greater disregard and contempt for the law, and ethics, than the corrupt politicians it pretends to hold accountable? When the motto "because no one is above the law" seemingly applies to everyone but the "public interest" group itself?

This 501(c)3 tax exempt educational foundation, I contend, pillages the principles it espouses in its self-description in IRS non-profit filings, that it "serves as a legal and ethical 'watchdog' over our government, legal, and judicial systems. Through its programs, [it] seeks to ensure governmental and judicial officials are acting ethically and not abusing powers entrusted to them by the American public."

Judicial Watch, founded in 1994 and, until September 2003, entirely commanded by its ethically challenged Chairman

and Chief Counsel, Larry Klayman, represented me in all aspects of my public corruption whistle blowing from March, 2001 through March 2005.

My Judicial Watch saga began in early February, 2001, immediately after my first review of Hillary Clinton's final Senate Campaign Finance Report, filed on January 30, 2001. I discovered in my online search of the FEC web site that Hillary understated the cost of her largest fundraising event, the Hollywood Gala Farewell Salute to President Clinton that I produced for her, by more than $1 million. She hid the true identity of the contributor (me) that paid that cost for her, and falsely attributed the $400,000 in-kind contribution that she alleged paid for the event as coming from my public company, Stan Lee Media. However she and her campaign had been advised by me and my company executives that I was personally paying all the expenses, and therefore making all the contributions. She also omitted reporting the expenses I paid for two other fund raising events I hosted for her which she attended in June, 2000.

I realized that by not challenging Hillary's two false reports to the FEC (filed in October, 2000 and January, 2001) in February, 2001, as I failed to do when she misrepresented my contributions to her to the Washington Post in August, 2000, I could be deemed an accomplice in her filing a false statement to a government agency (a violation of Title 18 Sec 1001 that was used to indict her finance director, and is now part of Lewis Libby's indictment) . If I did not make every effort to notify authorities of the true information that was misreported and omitted, I could be accused of participating in the Clinton orchestrated fraud on the Federal Election Commission.

It was at that moment I decided I had to become a whistle blower, I had to alert federal authorities of the role of President Clinton and newly elected Senator Clinton in a massive campaign finance fraud induced and aided by then Chairman of the Democratic National Committee, Ed Rendell (now Governor of Pennsylvania, the Honorable Ed Rendell). That decision has forever altered many lives. It led me into an outrageously exploitive relationship by Judicial Watch, based on undue influence, fraud in the inducement, misfeasance and malpractice by legal advisors and counsel Judicial Watch provided to me.

I flew to Miami from my home in Sao Paulo, Brazil in early March, 2001, to meet with Larry Klayman and the Klayman appointed President of Judicial Watch, Tom Fitton, to explore their possible "global" representation of my imminent whistle blowing activities. I had settled on Judicial Watch based on my internet search for legal groups that had gone up against the Clintons. I was convinced that any major Washington firm would be compromised by conflicting agendas and pressures that would sabotage my representation. A small firm would be no match against the seasoned Clinton legal team that had years of experience in manipulating the legal system and the media to protect the Clintons. Judicial Watch had seemingly demonstrated it was relentless in pursuing the Clintons and appeared to have the dedication to follow through on my claims.

When Klayman and Fitton vetted my reams of hard evidence of Clinton and DNC misconduct in funding and reporting on Hillary's Senate campaign as well as Al Gore's campaign, their reaction was, like the Yukon gold miners of old, they had finally hit the Clinton mother lode of damning evidence that at last linked both Clintons personally to criminal and ethical misconduct in getting Hillary elected to the Senate.

It was particularly ironic that my first meeting with the Judicial Watch team of Klayman, Fitton and investigator Chris Farrell, was in their " virtual office" in the Bank of America Tower that was my legacy to my home town, Miami. The 65 story lighted sculpture that became a landmark of the Miami nighttime skyline, designed by the world famous architect I.M.Pei under my employ, and at my direction in 1978. It was intended to be the Miami World Trade Center. I had obtained the air rights from the Mayor of Miami to build the tower over the city's conference center. I obtained the WTC franchise for Miami from New York World Trade Center and World Trade Centers Association founder and President Guy Tozzoli (who became my mentor in the late 1970s, in marketing World Trade Centers throughout South America).

Before deciding to risk the safety and security of my family, as well as myself, by relying on the resources, skills and good faith of a small non profit legal foundation, I wanted to be assured and reassured by Klayman that when the going got tough, which was as predictable as the Clintons lying about what I did for Hillary's campaign, I would have my own constituency to stand behind me and support my family if I was incapacitated in the whistle blowing process.

No matter what slings and arrows would be directed at me by the Clintons and others, I sought assurance that I would have my own army of supporters that would give me a fighting chance to prevail over the legions of Clintonistas that

would be arrayed against me.

Seeking to assure me and close the deal with me, Klayman materially misrepresented the level of support he truly had obtained and falsely indicated the personal support of key religious leaders and their constituencies. Prior to finally signing Judicial Watch's representation agreement, which legally enabled Klayman to control all legal and media issues relating to my cases, Klayman repeatedly made the assurances I asked for. He swore that he consulted with Dr. James Dobson and Rev. Jerry Falwell on more than one occasion and that they personally promised him they would enlist their constituencies and good offices to back me up and protect my family.

He gave me his word as a "gentleman" that if I decided to proceed down the path we discussed, of complete exposure of the misconduct of the Clintons and leadership of the Democratic Party, we would absolutely and unequivocally have our own legion of supporters, led by the most respected religious leaders in the nation. I finally acquiesced, against my better judgment, after being further suckered by the self professed religiousness of Klayman and his merry men, and signed away my fate and that of my family, to a band of Philistines more insidious tahn any described in the Bible.

Klayman's various assurances to me turned out to be as deceptive as the statements he made in his fundraising solicitations to 500,000 potential donors - that he had associated the House Impeachment Manager Dave Schippers to help lead my defense team. In a letter I just obtained directly from Dr. James Dobson, dated September 23, 2005, Dr. Dobson stated that Klayman's inducements and assurances to me were false. Klayman had copied Dr Dobson and Rev Falwell on various letters he sent to Atty Gen Ashcroft and others on my behalf, in order to show me of their support and involvement.

Dobson described his involvement in supporting my whistleblowing as follows, " It is true that Larry Klayman spoke with me concerning your lawsuit, and that, as a favor to Larry, I passed along a letter he wrote on your behalf to Attorney General Ashcroft. However, I did not, at any time, give assurances to Mr Klayman that Focus on the Family would involve itself in the lawsuit in any way. I merely expressed a personal interest in following the progress of the case." This was Dr. Dobson's explanation of why Klayman compromised my lawyer-client privilege in confidential communications with the Justice Department by copying Dr. Dobson, who is not an attorney.

Klayman, commencing on March 20, 2001, served as my Chief Legal Counsel in representing me in negotiations and proffers with Attorney General Ashcroft, Assistant Attorney General Chertoff and his staff, Noel Hillman, Chief of the Office of Public Integrity, William Johnson, Investigator with the Office of the Inspector General, and in defending criminal charges filed against me in the Eastern District of New York three months after I began officially presenting allegations against the Clintons.

Klayman's legal advice that I await, in Brazil, written assurances from Assistant Attorney General Michael Chertoff's office, that Chertoff would supervise what Klayman described as a political prosecution of me by "a political hack" US Attorney in New York, resulted in my delaying my voluntary return to the US and my subsequent arrest in Brazil for extradition on the very day that the awaited letter was delivered by Chertoff to Klayman in Washington.

Klayman's inability to reasonably negotiate my voluntary return from Brazil, and his contentiousness with the Justice Department authorities I was cooperating with, ensured that I remained in Brazil unnecessarily for two years while being subjected to the vindictive use of the Brazilian extradition process by the Justice Department authorities Klayman antagonized.

In September, 2003, around the time I was finally returned to New York from Brazil by U.S. federal agents, Klayman was dismissed from Judicial Watch, like a thief in the night, by the very yes men he installed to rubberstamp his every whim. His loyal minions discovered major unanswered questions about Klayman's personal use of thousands of the millions in donated funds that were received from thousands of donors.
JUDICIAL WATCH FORM 990

Seemingly, for their own protection, they forced their founder and leader to quietly disppear from the tax exempt trough that he created to fatten them all. So unheralded was Klayman's departure from Judicial Watch in September, 2003, that until 2005 most people I have encountered were not aware that Klayman had in fact departed. Klayman never notified me that he withdrew as my counsel when he left Judicial Watch in September, 2003. To this date, my former Chief Counsel has never advised me that he no longer represents me. He literally abandoned the representation

of his client with no notice whatsoever.

In October, 2003 Judicial Watch pawned off on me a California tax lawyer, Robert Sticht, with no criminal defense trial experience in New York Federal Courts, to lead my defense team and supervise the securities fraud case in the Eastern District of New York. Sticht broke the promise he made to convince me that he should replace Klayman in directing my global representation, that he would associate and supervisel experienced New York federal criminal defense trial counsel for court appearances. When the original local counsel that he did retain left private practice to join the SEC, Sticht refused to replace him. He decided on his own that he would personally argue my case in the New York courtroom, and there was no discussion

Sticht quicly reveled in aggravating the presiding Federal Judge, until he was almost held in contempt, on more than one occasion. Sticht explained to me that his strategy of exasperating the Judge would enrage the Judge to act prejudicially to me and wouldthereby ensure our victory "on appeal". It was irrelevant to him or Judicial Watch, that his strategy ensured that the judge would deny every request for bail that I made, keeping me in custody indefinitely as the trial kept being postponed.

His exasperating court room behavior caused the Judge to finally take the extraordinary step of appointing a private lawyer to advise me that Sticht's handling of my defense, at Judicial Watch's behest and direction, represented a conflict of interest so prejudicial to my defense that it warranted replacing Sticht as my counsel. In other words, the Judge advised me that my counsel was working against my best interests!

Finally, after an extraordinary 43 months of pre trial detention on one count of violating SEC Regulation 10(b)5, with no bail and no speedy trial allowed by the court, I was bailed from custody by new lawyers I personally retained, separate from Mr Sticht, with no help from Judicial Watch, and over their objection. I accepted the message that the judge had given me and retained a former assistant US Attorney who had just retired from the Eastern District of New York.

When I was finally free on bail to witness/supervise Judicial Watch's actions in my representation and fund raising, Judicial Watch demanded I renegotiate their April, 2001, representation contract with me. Judicial Watch unethically demanded I sign a general release for anything and everything they might have done that constituted malpractice, misfeasance and malfeasance during the four years they represented me. While I was under this duress resulting from their intentional and negligent legal misrepresentation, they audaciously conditioned their continuing representation in Paul v. Clinton et al, on my signing a release for the actions of Klayman, and various lawyers they hired to represent me.

Judicial Watch then held hostage the millions of dollars they raised from hundreds of thousands of donors anxious to support my efforts to hold the Clintons accountable. When I refused to do what I was not legally bound to do- forego any and every legal right and remedy I had - they withdrew from my civil cases and converted to their own benefit the multi million dollar defense fund they had collected through FIVE MILLION direct mail solicitations over four years. They violated not only the legal canons of ethics dealing with representation of clients, but also their fiduciary duties to the unwitting thousands of donors who contributed in good faith to support my historic suit against the Clintons.

Judicial Watch effectively took the money entrusted to them to hold the Clintons accountable through my civil suit, and they diverted it to their other activities and to pay their quarter million dollar salaries. They left me high and dry in the middle of the multi million dollar litigation they contractually promised me they would pay for. They left me with the task of proceeding alone against the Clinton defense team, with no significant resources to fund the multi million dollar expenses and fees necessary to conduct discovery and proceed to trial as the California Supreme Court ordered I could.

Judicial Watch self servingly placed into jeopardy the years of suffering my family and I endured while overcoming the numerous Clinton appeals to throw my case out. They left me with no resources, no representation, jeopardizing my ability to prosecute the first ever suit against a President and a Senator for business fraud and coercion. Their espoused principles, their fiduciary duties, their legal responsibility to their client all went out the window when they were faced with possible accountability for the questionable actions that prejudiced their own client.

What were they so afraid of? If they had done no wrong, committed no injury, then why issue an ultimatum that their star client sign a release of their non-existant liability? Why jeopardize the common goal that they had worked on since

their representation began in April, 2001?

This week, to add insult to injury, after abandoning my litigation in the middle and keeping the millions they collected to fund that litigation to conclusion, they have decided to continue a course of conduct in deceptive fundraising that I have protested to various state's attorney generals. They have ignored my specific demand that they cease and desist from using my name in any further fundraising materials. Judicial Watch has just mailed hundreds of thousands of solicitations referring to me by name as their 'former client' —without explaining why I am their "former" client and what they have done with the money entrusted to them for my litigation.

This isn't their first unauthorized use of names in fundraising letter. Another, more egregious example is when in October - November, 2001, Judicial Watch sent more than 400,000 letters out to donors stating that they had associated the famous Chicago prosecutor Dave Schippers, who led the House Impeachment Team against President Clinton to lead my defense team in representing me with the Justice Department. Mr Schippers recently confirmed to me in the summer of 2005, in various phone conversations and on video tape, that not only had his name been used by Judicial Watch in its fund raising letters without his knowledge and consent, but after he specifically advised Klayman that his name could not be used publicly in association with my case, even though he personally supported my efforts.

If any other 501 (c) 3 tax exempt foundation had misrepresented a relationship with one of the most respected lawyers in the nation, for the purpose of inducing donors to make contributions urgently required to subsidize that relationship, and had used the name of that noted lawyer without his knowledge, consent and against his specific instructions, for that purpose, they would probably lose their 501 (c) 3 status and face criminal prosecution for mail fraud. However Judicial Watch, like the politicians it unsuccessfully prosecutes, seems to be above the law that applies to the rest of us.

These modern day Philistines relied on religion, political and moral conviction, tax free status and a litigation factory they controlled to deceive those whom they could exploit for their personal aggrandizement and material benefit. What Judicial Watch did to me and my family, as trusted counsel and fiduciaries, betrayed a special trust that resulted in injuries to my family that can never be repaired. they intentionally violated a trust and inflicted hardships and distress on women and children that even the Clintons had not done.

The history of how Judicial Watch has abused their tax exempt status and the use of fund raising technologies to generate multi millions of dollars a year for their coffers, is a subject I will address in upcoming lawsuits and complaints to regulatory agencies and the Bars of several states. Until then, Judicial Watch will continue to operate "far above the law".

I am hopeful that they will not be able to continue to use my whistle blowing, and my name, to hoodwink past and new donors that truly care about the success of my efforts to hold Hillary Clinton accountable for the frauds that ensured her election to the US Senate.

---

**TOPICS:** Crime/Corruption; Culture/Society; Government; News/Current Events; Politics/Elections
**KEYWORDS:** CLINTON; FINANCEFRAUD; HILLARY; HILLARYSCANDALS; JUDICIALWATCH; KLAYMAN; LARRYKLAYMAN; PAUL; WHISTLEBLOWER

---

**1** posted on **11/15/2005 9:45:15 AM PST** by **doug from upland**
[ **Post Reply** | **Private Reply** | **View Replies** ]

---

To: **doug from upland**

This isn't news if it's not on CNN, etc. The Clintons can do untold numerous crimes without them being reported. The tree falls in the forest but nobody hears it.

**2** posted on **11/15/2005 9:52:00 AM PST** by **mallardx**
[ **Post Reply** | **Private Reply** | **To 1** | **View Replies** ]

---

To: **All**

# Paul v Hilllary R. Clinton et al: Holding Hillary Clinton Accountable Under Oath For the Fraud That Elected her to the US Senate.

« Origins Of Hillary Clinton's Whistleblower | Main | Why Not a Special Prosecutor for Hillary Campaign Fraud Affair? »

## Judicial Watch - A Watch Dog That Bites the Hands that Feed It

What is a whistleblower to do when he discovers that the "non-profit" law firm that represents him "in the public interest" shows an even greater disregard and contempt for the law, and ethics, than the corrupt politicians it pretends to hold accountable? When the motto "because no one is above the law" seemingly applies to everyone but the "public interest" group itself?

This 501(c)3 tax exempt educational foundation, I contend, pillages the principles it espouses in its self-description in IRS non-profit filings, that it "serves as a legal and ethical 'watchdog' over our government, legal, and judicial systems. Through its programs, [it] seeks to ensure governmental and judicial officials are acting ethically and not abusing powers entrusted to them by the American public."

Judicial Watch, founded in 1994, commanded by its ethically challenged President and legal staff, represented me in all aspects of my public corruption whistle blowing from March, 2001 through March 2005.

My Judicial Watch saga began in early February, 2001, immediately after my first review of Hillary Clinton's final Senate Campaign Finance Report, filed on January 30, 2001. I discovered in my online search of the FEC web site that Hillary understated the cost of her largest fundraising event, the Hollywood Gala Farewell Salute to President Clinton that I produced for her, by more than $1 million, and failed to report my contributions to two other fundraisers I hosted and underwrote for her in June, 2000. She hid the true identity of the contributor (me) that paid that costs of these events for her, and falsely attributed a $400,000 in-kind contribution that she alleged paid for one event to my public company, Stan Lee Media. However she and her campaign had been advised by me and company executives that I was personally paying all the expenses, and therefore making all the contributions.

I realized that by not challenging Hillary's two false reports to the FEC (filed in October, 2000 and January, 2001) in February, 2001, as I failed to do when she misrepresented my contributions to her to the Washington Post in August, 2000, I could be deemed an accomplice in her filing false statements to a government agency (a violation of Title 18 Sec 1001 that was used to indict her finance director, and is now part of Lewis Libby's indictment) . If I did not make every effort to notify authorities of the true information that was misreported and omitted, I could be accused of participating in the Clinton orchestrated frauds on the Federal Election Commission.

It was at that moment I decided I had to become a whistle blower, I had to alert federal authorities of the role of President Clinton and newly elected Senator Clinton in a massive campaign finance fraud induced and aided by then Chairman of the Democratic National Committee, Ed Rendell (now Governor of Pennsylvania, the Honorable Ed Rendell). That decision has forever altered many lives. It led me into an outrageously exploitive relationship by Judicial Watch, based on undue influence, fraud in the inducement, misfeasance and malpractice by legal advisors and counsel Judicial Watch provided to me.

I flew to Miami from my home in Sao Paulo, Brazil in early March, 2001, to meet with Larry Klayman and the President of Judicial Watch, Tom Fitton, to explore their possible "global" representation of my imminent whistle blowing activities. I had settled on Judicial Watch based on my internet search for legal groups that had gone up against the Clintons. I was convinced that any major Washington firm would be compromised by conflicting agendas and pressures that would sabotage my representation. A small firm would be no match against the seasoned Clinton legal team that had years of experience in manipulating the legal system and the media to protect the Clintons. Judicial Watch had seemingly demonstrated it was relentless in pursuing the Clintons and appeared to have the dedication to follow through on my claims.

When Fitton et al vetted my reams of hard evidence of Clinton and DNC misconduct in funding and reporting on Hillary's Senate campaign as well as Al Gore's campaign, their reaction was, like the Yukon gold miners of old, they had finally hit the Clinton mother lode of damning evidence that at last linked both Clintons personally to criminal and ethical misconduct in getting Hillary elected to the Senate.

It was particularly ironic that my first meeting with the Judicial Watch team led by Tom Fitton, was in their "virtual office" in the Bank of America Tower that was my legacy to my home town, Miami. The 65 story lighted sculpture that became a landmark of the Miami nighttime skyline, designed by the world famous architect I.M.Pei under my employ, and at my direction in 1978. It was intended to be the Miami World Trade Center. I had obtained the air rights from the Mayor of Miami to build the tower over the city's conference center. I obtained the WTC franchise for Miami from New York World Trade Center and World Trade Centers Association founder and President Guy Tozzoli (who became my mentor in the late 1970s, in marketing World Trade Centers throughout South America).

Before deciding to risk the safety and security of my family, as well as myself, by relying on the resources, skills and good faith of a small non profit legal foundation, I wanted to be assured and reassured that when the going got tough, which was as predictable as the Clintons lying about what I did for Hillary's campaign, I would have my own constituency to stand behind me and support my family if I was incapacitated in the whistle blowing process.

No matter what slings and arrows would be directed at me by the Clintons and others, I sought assurance that I would have my own army of supporters that would give me a fighting chance to prevail over the legions of Clintonistas that would be arrayed against me.

Seeking to assure me and close the deal with me, I was assured and reassured of the personal support of my case and my family by key religious leaders and their constituencies. Prior to finally signing Judicial Watch's representation agreement, which legally enabled Judicial Watch to control all legal and media issues relating to my cases, I was categorically assured that Dr. James Dobson and Rev. Jerry Falwell personally promised him they would enlist their constituencies and good offices to back me up and protect my family.

I was promised that if I decided to proceed down the path discussed with Judicial Watch, of complete exposure of the misconduct of the Clintons and leadership of the Democratic Party, we would absolutely and unequivocally have our own legion of supporters, led by the most respected religious leaders in the Nation. I finally acquiesced, against my better judgment, and signed away my fate and that of my family, to what I would painfully learn was a band of Philistines more insidious than any described in the Bible.

The various assurances made to me turned out to be as deceptive as the statements made in Judicial Watch's fundraising solicitations to 500,000 potential donors - that Judicial Watch had associated the House Impeachment Manager Dave Schippers to help lead my defense team. In a letter I just obtained directly from Dr. James Dobson, dated September 23, 2005, Dr. Dobson stated that the inducements and assurances to me regarding the support of Focus on the family, and him personally, were in fact false. Dr Dobson and Rev Falwell had been copied on various letters Judicial Watch sent to Atty Gen Ashcroft and other attorneys in Main Justice on my behalf, in order to convince me and the officials at the Justice Department of the non existent support of these religious leaders and their constituencies.

Dobson described his involvement in supporting my whistleblowing as follows, " It is true that [Judicial Watch] spoke with me concerning your lawsuit, and that, as a favor to [them], I passed along a letter [they] wrote on your behalf to Attorney General Ashcroft. However, I did not, at any time, give assurances to [Judicial Watch] that Focus on the Family would involve itself in the lawsuit in any way. I merely expressed a personal interest in following the progress of the case." This was Dr. Dobson's explanation of why Judicial Watch compromised my lawyer-client privilege in confidential communications with the Justice Department by copying Dr. Dobson, who is not an attorney.

Commencing on March 20, 2001, Judicial Watch attorneys represented me in negotiations and proffers with Attorney General Ashcroft, Assistant Attorney General Chertoff and his staff, Noel Hillman, Chief of the Office of Public Integrity, William Johnson, Investigator with the Office of the Inspector General, and in defending criminal charges filed against me in the Eastern District of New York three months after I began officially presenting allegations against the Clintons.

Judiical Watch's legal advice that I await, in Brazil, written assurances from Assistant Attorney General Michael

Chertoff's office, that Chertoff would supervise what Judicial Watch described as a political prosecution of me by "a political hack" US Attorney in New York, resulted in my delaying my voluntary return to the US and my subsequent arrest in Brazil for extradition on the very day that the awaited letter was delivered by Chertoff to Klayman in Washington.

Judicial Watch's inability to reasonably negotiate my voluntary return from Brazil, and their contentiousness with the Justice Department authorities I was cooperating with, ensured that I remained in Brazil unnecessarily for two years while being subjected to the vindictive use of the Brazilian extradition process by the Justice Department authorities antagonized in various ways by Judicial Watch.

In the middle of delicate negotiations with the Justice Department to allow me to return voluntarily to New York after I was detained for extradition in Brazil, I had to personally restrain the Judicial Watch's lawyer from physically attacking the Assistant US Attorney who flew to Brazil to interview me. During the second day of my interview by the three representatives sent by Assistant Attorney General Chertoff to meet with me in my Brazilian jail cell, my counsel yelled he would "Eat [the Asst US Attorney's] balls for lunch" as he lunged over the interview table to grab the Assistant US Attorney from New York by his throat. I learned three years later from a lawyer based in Washington, that this incident was still being discussed at cocktail parties by Washington legal insiders.

In September, 2003, around the time I was finally returned to New York from Brazil by U.S. federal agents, Judicial Watch forced its Chairman, Founder and Chief Counsel out of the organization. The promises he made regarding how my representation would be provided in my defense of my criminal charges, upon which I relied to associate Judicial Watch in the first place, were promptly ignored and forgotten along with his former involvement with the organization he created.

In October, 2003 Judicial Watch pawned off on me a California tax lawyer, Robert Sticht, with no criminal defense trial experience in New York Federal Courts, to lead my defense team and supervise the securities fraud case in the Eastern District of New York. Sticht broke the promise he himself made to convince me that he should direct the global representation being provided me by Judicial Watch under written agreement from April, 2001. He promised that in exchange for me agreeing to his masterminding my cases he would associate and supervise experienced New York federal criminal defense trial counsel for court all appearances. When the original local counsel that he did initially retain left private practice to join the SEC, without any notice to me whatsoever, Sticht refused to replace him. He decided on his own that he would personally argue my case in all hearings in the New York courtroom, and he would hear no discussion on the matter. The wishes of his client were subservient to the agendas of Judicial Watch seemingly to keep me in custody as long as possible to ensure total control over me and the fundraising being done about me.

Sticht quickly reveled in aggravating the presiding Federal Judge, until he was almost held in contempt by the Judge, on more than one occasion. Sticht explained to me that his strategy of exasperating the Judge would enrage the Judge to act prejudicially to me and would thereby ensure our victory "on appeal". It was irrelevant to him or Judicial Watch, that his strategy ensured that the judge would deny every request for bail that I made, keeping me in custody indefinitely as the trial kept being postponed.

His exasperating court room behavior caused the Judge to finally take the extraordinary step of appointing a private lawyer to advise me that Sticht's handling of my defense, at Judicial Watch's behest and direction, represented a conflict of interest so prejudicial to my defense that it warranted replacing Sticht as my counsel. In other words, the Judge advised me that my counsel was working against my best interests!

Finally, after an extraordinary 43 months of pre trial detention on one count of violating SEC Regulation 10(b)5, with no bail and no speedy trial allowed by the court, I finally obtained a $1.2 million secured bail from custody by new lawyers I personally retained, separate from Mr Sticht, with no help from Judicial Watch, and over their objection. I accepted the message that the judge had given me and retained a former assistant US Attorney who had just retired from the Eastern District of New York.

When I was finally free on bail to witness/supervise Judicial Watch's actions in my representation and fund raising, Judicial Watch demanded I renegotiate their April, 2001, representation contract with me. Judicial Watch unethically demanded I sign a general release for anything and everything they might have done that constituted malpractice,

misfeasance and malfeasance during the four years they represented me. While I was under the duress resulting from their intentional and negligent legal misrepresentation, they audaciously conditioned their continuing representation in Paul v. Clinton et al, and final payment of my criminal attorneys who had liberated me from custody, on my signing a release for the actions of the various lawyers they hired to represent me.

Judicial Watch breached their representation agreement with me with impunity because they believe that Judicial Watch is Above the Law! Their publicly financed litigation mill does in fact intimidate almost every lawyer who thinks about challenging them, confirming that they abuse the legal system as much or more egregiously than the Clintons whom they have been chasing unsuccessfully for over a decade! My difficulties in finding counsel to challenge their clear violations of their contract and their ethical duties to their client attests to this fact.

Judicial Watch then held hostage the millions of dollars they raised from hundreds of thousands of donors anxious to support my efforts to hold the Clintons accountable. When I refused to do what I was not legally bound to do- forego any and every legal right and remedy I had - they withdrew from my civil cases and converted to their own benefit the multi million dollar defense fund they had collected through FIVE MILLION direct mail solicitations over four years. They violated not only the legal canons of ethics dealing with representation of clients, but also their fiduciary duties to the unwitting thousands of donors who contributed in good faith to support my historic suit against the Clintons.

Judicial Watch effectively took the money entrusted to them to hold the Clintons accountable through my civil suit, and they diverted it to their other activities and to pay their quarter million dollar salaries. They left me high and dry in the middle of the multi million dollar litigation they contractually promised me they would pay for. They left me with the task of proceeding alone against the Clinton defense team, with no significant resources to fund the multi million dollar expenses and fees necessary to conduct discovery and proceed to trial as the California Supreme Court ordered I could.

Judicial Watch self servingly placed into jeopardy the years of suffering my family and I endured while overcoming the numerous Clinton appeals to throw my case out. They left me with no resources, no representation, jeopardizing my ability to prosecute the first ever suit against a President and a Senator for business fraud and coercion. Their espoused principles, their fiduciary duties, their legal responsibility to their client all went out the window when they were faced with possible accountability for the questionable actions that prejudiced their own client.

What were they so afraid of? If they had done no wrong, committed no injury, then why issue an ultimatum that their star client sign a release of their non-existant liability? Why jeopardize the common goal that they had worked on since their representation began in April, 2001?

This week, to add insult to injury, after abandoning my litigation in the middle and keeping the millions they collected to fund that litigation to conclusion, they have decided to continue a course of conduct in deceptive fundraising that I have protested to various state's attorney generals. They have ignored my specific demand that they cease and desist from using my name in any further fundraising materials. Judicial Watch has just mailed hundreds of thousands of solicitations referring to me by name as their 'former client' —without explaining why I am their "former" client and what they have done with the money entrusted to them for my litigation.

This isn't their first unauthorized use of names in fundraising letter. Another, more egregious example is when in October - November, 2001, Judicial Watch sent more than 400,000 letters out to donors stating that they had associated the famous Chicago prosecutor Dave Schippers, who led the House Impeachment Team against President Clinton to lead my defense team in representing me with the Justice Department. Mr Schippers recently confirmed to me in the summer of 2005, in various phone conversations and on video tape, that not only had his name been used by Judicial Watch in its fund raising letters without his knowledge and consent, but after he specifically advised Klayman that his name could not be used publicly in association with my case, even though he personally supported my efforts.

If any other 501 (c) 3 tax exempt foundation had misrepresented a relationship with one of the most respected lawyers in the nation, for the purpose of inducing donors to make contributions urgently required to subsidize that relationship, and had used the name of that noted lawyer without his knowledge, consent and against his specific instructions, for that purpose, they would probably lose their 501 (c) 3 status and face criminal prosecution for mail fraud. However Judicial Watch, like the politicians it unsuccessfully prosecutes, seems to be above the law that applies to the rest of us.

These modern day Philistines relied on religion, political and moral conviction, tax free status and a litigation factory they controlled to deceive those whom they could exploit for their personal aggrandizement and material benefit. What Judicial Watch did to me and my family, as trusted counsel and fiduciaries, betrayed a special trust that resulted in injuries to my family that can never be repaired. they intentionally violated a trust and inflicted hardships and distress on women and children that even the Clintons had not done.

The history of how Judicial Watch has abused their tax exempt status and the use of fund raising technologies to generate multi millions of dollars a year for their coffers, is a subject I will address in upcoming lawsuits and complaints to regulatory agencies and the Bars of several states. Until then, Judicial Watch will continue to operate "far above the law".

I am hopeful that they will not be able to continue to use my whistle blowing, and my name, to hoodwink past and new donors that truly care about the success of my efforts to hold Hillary Clintonaccountable for the frauds that ensured her election to the US Senate.

Posted by Peter Paul on November 14, 2005 09:55 PM | Permalink

**From:** Colette Wilson [dcolettewilson@earthlink.net]
**Sent:** Friday, February 15, 2008 3:30 PM
**To:** Richard Driscoll
**Subject:** RE: Paul v. Clinton; Paul v. Judicial Watch, et al.

Mr. Driscoll:

This email will serve to memorialize the terms of Mr. Paul's proposal to Judicial Watch, as I relayed them to you in our phone call today.

- Mr. Paul will drop his lawsuit against Judicial Watch now, before both sides invest substantial money in discovery and trial preparation. No depositions, no discovery -- no need for Judicial Watch to have to explain what happened between itself and its star client, Peter Paul.
- Mr. Paul will stop his negative publicity campaign against Judicial Watch regarding his malpractice claim and contract breach.
- Mr. Paul will make a public statement that he and Judicial Watch have set aside their differences and will work together to hold Hillary Clinton accountable.
- Rod Martin, of TheVanguard.Org, who has been traveling around the country, meeting with high-dollar conservatives in order to raise money for the Paul v. Clinton case, is willing to work as a go-between, publicly supporting and applauding both Mr. Paul and Judicial Watch in their willingness to work together. Rod would effectively become an ambassador of good will on Judicial Watch's behalf while he's meeting with conservatives, drumming up support for launching TheVanguard.Org.
- Mr. Paul will cooperate with Judicial Watch against Larry Klayman in regard to Klayman's lawsuit.
- Mr. Paul will allow Judicial Watch to once again use the case for its own fundraising and publicity.
- Mr. Paul will permit Judicial Watch to have a special version of the "Hillary Uncensored" documentary created for its use and benefit, with footage of Tom Fitton being interviewed about Judicial Watch's role in bringing about this historic case against the Clintons.
- Judicial Watch will put up $500,000 immediately to pay a retainer fee to attorney Martin Garbus to serve as lead counsel in the Paul v. Clinton case and take it to trial. Mr. Garbus has already made a commitment to take on the case, if given the money. He estimates it will cost $2 million to take the case to trial.
- Judicial Watch will also make a commitment to put another $500,000 into the Paul v. Clinton litigation, or $1 million altogether. (Rod Martin is endeavoring to raise the rest.) Martin Garbus is reputed to be one of the top ten litigators in the country. He has better credentials than David Kendall. Several advantages to using Garbus: (1) absolutely a "must have" in order to have a realistic shot at getting this case to the jury and winning at trial, given the opposition; (2) a fundraising bonanza, since the involvement of a lawyer with Garbus's fame and expertise will likely generate more in donations than the cost of hiring him; (3) Garbus is anything but a conservative and hasn't made a career of pursuing conservative causes, let alone of suing the Clintons. This lends a credibility to the case that money can't buy. Garbus would not have committed to taking on the case if he didn't think he could win it. What is that association worth to Judicial Watch? What would it mean to Judicial Watch to actually win this case against the Clintons? Hillary's dismissal from the case is meaningless if Garbus can pull off a win against Bill Clinton. Even short of that, what would it mean to have a lawyer of Garbus's ability depose Hillary and later grill her on the witness stand at a public trial?
- Judicial Watch pays $250,000 to Peter Paul for damages in settling his lawsuit against Judicial Watch, which can be publicly characterized as an investment in the documentary or some other payment that won't concede liability.
- Judicial Watch pays $150,000 for a criminal attorney to represent Mr. Paul in withdrawing his guilty plea in the securities fraud case in New York and take the case to trial.
- Colette Wilson (that's me) will serve as local counsel. My involvement is essential because of my intense work on the case for the past two years. (As I mentioned, Gary Kreep has been discharged as counsel of record, and the United States Justice Foundation is therefore out of the case.) Mr. Paul also requires that Judicial Watch's in-house counsel not serve as counsel of record or otherwise make decisions regarding litigation strategy.

Obviously, there are numerous details to be worked out, but that is the offer.

Thank you for conveying this proposal to your clients.

Sincerely,

Colette Wilson

*Urgent memorandum from* **Larry Klayman, Esq.**

April 30, 2007

Re: Peter Paul joins me in taking on Tom Fitton and Saving Judicial Watch

Dear [redacted]:

As the founder of Judicial Watch I could not stand by and let it fall victim to the ethical abuses of its current president, Tom Fitton.

That's why, after a period of reflection and after I tried for three years to settle matters with him and his ethically challenged co-directors Paul Organedes and Christopher Farrell (the current Judicial Watch has only three directors and they are all also employed by the group), last May I had no choice but to bring suit to save the baby I had created.

[redacted] in the period after I left Judicial Watch to run for the U.S. Senate from Florida, and its aftermath, Fitton and company had:

- misrepresented that it had bought a building from donor funds,
- squandered and misused other donor monies,
- failed to aggressively pursue the cases I had left it to prosecute against the Clintons and other corrupt politicians and judges,
- and turned the organization into little more than a website that boasts about the appeals it is forced to take after it loses most of its cases.

To top this off, in the years since I left, Fitton has laid off most of the executive staff I had hired -- who were loyal to me and you -- and shut down nearly all of Judicial Watch's

(over, please. . .)

nationally syndicated television and radio shows.

So it's clear to me that Fitton and the other directors are, unless stopped, content to continue their ego driven road show until the money runs dry.

In short, Judicial Watch -- so critical to fighting criminals like the Clintons -- is in jeopardy of dying unless I reassume control and reassert adult leadership that actually fights for honest government rather than merely engaging in empty public relations gimmicks.

Now, the tide of battle has turned.

Because just recently, in a 48 page opinion the U.S. District Court for the District of Columbia ruled that I may regain control of Judicial Watch and fire Fitton and his comrades should I be successful in my lawsuit.

And thanks in part to you, a faithful partner of mine who has supported this lawsuit to save Judicial Watch, the court upheld my complaint, by denying Fitton's motion to dismiss! We could not have come this far without your generous financial help!

What's now happened is, that in addition to my lawsuit, others have had to take legal action against Fitton and his comrades.

For example, Louise Benson, a major donor who was ripped off by Fitton by being induced to make donations to buy the building Judicial Watch occupies, has filed a complaint for fraud and other unlawful fundraising acts in the Superior Court for the District of Columbia.

What's more, Sandra Cobas, former director of Judicial Watch's Southern Regional Office in Miami, has filed suit for defamation. Because she was smeared by Fitton over her Latin heritage. And she was falsely called a drug addict, trying to get her to leave Judicial Watch -- just because she was loyal to me.

And since Cobas was forced to leave, the directors of Judicial Watch's other regional offices in Los Angeles, Chicago, and Dallas were also let go or fired -- merely because they were loyal to me.

You see, Fitton, a cocky, self-aggrandizing and albeit

(go on to next page, please. . .)

dishonest kid who doesn't have a clue how to run Judicial Watch, feared someday I might return.

Ironically, he was right! Much like General Charles DeGaulle in World War II, I must return to liberate Judicial Watch from the hands of megalomaniacs who have hijacked the once great organization.

As you likely know, when I left Judicial Watch, Fitton and his comrades promised to fill my position as Chairman, but instead kept control for their own ends and never filled this position with an experienced lawyer who could lead the group.

But now, an even more potent lawsuit has been filed against Fitton and his co-director Paul Orfanedes.

Peter Paul has sued Fitton and company over fraudulent fundraising practices. Peter Paul was the most important of all Judicial Watch clients -- since he has the "goods" on Hillary Clinton, who aspires to be our next President!

In his complaint, Peter Paul alleges that Fitton engaged in the unauthorized practice of law, breached client fiduciary duties, abandoned his interests, stole copyrights and engaged in malpractice generally.

You can view Peter Paul's complaint, along with my own, at www.savingjudicialwatch.com.

Quite frankly, it reads like a criminal indictment.

Paul was conned into donating over $2 million to the 2000 Senate campaign of Hillary. However she and her campaign criminally did not report those donations to the Federal Election Commission.

But Judicial Watch abandoned Peter Paul's case when he demanded they hire competent counsel to represent him.

You see, Fitton and company violated their duties and responsibilities toward Paul. Yet even after they quit, they gave the false impression to donors that Judicial Watch was still representing him!

Now, as Hillary and her "lovely" husband Bill plot to retake

(over once more, please. . .)

The White House in 2008, and as corruption in Washington rises even higher, a strong and ethical Judicial Watch is more important than ever!

I know this, Louise Benson knows this, Sandra Cobas knows this and Peter Paul knows this. They nor I stood by to allow Fitton and his comrades to run the baby I created into the ground and you helped to succeed.

Together you and I have achieved success after success when we were in control of Judicial Watch. Now I'm sticking my neck out to save Judicial Watch -- and your support has been the life-blood that is enabling me to successfully pull off its rescue.

But, as much as I hate to ask, I need your urgent help again! Because to prosecute the cases against Fitton and his comrades, it'll cost millions of dollars. Already, I've spent over $300,000. And our bank balance is zero!

But I know, with your continuing support, and that of other faithful friends, we will be successful!

And it'll be worth it. [redacted], you owe it to your children and grandchildren to have a strong, ethical Judicial Watch.

As John Adams, our second American president said just days before signing the Declaration of Independence in my hometown of Philadelphia, "without ethics, morality and religion there will be no lasting liberty!" And, this will surely come to pass if we no longer have a group like Judicial Watch, America's true independent counsel, of old to watch over us.

Thank you once again for your support. God Bless you and the [redacted] family. And God Bless America!

Sincerely yours,

Larry Klayman

P.S. [redacted], if you can send $50 or even $100 now it'll put us that much closer to saving Judicial Watch. Thank you once again for your help.

**Dear Larry:**

Thank you for regaining control of **Judicial Watch**. I am thrilled we are well on the way to restoring Judicial Watch to its greatness. Here's my best gift to help you finish the job**:**

**[ ] $10,000 [ ] $7,500 [ ] $5,000 [ ] $3,000 [ ] $2,000 [ ] $1,000 [ ] $500**
**[ ] $300 [ ] $100 [ ] $75 [ ] $50 [ ] $35 [ ] Other ($_____)**
**[ ] My check is enclosed. I understand the donation is a gift and not tax deductible.**
**[ ] I prefer to give by [ ] Visa [ ] MasterCard** Card # ______________ Expires ___/___

My email ______________ Signed ______________

AIJW8
42969553

www.SavingJudicialWatch.org

**Saving Judicial Watch** P.O. Box 131567 · Houston, TX 77219-1567

PLACE
STAMP
HERE

**Saving Judicial Watch**
P.O. Box 131567
Houston, TX 77219-1567

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PETER F. PAUL,<br><br>Plaintiff,<br><br>v.<br><br>JUDICIAL WATCH, INC., *ET AL.*<br><br>Defendants. | Civil Action No. 1:07cv00279-RCL<br>Honorable Royce C. Lamberth |

**DECLARATION OF THOMAS J. FITTON**

I, Thomas J. Fitton, hereby declare as follows:

1. My name is Thomas J. Fitton. I am over the age of eighteen and have personal knowledge of the facts set forth below.

2. I am the President of Judicial Watch, Inc. ("Judicial Watch") and a Member of the Board of Directors. I was hired as President in July of 1998 and ratified as a Member of the Board during August of 1998.

3. From the date of my employment with Judicial Watch until September 19, 2003, Larry E. Klayman ("Klayman") was the Chairman, General Counsel, and Treasurer for Judicial Watch. In addition, Klayman was a Member of the Board of Directors. In these positions, Klayman was provided with access to privileged and confidential information regarding Judicial Watch's operations and activities.

4. On or about March 20, 2001, Judicial Watch entered into a contractual relationship with the Plaintiff, Peter F. Paul ("Paul") relating to public interest legal services, which relationship is outlined in a written document entitled "Legal Representation Agreement". Klayman directed and

supervised negotiation and drafting of the Legal Representation Agreement on behalf of Judicial Watch. The Agreement is executed on behalf of Judicial Watch by Klayman, as Chairman and General Counsel, and me, as President.

5. On or about April 2, 2001, Judicial Watch and Paul entered into new written agreement regarding public interest legal services. The agreement is entitled "First Modification to Legal Representation Agreement" and is attached to Paul's Complaint as Exhibit A. Klayman directed and supervised negotiation and drafting of the First Modification on behalf of Judicial Watch. Again, Klayman executed this agreement on behalf of Judicial Watch.

6. Following the formation of a relationship between Judicial Watch and Paul, Klayman managed the representation of Paul and served as his chief counsel. Among the activities that Klayman participated in were extradition efforts in Brazil and negotiations with the U.S. Justice Department.

7. On September 19, 2003, Klayman separated from Judicial Watch. The separation was documented in a Confidential Severance Agreement of the same date. The agreement was the culmination of five months of acrimonious negotiations between the parties. Consequently, during the negotiations, and following execution of the Confidential Severance Agreement, Klayman's relationship with Judicial Watch and its Officers/Directors have been extremely difficult.

8. On or about April 12, 2006, Klayman filed suit against Judicial Watch and its Officers/Directors alleging various claims arising from the Confidential Severance Agreement. The case is currently pending before The Honorable Colleen Kollar-Kotelly and is styled as *Klayman v. Judicial Watch, et al.*, Civil Action No. 1:06-cv-00670 (D.D.C. 2006).

9. At the same time that Klayman filed his lawsuit against Judicial Watch, he launched a website (www.savingjudicialwatch.org) and commenced a fundraising campaign directed toward

Judicial Watch's supporters. As part of this campaign, Klayman mailed direct mail/email solicitations to Judicial Watch supporters and took out advertisements in at least two national publications seeking donations to fund his smear campaign. Klayman's solicitations and advertisements are based largely on false, misleading and/or disparaging statements regarding Judicial Watch and its employees.

I HEREBY DECLARE under penalty of perjury that the foregoing is true and correct. Executed on this 3rd day of March, 2008 in Millbrae, California.

Thomas J. Fitton

# CONFIDENTIAL SEVERANCE AGREEMENT

This CONFIDENTIAL SEVERANCE AGREEMENT ("Agreement") is made and entered into by and between JUDICIAL WATCH, INC. ("Judicial Watch"), and LARRY E. KLAYMAN ("Klayman"), who are sometimes collectively referred to as the "Parties."

NOW, THEREFORE, in consideration of the promises and the mutual covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, the Parties agree as follows:

1. **Termination of Employment; Resignation**. Klayman's employment shall terminate effective September 19, 2003 (the "Separation Date"), and it shall be treated for all purposes as a voluntary resignation. Upon execution of this Agreement, Klayman shall submit a letter resigning from his positions as Treasurer and a member of the Board and all other positions he holds at Judicial Watch and its affiliated entities, including Judicial Watch of Florida, Inc.

2. **Severance Pay**. Subject to paragraphs 15 and 22 below, Judicial Watch shall pay Klayman as severance a lump sum payment equal to $400,000.00, from which shall be deducted all customary and legally required federal, state, and local tax and other withholdings (the "Severance Pay"). As soon as practicable after execution of this Agreement and in no event later than September 24, 2003, the Severance Pay shall be wired or otherwise deposited in U.S. funds to an escrow account maintained for clients of the law offices of Jordan, Coyne & Savits, L.L.P. to be disbursed to Klayman following the later of the expiration of the revocation period referred to in paragraph 15 of this Agreement and a finding by the authorized committee referred to in paragraph 22 that the Severance Pay is reasonable. Klayman acknowledges that he is not legally entitled to the Severance Pay or other consideration beyond payment of compensation through his last day of work, and that the Severance Pay and other consideration being provided to him pursuant to this Agreement is intended as, and is, consideration for his execution of this Agreement and in order to amicably resolve, on the terms set forth in this Agreement, differences between the Parties and in recognition of Klayman's leadership and contribution to the founding and development of Judicial Watch in a way commensurate with similar arrangements for principal executives of comparable organizations. The Severance Pay and other consideration being provided to Klayman pursuant to this Agreement is also intended to, and does, fully satisfy all amounts, if any, owed to Klayman by Judicial Watch, including, but not limited to, any amounts owed to him for accrued but unused vacation and sick leave. The Severance Pay shall be included in the IRS Form W-2 that Judicial Watch shall issue to Klayman for 2003.

3. **Insurance**.

A. Health Insurance. In the event Klayman properly and timely elects to continue his family health insurance coverage following the termination of his employment in accordance with the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), Judicial Watch shall pay the cost of such insurance, to the same extent that it paid Klayman's family health insurance coverage during his employment, for a period of twelve (12) months following the Separation Date. Nothing herein shall limit Klayman's right, consistent with the

terms of the insurance plan and COBRA, to continue to maintain the health insurance coverage beyond the twelve (12) month period at his own expense.

B. Malpractice Insurance. Judicial Watch shall purchase and maintain professional liability insurance that provides defense and indemnity coverage for any and all legal work performed by Klayman for or on behalf of Judicial Watch while he was employed by Judicial Watch or after the Separation Date.

4. **Confidential Information and Judicial Watch Property.**

A. Confidential Information. Klayman agrees that all non-public information and materials, whether or not in writing concerning Judicial Watch, its operations, programs, plans, relationships, donors, prospective donors, clients, prospective clients, past or current employees, contracts, financial affairs or legal affairs (collectively, "Confidential Information") are confidential and shall be the exclusive property of Judicial Watch to which Klayman has no right, title or interest. By way of illustration, but not limitation, Confidential Information includes matters not generally known outside Judicial Watch, such as projects, plans, research data, research projects, contacts, financial data, personnel data, donor lists, donor data, fundraising strategies and methods, computer programs, web site plans and developments, client lists, client data, contacts at or knowledge of clients or donors or prospective clients or donors, litigation strategies, work-product, supplier and vendor lists, developments relating to existing and future programs, services or products offered, marketed or used by Judicial Watch, and data relating to the general operations of Judicial Watch. Klayman agrees that after the Separation Date, he shall not disclose any Confidential Information to any person or entity or use Confidential Information for any purpose without written approval by an officer of Judicial Watch, unless and until such Confidential Information has become public knowledge through no fault or conduct by Klayman.

B. Judicial Watch Property. Klayman agrees that all documents, computer tapes and disks, computer printouts, computer hardware and software, office furniture and furnishings, memorabilia, equipment, supplies, keys, credit cards, publications, manuals, working papers, notes, reports, client lists, donor lists, and any other tangible items or materials that were created or used by Klayman while performing his duties for Judicial Watch or which otherwise came into Judicial Watch's custody or control by virtue of Klayman's employment with Judicial Watch ("Judicial Watch Property") are and shall be the exclusive property of Judicial Watch to which Klayman has no right, title or interest. Upon reasonable advance notice to Judicial Watch, Klayman shall be permitted to remove his personal effects (e.g., family photos and other similar personal property that he purchased with his personal funds), as well as a digital copy of his electronic "Rolodex", from Judicial Watch's offices.

C. Return of Property and Confidential Information. Klayman agrees that all Judicial Watch Property and Confidential Information, in all their tangible or intangible forms, whether created by Klayman or others, that came into Klayman's custody or possession, including, without limitation, all computer equipment, cellular phones, personal digital assistants ("PDAs"), keys, including keys to the Volvo automobile currently owned by Judicial Watch, (VIN No. YV1CZ91H931018257) title and registration documents for the Volvo automobile,

passwords, security cards, security codes, identification badges, and any other means of access to Judicial Watch's Property and Confidential Information, shall be delivered to the President of Judicial Watch, or his designated representative, on or before the Separation Date. Any property or Confidential Information which Klayman cannot return to Judicial Watch on or before the Separation Date, notwithstanding his best efforts, shall be returned as soon as practicable thereafter. In any event, Klayman shall not use or access any Judicial Watch Property or Confidential Information or copies thereof following the Separation Date, provided, however, that Klayman may continue to use through September 24, 2003 the Judicial Watch cell phone and laptop computer currently in his possession, at which time he shall return them to Judicial Watch.

D. Client and Donor Information. Klayman agrees that Klayman's obligation not to disclose or use Judicial Watch's Confidential Information and Klayman's obligation to return all Judicial Watch Property and Confidential Information also extend to such types of proprietary, secret or confidential information, materials and property of clients or donors of Judicial Watch or of other third parties who may have disclosed or entrusted the same to Judicial Watch or to Klayman. Klayman expressly agrees and acknowledges that, following the Separation Date, he shall not retain or have access to any Judicial Watch donor or client lists or donor or client data.

E. Limited Access to Certain Property in the Public Domain. Anything in subparagraphs A through D above to the contrary notwithstanding, Klayman shall be entitled to obtain from Judicial Watch copies of press clips, press releases, other press materials, photographs, artist renderings, and television show videos involving him which are in the public domain and not confidential, provided that he shall use such materials solely for his personal, use and not for any partisan or other political purpose. Klayman shall reimburse Judicial Watch the costs it incurs in providing such copies.

F. Limited Access to Certain Confidential Information. Anything in subparagraphs A through D above to the contrary notwithstanding, subject to Judicial Watch's consent, which consent shall not be unreasonably withheld, Klayman shall be afforded access to such Confidential Information as he may reasonably require in order to defend or respond to any accusation, action or threat of action against him arising out of or relating to his tenure at Judicial Watch. Such access shall include an opportunity on reasonable notice to examine and copy, at his cost, Confidential Information related to such accusation, action or threat, provided that such Confidential Information shall be used or disclosed by him solely in connection with such defense or response and provided, further, that he shall take reasonable steps to protect such Confidential Information from any use or disclosure by others other than in connection with such defense or response (e.g., by Protective Order or Confidentiality Agreement).

5. **Non-Competition; Non-Solicitation**. In consideration of the payment described in paragraph 6 below, Klayman agrees to the following:

A. Judicial Watch's Goodwill and Business Interests. Klayman agrees and acknowledges that Judicial Watch has, over the course of many years and through substantial investment and efforts by Judicial Watch, developed goodwill in North America and

internationally, and that Judicial Watch's goodwill is associated with its ongoing educational and other operations and its use of certain trade names, trade marks, service marks and "trade dress." Klayman also agrees that the trade secrets and other valuable Confidential Information and Judicial Watch Property (as such terms are defined above) to which Klayman had access during his employment and as an officer and director of Judicial Watch, the substantial relationships with prospective and existing contacts, clients and donors of Judicial Watch that Klayman formed and maintained, the specialized training and opportunities that Klayman received from Judicial Watch, and Judicial Watch's goodwill are, individually and collectively, valuable and legitimate business interests of Judicial Watch that Judicial Watch rightfully seeks to preserve and protect.

B. Covenant Not to Compete or Solicit. Klayman agrees that, in order to enable Judicial Watch to preserve and protect Judicial Watch's valuable and legitimate business interests, including, but not limited to, those valuable and legitimate business interests set forth in paragraph 5 A, and in exchange for the additional consideration referred to in paragraph 6 below (which the parties acknowledge to be separately bargained for), Klayman shall not, for a period of two (2) years following the Separation Date, directly or indirectly:

(i) work or render advice as an individual or sole proprietor in Competition with Judicial Watch or work or render advice as an employee, agent, independent contractor, consultant or representative of any person, firm or legal entity which is engaged in or has plans to enter into Competition with Judicial Watch. For purposes of this Agreement, the term "Competition" means directly or indirectly engaging in the work or advancing the mission of any ethics, anti-corruption, public integrity and government accountability watchdog or similar public interest or educational organization, or engaging in any other activities the purpose or effect of which would be to provide information, programs, publications, services or products that Judicial Watch offers, develops or sells or has plans to offer, develop or sell, as of the Separation Date;

(ii) solicit or in any manner encourage or induce, or attempt to solicit, encourage or induce, any employee of Judicial Watch to leave the employ of Judicial Watch;

(iii) solicit or in any manner encourage or induce, or attempt to solicit, encourage or induce, any client of Judicial Watch to terminate its attorney-client relationship with Judicial Watch; provided, however, that Klayman shall not be precluded from providing legal representation to any client, if requested by the client, in his capacity as a lawyer in private practice; or

(iv) solicit, divert, interfere in or take away, attempt to solicit, divert, interfere in or take away, or otherwise assist or encourage third parties to solicit, divert, interfere in or take away the support or patronage of any of the donors, clients or supporters of Judicial Watch, or prospective donors, clients or supporters of Judicial Watch; provided, however, that this provision shall not prohibit Klayman from soliciting contributions to any entity that is not engaged in Competition with Judicial Watch from any person who may be an existing or prospective donor of Judicial Watch.

**Confidential Severance Agreement**

6. **Payment on Account of Klayman's Agreement Not to Compete or Solicit**. Subject to paragraphs 15 and 22 below, Judicial Watch shall pay Klayman $200,000.00 in consideration of his agreement not to compete or solicit, as set forth in paragraph 5 above (the "Non-Compete Payment"). As soon as practicable after execution of this Agreement and in no event later than September 24, 2003, the Non-Compete Payment shall be wired or otherwise deposited in U.S. funds in escrow to be maintained and disbursed to Klayman in the same manner and subject to the same conditions as the Severance Pay. The Non-Compete Payment shall be treated as "Other Compensation" for which Judicial Watch will issue Klayman a Form 1099. Klayman shall pay all federal, state and other taxes required to be paid in connection with such payment and indemnifies Judicial Watch and its officers from any liability for payment of payroll, income, or other taxes in connection with the Non-Compete Payment.

7. **Enforcement of Paragraphs 4 and 5**. Klayman understands and acknowledges that the restrictions contained in paragraphs 4 and 5 of this Agreement are reasonably necessary for the protection of the legitimate business interests and goodwill of Judicial Watch and Klayman considers these restrictions necessary and reasonable for such purpose. Klayman further acknowledges and agrees that any breach of any provision in paragraphs 5 or 6 of this Agreement will cause Judicial Watch substantial and irreparable injury and, therefore, in the event of any such breach, Klayman agrees that Judicial Watch, in addition to such other remedies which may be available, shall be entitled to specific performance and other injunctive relief without the necessity of posting a bond.

8. **IRS Audit**. In connection with the ongoing audit of Judicial Watch, the Parties agree to work cooperatively and in good faith to timely and appropriately respond to any inquiries or allegations by IRS relating to matters involving activities or other conduct on the part of Klayman or K&A. In this connection, Judicial Watch agrees to promptly provide Klayman's designated representative a copy of any IRS communications or other document containing such inquiries or allegations; Klayman agrees then to promptly provide input to Judicial Watch, through the Parties' respective legal representatives, regarding any such matter sufficiently in advance of the required response date to IRS, that such input can be considered and incorporated as appropriate in Judicial Watch's response to IRS. In addition, Judicial Watch agrees (i) to furnish Klayman's designated legal representative copies of all written submissions to IRS relating to any such matters, for their review and comment, timely and as soon as reasonably available, and to provide them copies of the final versions of all such submissions contemporaneously with their being sent to IRS; (ii) to timely apprise Klayman's designated legal representative of material developments concerning any such matters, including by furnishing, upon request, periodic reports of the status of any such matters and by providing copies of correspondence or other IRS produced written materials regarding any such matters. In addition, upon Klayman's request, Judicial Watch may afford Klayman's designated legal representative an opportunity to participate in meetings and telephone discussions with IRS regarding such matters whenever Judicial Watch reasonably deems such participation appropriate, consistent with the first sentence of this paragraph. All information provided to or otherwise learned by Klayman and/or his legal representative with respect to or in connection with IRS audit shall be deemed and treated as Confidential Information, shall be used by Klayman and his legal representative solely in connection with the purposes described in this paragraph, and shall not be used or disclosed by them for any other purpose.

9. **Personal Guaranties.**

A. Credit Cards. Judicial Watch shall remove Klayman as guarantor of all credit cards issued to Judicial Watch, including, without limitation Judicial Watch's American Express card, within thirty (30) days of the Separation Date.

B. Lease Guaranty. Judicial Watch agrees to continue to work in good faith to remove Klayman as guarantor of its lease for its Washington, D.C. headquarters located at 501 School Street, S.W., Suite 500, Washington, D.C., 20024. Klayman acknowledges and agrees that he shall not receive any additional compensation from Judicial Watch above and beyond the Severance Pay and other benefits provided for in this Agreement for his guarantying the lease.

10. **Reimbursement of Expenses**. Judicial Watch agrees to review and reimburse Klayman for any legitimate and properly documented business expenses he submits to Judicial Watch pursuant to this paragraph in accordance with Judicial Watch's normal and customary reimbursement polices and practices. Klayman agrees to submit all business expenses for which he seeks reimbursement from Judicial Watch, along with details and justifications for those expenses, to Judicial Watch within 30 days after the Separation Date. Klayman further agrees to reimburse Judicial Watch for personal costs or expenses incurred by him during his employment, if any, that Judicial Watch may determine in good faith were mistakenly charged or allocated as costs or expenses of Judicial Watch, as well as any additional expenses that Klayman has billed to Judicial Watch or charged to a Judicial Watch credit card that Judicial Watch determines in good faith are personal expenses of Klayman. Klayman shall reimburse Judicial Watch for any such amounts within seven (7) days of being notified by Judicial Watch and being presented with supporting documentation of the amount, date and category of cost or expense items for which reimbursement is sought.

11. **Klayman & Associates, P.C.**

A. Klayman, and by its signature below, Klayman & Associates, P.C. ("K&A") re-affirm and acknowledge the debt of K&A to Judicial Watch, which was in the amount of $78,810 as of December 31, 2002, and agree that K&A shall pay the then full outstanding balance of the debt (including additional amounts allocated to K & A by Judicial Watch's accountants in accordance with their customary practice regarding this debt), without offset or deduction, together with accrued interest of 8% per annum, on or before May 15, 2004, per the terms of the Minutes of the May 15, 2002 Meeting of the Board of Directors of Judicial Watch. Klayman and K & A expressly acknowledge that Judicial Watch is not indebted to K & A.

B. Klayman agrees to remove all K&A files and boxes from Judicial Watch's office premises at Klayman's expense before the Separation Date or within a reasonable time thereafter, at his expense. Should Klayman not remove such files and boxes within sixty (60) days of the Separation Date, Judicial Watch may destroy them. Klayman and Judicial Watch agree that Judicial Watch shall arrange for all K&A's boxes currently being stored under Judicial Watch's name and account with Iron Mountain to be transferred to K&A's account with Iron

Mountain, and that any additional files or boxes of K&A that Judicial Watch locates or identifies in the future shall likewise be transferred to K&A's Iron Mountain account.

12. **Withdrawal of Appearance in Judicial Watch Litigation**. Except as otherwise agreed by Judicial Watch, and consistent with the applicable rules of court, Klayman's appearance as counsel shall be withdrawn in all legal proceedings in which Judicial Watch currently is involved as a party or as counsel for any person or entity.

13. **Cooperation**. Following the Separation Date, Klayman agrees to make himself reasonably available to Judicial Watch to answer questions regarding pending Judicial Watch litigation matters and other business in which Klayman was involved during his employment with Judicial Watch, at no cost. Klayman also understands and acknowledges that, following the Separation Date, Judicial Watch may ask him to serve as counsel in on-going Judicial Watch litigation matters on such terms, including compensation terms, as Judicial Watch, its clients and Klayman may agree. Judicial Watch acknowledges and understands that, apart from answering questions related to Judicial Watch litigation matters and other business in which Klayman was involved during his employment, Klayman shall have no obligation to accept any post-Separation Date assignments from Judicial Watch. Klayman acknowledges and agrees that he shall not perform any post-Separation Date assignment from Judicial Watch without having previously received written authorization to perform the assignment from an officer of Judicial Watch.

14. **Mutual Releases.**

A. Release by Klayman. Klayman, for himself and his heirs, successors, assigns, employees, agents and other representatives, and anyone acting by, through or under them, hereby releases and forever discharges Judicial Watch, and each and all of its affiliates, subsidiaries and related entities, and its and their past and present directors, officers, managers, supervisors, employees, attorneys, and agents, including, without limitation, Paul Orfanedes, Thomas Fitton and John Maruna, and their respective predecessors, successors and assigns, in their capacities as such (collectively, "the Judicial Watch Releasees"), from any and all claims, actions, suits, damages, liabilities, losses or expenses of whatever kind and nature which exist as of the date of this Agreement, whether such claims, actions, suits, damages, liabilities, losses or expenses are known or unknown, including, but not limited to, any claim based on or arising under any civil rights or employment discrimination laws, such as the Americans with Disabilities Act of 1992; the Fair Labor Standards Act of 1938, as amended; the Age Discrimination in Employment Act ("ADEA"), as amended; Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; the District of Columbia Human Rights Act; or any other federal, state or local statutes, laws or legal principles or any common law contract or tort claims now or hereafter recognized. Klayman specifically acknowledges that he understands that by signing this Agreement he waives all claims he ever had or now has against any of the Judicial Watch Releasees, except for claims relating to any breach of this Agreement.

B. Release by Judicial Watch. Judicial Watch, for itself and its affiliated corporations and entities, and anyone acting by, through or under them, including, without limitation, Paul Orfanedes, Thomas Fitton and John Maruna, hereby releases and forever

discharges Klayman, and anyone acting by or through him, including his attorneys and agents, and his and their respective heirs, successors, and assigns from any and all claims, actions, suits, damages, liabilities, losses or expenses of whatever kind and nature which exist as of the date of this Agreement, whether such claims, actions, suits, damages, liabilities, losses or expenses are known or unknown. Judicial Watch specifically acknowledges that it understands that by signing this Agreement it waives all claims it ever had or now has against Klayman, except for claims relating to any breach of this Agreement.

15. **Right to Consider/Revocation**. Employees forty (40) years of age or older have specific rights under the Older Workers Benefit Protection Act ("OWBPA"), which prohibits discrimination on the basis of age. It is Judicial Watch's desire and intent to make certain that Klayman fully understands the provisions and effects of the release contained in paragraph 14(A). To that end, Klayman has been encouraged and has been given the opportunity to consult with legal counsel for the purpose of reviewing the terms of this Agreement. Klayman acknowledges that, consistent with the provisions of the OWBPA, he has been given a period of at least twenty-one (21) days within which to consider this Agreement before signing it, and that he may waive the 21-day period and sign this Agreement prior to its expiration. This Agreement will become effective immediately upon execution by the Parties, but Klayman shall have seven (7) days after his execution of the Agreement to revoke the Agreement. Any revocation must be in writing and delivered to Judicial Watch, Inc., c/o Thomas Fitton, President, 501 School Street, S.W., Suite 500, Washington, D.C. 20024 before the expiration of the seven (7) revocation period. In addition, consistent with the provisions of the OWBPA and other employment discrimination laws, the release contained in paragraph 14(A) does not preclude Klayman from filing a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), participating in an EEOC investigation, or challenging the validity of this Agreement, but he will not be entitled to any monetary or other relief from the EEOC or from any court as a result of litigation brought on the basis of, or in connection with, such charge, except if and to the extent that the release and waiver contained in paragraph 14(A) are held to be invalid or unenforceable (in which event, Judicial Watch will be entitled to restitution or set off for the amounts paid to Klayman hereunder, as and to the extent determined by the court).

16. **Covenant Not to Sue**. Klayman expressly represents and warrants that, except as may be necessary to enforce this Agreement, neither he nor any person, organization or other entity on his behalf has or will file, charge, claim, sue or cause or permit to be filed, charged or claimed, any civil action or legal proceeding seeking personal monetary or other relief against Judicial Watch or any of its past or present directors, shareholders, officers, managers, supervisors, employees, attorneys, or agents, including, without limitation, Paul Orfanedes, Thomas Fitton and John Maruna, involving any matter occurring at any time in the past up to and including the date of this Agreement or involving any continuing effects of any acts or practices which may have arisen or occurred prior to or on the date of this Agreement. Judicial Watch expressly represents and warrants that, except as may be necessary to enforce this Agreement, neither it nor any person, organization or other entity on its behalf has or will file, charge, claim, sue or cause or permit to be filed, charged or claimed, any civil action or legal proceeding

seeking personal monetary or other relief against Klayman, K&A or their respective agents and attorneys.

17. **Non-Disparagement**. Klayman expressly agrees that he will not, directly or indirectly, disseminate or publish, or cause or encourage anyone else to disseminate or publish, in any manner, disparaging, defamatory or negative remarks or comments about Judicial Watch or its present or past directors, officers, or employees. Judicial Watch expressly agrees that its present directors and officers namely Paul Orfanedes and Thomas Fitton, will not, directly or indirectly, disseminate or publish, or cause or encourage anyone else to disseminate or publish, in any manner, disparaging, defamatory or negative remarks or comments about Klayman. Nothing in this paragraph is intended to, nor shall be deemed to, limit either party from making fair commentary on the positions or activities of the other following the Separation Date.

18. **Press Release; Statements Of the Parties**. On or before September 27, 2003, Judicial Watch shall issue a press release announcing that Klayman is leaving Judicial Watch. That press release shall state:

> Judicial Watch announced today that Larry Klayman has stepped down as Chairman and General Counsel of Judicial Watch,, to pursue other endeavors. Tom Fitton, who is President of Judicial Watch, said: "Larry conceived, founded and helped build Judicial Watch to the organization it is today, and we will miss his day to day involvement. Judicial Watch now has a very strong presence and has become the leading non-partisan, public interest watchdog seeking to promote and ensure ethics in government, and Larry leaves us well positioned to continue our important work."

Judicial Watch agrees that Klayman shall be permitted to use, publish and otherwise disseminate to third parties the following additional statement of Judicial Watch: "Larry was the creator and founder of Judicial Watch, and helped build it to be a stable, successful and widely respected organization. We thank him for his service." Klayman agrees that Judicial Watch shall be permitted to use, publish and otherwise disseminate to third parties the following statement of Klayman: "I have left Judicial Watch in good hands and will continue to support it, and I hope you will too." The Parties agree that they will limit any statements to third parties regarding Klayman's leaving Judicial Watch to be consistent with the Press Release and statements contained in his paragraph, except as may be required by law.

19. **Indemnification; Attorneys' Fees.**

A. Indemnification by Judicial Watch. Judicial Watch agrees to defend, indemnify and hold harmless Klayman from any monetary sanctions assessed against him personally by a court of law for conduct undertaken by Klayman or others in conjunction with his or their work on Judicial Watch litigation matters, or any breach of its obligations and responsibilities under this Agreement.

Confidential Severance Agreement

B. Indemnification by Klayman. Klayman agrees to defend, indemnify and hold harmless Judicial Watch and each and all of the Judicial Watch Releasees from any and all claims, liabilities, costs, damages or judgments of any and every kind (including, without limitation, attorneys' fees and costs) which Judicial Watch or any of the Judicial Watch Releasees may incur or be threatened with that arise out of any intentional wrongdoing by Klayman, or breach of his obligations and responsibilities under this Agreement, or out of K& A's breach of its obligations under this Agreement. Klayman expressly acknowledges that, pursuant to this paragraph, he shall be obligated to defend, indemnify and hold harmless Judicial Watch from any and all attorneys' fees, court costs or other expenses Judicial Watch may incur on account of Klayman's or K&A's failure to make prompt payment to Judicial Watch in accordance with paragraphs 10 and 11 of this Agreement.

C. Attorneys' Fees. The prevailing party in any legal proceeding instituted on account of a Party's breach of this Agreement shall be entitled to an award of the costs incurred in connection with such action, including reasonable attorneys' fees and suit costs.

20. **Confidentiality of this Agreement**. The Parties will preserve the strict confidentiality of the terms and existence of this Agreement, which shall not be disclosed, communicated or publicized to any third party or any entity other than their respective counsel, accountants, and financial advisors, and, in the case of Klayman, also to his immediate family, directly or indirectly, by implication, gesture, or innuendo, or by any other manner or device; provided, however, that the Parties may disclose the terms of this Agreement: (i) if compelled to do so pursuant to a lawful subpoena or other process from a court of competent jurisdiction or in conjunction with the on-going IRS audit of Judicial Watch; (ii) in connection with litigation between or among the Parties relating to this Agreement; or (iii) if and to the extent necessary to comply with applicable Treasury regulations relating to tax return disclosure. In the event that either Party is lawfully subpoenaed (or informed that he or it will be subpoenaed) to testify and such testimony forseeably might require the disclosure of information required by this Agreement to be kept confidential, such Party shall promptly notify the other Party in writing so that he or it will have an opportunity to quash the subpoena or otherwise protect his or its interest in the continuing confidentiality of the information.

21. **Full Knowledge of Terms**. Each Party to this Agreement affirms that he, or in the case of Judicial Watch, its respective authorized officer(s) have read the foregoing Agreement and fully understand its content and effect, was given a reasonable period of time to consider its terms, and is voluntarily entering into this Agreement. Accordingly, in construing this Agreement, no provision shall be construed against Judicial Watch on the basis that it is the draftsman of this Agreement

22. **Section 4958 Presumption**. As soon as possible after the execution of this Agreement, Judicial Watch shall appoint an authorized body to conduct, within ten business days following the execution of this Agreement, the process described in Treasury Regulation 53.4958-6, in order to establish a rebuttable presumption that the transactions reflected in this Agreement do not constitute an excess benefit transaction subject to tax under Internal Revenue Code section 4958. Upon favorable completion of the process by the authorized body and completion of all other requirements set forth herein, amounts due under this Agreement shall be

released from escrow and paid over to Klayman in accordance with paragraphs 1 and 6 above. If the authorized body does not conclude that the transaction is reasonable, the Parties shall meet promptly to renegotiate in good faith the terms of this Agreement in such a way that the requirements of regulation section 53.4958-6 can be met.

23. **Choice of Law; Consent to Venue and Jurisdiction**. This Agreement shall be governed by and construed in accordance with the laws of the District of Columbia, without regard to its conflict of laws principles. The Parties consent to the jurisdiction and venue of any state or federal court located within the District of Columbia in any action or judicial proceeding brought to enforce, construe or interpret this Agreement or otherwise arising out of or relating to Klayman's employment.

24. **Notice**. Any and all notices which any Party shall be required or may elect to provide to another Party pursuant to this Agreement shall be a signed writing unless otherwise so agreed. Any and all notices hereunder shall be personally delivered, telecopied (receipt confirmed) or sent by certified or registered mail, postage prepaid, return receipt requested, or by courier service providing evidence of delivery to the other party, at the applicable addresses set forth below:

| | |
|---|---|
| If to Judicial Watch: | Judicial Watch, Inc.<br>c/o Thomas Fitton, President<br>501 School Street, N.W.<br>Suite 500<br>Washington, D.C. 20024 |
| With a copy to: | David Barmak<br>MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO, PC<br>12010 Sunset Hills Rd.<br>Suite 900<br>Reston, VA 20190 |
| If to Klayman: | Larry E. Klayman<br>540 Brickell Key Drive, Unit 732<br>Miami, Florida 33131 |
| With a copy to: | Herbert N. Beller<br>Sutherland Asbill & Brennan, L.L.P.<br>1275 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20004-2415<br><br>and<br><br>David P. Durbin<br>Jordan, Coyne & Savits, L.L.P.<br>1100 Connecticut Avenue, N.W.<br>Washington, D.C. 20036 |

**Confidential Severance Agreement**

25. **Binding Effect**. This Agreement shall inure to the benefit of and be binding upon the Parties and their respective executors, administrators, personal representatives, heirs, predecessors, successors, assigns, directors, agents, employees, trustees and affiliates forever.

26. **Entire Agreement**. This Agreement constitutes the entire agreement and understanding between and among the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous written or oral agreements and understandings between the Parties with respect to the subject matter of this Agreement. Each of the Parties agrees and acknowledges that in deciding to enter into this Agreement he or it is not relying on any statements, representations, understandings or promises other than those contained herein. This Agreement shall be interpreted and enforced in all respects based on its express terms and without regard to who drafted the Agreement or any particular provision of the Agreement. Neither the negotiations preceding this Agreement or any draft, term sheet, outline, note, or statement, assertion, representation, or understanding prior to or contemporaneous with the execution of this Agreement shall be used to interpret, change or restrict the express terms and provisions of this Agreement.

27. **Captions**. Captions are inserted herein for convenience, do not constitute part of the Agreement, and shall not be admissible for the purpose of proving the intent of the Parties.

28. **Counterparts**. This Agreement may be executed in counterparts, each of which will be considered an original.

IN WITNESS WHEREOF, the Parties have set their hands and seals as of the dates indicated.

ATTEST:

______________________
Paul Orfanedes
Corporate Secretary

**JUDICIAL WATCH, INC.**

______________________
By: Thomas Fitton, President
Date: 9/19/03

**LARRY E. KLAYMAN**

______________________
Witness

______________________
Date: ______________________

**KLAYMAN & ASSOCIATES, P.C.**

______________________
Witness

______________________
By: Larry E. Klayman, President
Date: ______________________

**Confidential Severance Agreement**

25. **Binding Effect**. This Agreement shall inure to the benefit of and be binding upon the Parties and their respective executors, administrators, personal representatives, heirs, predecessors, successors, assigns, directors, agents, employees, trustees and affiliates forever.

26. **Entire Agreement**. This Agreement constitutes the entire agreement and understanding between and among the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous written or oral agreements and understandings between the Parties with respect to the subject matter of this Agreement. Each of the Parties agrees and acknowledges that in deciding to enter into this Agreement he or it is not relying on any statements, representations, understandings or promises other than those contained herein. This Agreement shall be interpreted and enforced in all respects based on its express terms and without regard to who drafted the Agreement or any particular provision of the Agreement. Neither the negotiations preceding this Agreement or any draft, term sheet, outline, note, or statement, assertion, representation, or understanding prior to or contemporaneous with the execution of this Agreement shall be used to interpret, change or restrict the express terms and provisions of this Agreement.

27. **Captions**. Captions are inserted herein for convenience, do not constitute part of the Agreement, and shall not be admissible for the purpose of proving the intent of the Parties.

28. **Counterparts**. This Agreement may be executed in counterparts, each of which will be considered an original.

IN WITNESS WHEREOF, the Parties have set their hands and seals as of the dates indicated.

ATTEST:

[signature]
Paul Orfanedes
Corporate Secretary

**JUDICIAL WATCH, INC.**

By: Thomas Fitton, President
Date: ____________

**LARRY E. KLAYMAN**

____________
Witness

Date: ____________

**KLAYMAN & ASSOCIATES, P.C.**

____________
Witness

By: Larry E. Klayman, President
Date: ____________

**Confidential Severance Agreement**

25. **Binding Effect.** This Agreement shall inure to the benefit of and be binding upon the Parties and their respective executors, administrators, personal representatives, heirs, predecessors, successors, assigns, directors, agents, employees, trustees and affiliates forever.

26. **Entire Agreement.** This Agreement constitutes the entire agreement and understanding between and among the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous written or oral agreements and understandings between the Parties with respect to the subject matter of this Agreement. Each of the Parties agrees and acknowledges that in deciding to enter into this Agreement he or it is not relying on any statements, representations, understandings or promises other than those contained herein. This Agreement shall be interpreted and enforced in all respects based on its express terms and without regard to who drafted the Agreement or any particular provision of the Agreement. Neither the negotiations preceding this Agreement or any draft, term sheet, outline, note, or statement, assertion, representation, or understanding prior to or contemporaneous with the execution of this Agreement shall be used to interpret, change or restrict the express terms and provisions of this Agreement.

27. **Captions.** Captions are inserted herein for convenience, do not constitute part of the Agreement, and shall not be admissible for the purpose of proving the intent of the Parties.

28. **Counterparts.** This Agreement may be executed in counterparts, each of which will be considered an original.

IN WITNESS WHEREOF, the Parties have set their hands and seals as of the dates indicated.

ATTEST:

Paul Orfanedes
Corporate Secretary

Witness

Witness

**JUDICIAL WATCH, INC.**

By: Thomas Fitton, President
Date: __________

**LARRY E. KLAYMAN**

Date: 9/19/03

**KLAYMAN & ASSOCIATES, P.C.**

By: Larry E. Klayman, President
Date: 9/19/03

**Chris Farrell**

**From:** leklayman@bellsouth.net
**Sent:** Thursday, January 19, 2006 3:33 PM
**To:** cfarrell@judicialwatch.org
**Cc:** leklayman@bellsouth.net
**Subject:** [Fwd: [Fwd: Re: RE: Barmak/JW Mediation]]

>
> From: <leklayman@bellsouth.net>
> Date: 2006/01/19 Thu PM 02:52:56 EST
> To: <adye@wc-b.com>, <kraffa@raffa.com>,
> <torfanedes@judicialwatch.org>, <porfanedes@judicialwatch.org>
> CC: <dbarmak@mintz.com>, <jkulunas@foxrothschild.com>
> Subject: [Fwd: Re: RE: Barmak/JW Mediation]
>
>
> >
> > From: <leklayman@bellsouth.net>
> > Date: 2006/01/19 Thu PM 02:47:35 EST
> > To: "Barmak, David" <DBarmak@mintz.com>
> > CC: <jkulunas@foxrothschild.com>, <jroscoe@jamsadr.com>
> > Subject: Re: RE: Barmak/JW Mediation
> >
> > David:
> >
> > While it was inappropriate for the mediator to send my e-mails of
> > this morning to you, apparently it happened nevertheless.
> >
> > The reason I made the inquiry was to be sure that you were aware of
> > my counterproposal to settle all claims by JW with regard to me
> > personally and Klayman & Asspociates. This counterproposal did not
> > hinge on the security deposit with the landlord.
> >
> > The counterproposal referred to monies which are alledegly due by
> > both Klayman & Associates and me. As you know, I have disputed most
> > of the claims and paid you what I did not dispute, and the law firm
> > has no monies or assets at this time. So I thought that this was a
> > realistic, fair offer, and at a minimum was intended in good faith
> > to keep the discussions alive. My letter of December 29, 2005,
> > where I went the extra mile by paying you monies despite my well
> > documented position that JW and its currentl officers and directors
> > owe me much more than they claim is due them, was thus intended to
> > further the discussions in good faith, believing that the mediator
> > had also forwarded my 50K counterproposal -- which in fact he
> > confirmed several times that he had. I am obviously open to
> > negotiation and remain so.

> >
> > However, JW and its current officers and directors, with its lawyers
> > counsel, has tried to coerce me into paying everything you and they
> > claim is due under the threat of issuing Form 1099s to trigger IRS
> > action. Among other venues, this was represented in JW's 2004 Form
> > 1099, which has been prominently displayed on JW's website. As you
> > know, the false and misleading references to our dispute published
> > onJW's 2003 Form 1099, which also had been published on JW's
> > website, was again republished by Peter Paul and defamed me and
> > caused great damage to my reputation and other interests. It is not
> > ethical to threaten or to trigger IRS action to coerce me into
> > settling on JW's terms and all of the correspondence thus far shows
> > that this is your position.
> >
> > I remain open to negotiation directly with you. I chose this
> > mediator at your suggestion and after you provided his name to me. I
> > do not believe that I was well served.
> >
> > But the issue now remains how JW, its curent officers and directors,
> > you and me now try resolve this without trying to improperly force
> > settlement on your terms by using the IRS as a club.
> >
> > I had Joe Kulunas contact you yesterday. I hope that you will get
> > back to him today.
> >
> > Finally, given the threats by Peter Paul against JW, its current
> > officers and me, and his published statement that he was filing suit
> > and taking other legal actions, I ask again that you provide any and
> > all relevant correspondence concerning Peter Paul to me and report
> > these matters to the appropriate insurance carriers. I also need the
> > name and contact information for the insurance agents so I can
> > myself be in touch with them. The confidential severance agreement
> > provides explicity that I am entitled to this information
> > immediately, so I can defend myself.
> >
> > Thank you for your cooperation.
> >
> >
> > Sincererly,
> >
> > Larry Klayman
> >
> >
> > >
> > > From: "Barmak, David" <DBarmak@mintz.com>
> > > Date: 2006/01/19 Thu PM 01:46:34 EST
> > > To: <JPRoscoe@aol.com>,
> > > <leklayman@bellsouth.net>,

> > > <JEdmonds@JAMSADR.com>
> > > Subject: RE: Barmak/JW Mediation
> > >
> > > I've never gotten anything I regarded as a firm proposal to pay
> > > $50,000; however, I doubt any such proposal would have been taken
> > > seriously by JW, in any event, especially absent some collateral
> > > or other security and some understanding as to what would happen
> > > with the balance of the amounts owed by Larry individually and by
> > > K&A. At various times, Mr. Roscoe talked to me about approaches
> > > he thought Larry might consider particularly if it turned out that
> > > the Landlord still had some of K&A's money as a still unreturned
> > > security deposit. I regarded the whole unreturned security deposit
> > > issue as a strawman and the various potential approaches discussed
> > > with me as mere ideas not concrete proposals, and neither I nor my
> > > client thought they required any further thought or action
> > > especially after I got Larry's email/letter of 12/29 which agreed
> > > to make only a small payment, leaving unaddressed all the other
> > > issues.
> > >
> > > David Barmak
> > >
> > > ________________________________
> > >
> > > From: JPRoscoe@aol.com [mailto:JPRoscoe@aol.com]
> > > Sent: Thursday, January 19, 2006 11:50 AM
> > > To: leklayman@bellsouth.net; Barmak, David; JEdmonds@JAMSADR.com
> > > Subject: Re: Barmak/JW Mediation
> > >
> > >
> > > Larry:
> > >
> > > I suggested that you to put your proposal in writing and forward
> > > it directly to Mr. Barmak. I did not see your document until after
> > > it was sent and did not compare it to your email of ideas dated
> > > the 29th. As I was leaving the country I believed that you
> > > communicated everything to him that you wanted to, as you had
> > > introduced the 50K proposal prior to sending him the writing. I
> > > did follow up to the extent that I asked him to reply to you in
> > > writing and, later, to ask where things stood.
> > >
> > > Kind regards,
> > >
> > > Jerry
> > >
> > > n a message dated 1/19/2006 11:42:35 A.M. Eastern Standard Time,
> > > leklayman@bellsouth.net writes:
> > >
> > >

> > > Jerry:
> > >
> > > The problem is that you told me that you were going to relay the
> > > 50 K offer, and did not. Indeed, after the one day session we had
> > > a telephone conference with Barmak and said that you were going to
> > > follow up for both of us. Now weeks have passed and I trust that
> > > things that did not happen that are harmful to my and K&A's
> > > interests.
> > >
> > > Larry
> > >
> > >
> > >
> > >
> > > ----------------------------------------------------------------
> > >
> > > IRS CIRCULAR 230 NOTICE
> > >
> > > In compliance with IRS requirements, we inform you that any U.S.
> > > tax advice contained in this communication is not intended or written to be used, and cannot be used, for the purpose of avoiding tax penalties or in connection with marketing or promotional materials.
> > >
> > > ----------------------------------------------------------------
> > >
> > > STATEMENT OF CONFIDENTIALITY:
> > > The information contained in this electronic message and any
> > > attachments to this message are intended for the exclusive use of
> > > the addressee(s) and may contain confidential or privileged
> > > information. If you are not the intended recipient, or the person
> > > responsible for delivering the e-mail to the intended recipient,
> > > be advised you have received this message in error and that any
> > > use, dissemination, forwarding, printing, or copying is strictly
> > > prohibited. Please notify Mintz, Levin, Cohn, Ferris, Glovsky and
> > > Popeo immediately at either (617) 542-6000 or at
> > > ISDirector@Mintz.com, and destroy all copies of this message and
> > > any attachments. You will be reimbursed for reasonable costs
> > > incurred in notifying us.
> > >
> > >
> >
> >
>
>