**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **PETER PAUL, et al.,** | |
| Plaintiffs, | |
| v. | Civil Action No.  –CV-00279-RCL<br>Honorable Royce C. Lamberth |
| **JUDICIAL WATCH, INC., et al.,** | |
| Defendants. | |

## SUPPLEMENT TO MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISQUALIFY LARRY KLAYMAN AS COUNSEL

Counsel for Plaintiff, Larry Klayman, hereby supplements the above styled pleading with

a copy of Larry Klayman's  response to a bar complaint filed previously with The District

of Columbia Bar Counsel, by Thomas Fitton, against Larry Klayman concerning the

same issue before this Court. The response of Plaintiff and the other attached exhibits are

self-explanatory.

Respectfully submitted,

s/Larry Klayman_____
Larry Klayman, Esq.
D.C. Bar No.: 334581
The Klayman Law Firm, P.A.
3415 SW 24th Street
Miami, FL 33145
Tel: 305.447.1091
Fax: 305.447.1548

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 25th day of June 2008, a true copy of the foregoing

Plaintiff's Motion for Extension of Time was served via electronic means to:

> Richard W. Driscoll, Esquire
> Driscoll & Seltzer, PLLC
> 600 Cameron Street
> Alexandria, VA 22314

> By:  s/Larry Klayman_____
> Larry Klayman, Esq.
> D.C. Bar No.: 334581
> The Klayman Law Firm, P.A.
> 3415 SW 24th Street
> Miami, FL 33145
> Tel: 305.447.1091
> Fax: 305.447.1548

Larry Klayman, Attorney at Law
**The Klayman Law Firm, P.A.**
3415 SW 24th Street, Miami, Florida 33145
Telephone: 305-447-1091 – Facsimile: 305-447-1548
leklayman@bellsouth.net

Via Facsimile and Mail

March 27, 2008

Elizabeth A. Herman, Esq.
Deputy Bar Counsel
Office of Bar Counsel
515 5th Street N.W., Building A
Room 117
Washington, D.C. 20001

Re:    Klayman/Fitton, Bar Docket No. 2008-D048

Dear Ms. Herman:

Thank you for granting me extensions of time to respond to the above- styled complaint filed by Mr. Thomas Fitton. With the death of my mother and some other family issues, it has been a very difficult period. I appreciate your and Bar Counsel's courtesy. I am currently in New York City and am faxing this response from a hotel. A hard copy has been mailed.

**I.    Background**

Mr. Fitton's complaint was filed, after years of contention and litigation between us, for tactical and coercive reasons, the history of which is explained in the attached pleadings in one of the cases that I was forced to file after my unilateral attempts to amicably settle our differences repeatedly failed. Ironically, the use of a bar complaint for coercive tactical purposes is itself a violation of Rule 8.4(g) of the D.C. Code of Professional Responsibility; so please consider this filing a cross complaint against counsel for Mr. Fitton, as identified below.

Rule 8.4(g) of the D.C. Code of Professional Responsibility states:

> It is professional misconduct for a lawyer to: Seek or threaten to seek criminal charges or disciplinary charges solely to obtain an advantage in a civil matter.

1

Mr. Fitton's complaint, who is a non-lawyer, was conceived of, furthered and prepared by his counsel, Mr. Richard Driscoll and Mr. Paul Orfanedes, both members of the District of Columbia Bar. Mr. Orfanedes is a director of Judicial Watch and Mr.Driscoll is outside litigation counsel in my lawsuit against Mr. Fitton and Judicial Watch. Both have been the subject of recent bar complaints filed by me, when they disclosed court sealed, private information about my divorce and had it published in Legal Times in an attempt to falsely damage my reputation and harm my family. Bar Counsel essentially deferred ruling on my complaints based on the on-going litigation.

The issues, however non-meritorious, raised in the apparently retaliatory complaint now belatedly filed by Mr. Fitton – who conveniently is a non-lawyer - are also currently the subject of a pending motion to disqualify counsel in Paul v. Fitton, et al, (D.D.C.) before the Honorable Royce Lamberth. Recently, I entered a notice of appearance in this case, so the issues are squarely in front of Judge Lamberth. As set forth in previous correspondence with you, it is my understanding that Bar Counsel generally defers consideration of a bar complaint when overlapping litigation is still on-going. In the case of Judge Lamberth, who has presided over many Judicial Watch cases while I was chairman and general counsel of the organization, he is uniquely qualified to assess the issues raised by Mr. Fitton – which argues the same Bar Rules as in this complaint before Bar Counsel.

The complaint filed by Mr. Fitton, with the aid of and furthered by Mr. Driscoll and Mr. Orfanedes, alleges certain violations of Rules 1.6, 1.9 and 3.7 of the D.C. Bar Rules, as it specifically relates to my actions to protect and come to the aid of Mrs. Sandy Cobas, Mrs. Louise Benson and Mr. Peter Paul – a former employee, donor and client respectively of Judicial Watch – from unethical and illegal conduct by Mr. Fitton.

In the case of Ms. Benson, she was forced to leave Judicial Watch when, with the involvement of Mr. Fitton, she was defamed for her Latin/Cuban ethnicity and physical appearance. Mrs. Cobas, who is very close to me and has been like a sister, was the Director of Judicial Watch's Southern and Latin American Regional Office in Miami, Florida, where I reside. After she was forced to leave Judicial Watch, presumably because of her ties and loyalty to me, she became the chief of staff of my campaign to run for the U.S. Senate in 2003-2004 – which was the reason I stepped down as \chairman of Judicial Watch on September 19, 2003.

Mrs. Benson was a volunteer, supporter of Judicial Watch when I was chairman and we developed a very close personal relationship. Mrs. Benson, a former nurse and an elderly lady, not only cared for my mother while she was convalescing in an Alzheimers nursing home in Glendale, California, but became like a second mother to me. After, I left Judicial Watch to run for the U.S. Senate in the fall of 2003, Mrs. Benson's donations to Judicial Watch were converted by Mr. Fitton, who effectively seized control of Judicial Watch, and she was defrauded of her purchase of the naming rights to an office, ironically Mr. Fitton's, at Judicial Watch's headquarters in Washington, D.C. As with Mrs. Cobas, the efforts which I made to protect Mrs. Benson and have her money returned occurred after I left Judicial Watch, as that is when the gravaman of Mr. Fitton's

misconduct and illegalities occurred. I was not chairman and general counsel of Judicial Watch when the actionable conduct by Mr. Fitton and his "hijacked" Judicial Watch essentially took place.

The same is true of Mr. Peter Paul, a client who was abandoned by Mr. Fitton and Judicial Watch – and thus cut off from a legal representation in a high profile criminal case -- after I left the organization to run for the U.S. Senate. When this occurred, Mr. Paul was left without legal representation in a criminal proceeding, as had been committed to by the organization. It is thus Mr. Fitton, a non-lawyer, who, according to a complaint filed with Bar Counsel by Mr. Paul, engaged in the unauthorized practice of law and then abandoned him in the midst of criminal proceedings. To make matters worse, Mr.Fitton and Judicial Watch then proceeded to give donors and others the misleading impression that they were still representing Mr. Paul, an individual who gave over $2 million dollars in unreported campaign contributions to the New York Senate campaign of Hillary Clinton, in order to raise funds for the organization. Mr. Paul then brought suit against Mr. Fitton and Judicial Watch on a number of actionable bases. Because of Mr. Paul's abandonment by Mr. Fitton and Judicial Watch, and the lack of resources this created for his criminal defense, Mr. Paul remains under house arrest in North Carolina and does not have the money to retain counsel to move his sentencing along to a conclusion. Mr. Paul is in a state of legal limbo and perpetual incarceration, in large part thanks to the misconduct of Mr. Fitton and "his" Judicial Watch.

It is this context that Bar Counsel must respectfully assess the complaint filed by Mr. Fitton. Any assistance on my part to help these persons after I left Judicial Watch was done for ethical purposes; to rectify wrongs against a former employee, supporter and client of the organization. Indeed, as the founder of Judicial Watch and its former chairman, I felt that I had an ethical duty to help them, as I myself, had regrettably experienced similar actionable and unethical conduct by Mr. Fitton and Mr. Orfanedes, which is the subject of on-going litigation in various fora. Most importantly, in helping these former employees, supporters and clients of the organization, I never shared any alleged confidential information from Judicial Watch with them. This is the crux of Mr. Fitton's desperate, belated, tactical, coercive and non-meritorious complaint, intended to harm me and cut off these persons from obtaining legal assistance for the wrongs committed against them.

## II. Preliminary Analysis.

During my tenure at Judicial Watch, I was chairman and general counsel to the organization. As stated in D.C. Rules of Professional Conduct, Rule 1.9 Comment [3], emphasis added,

> ...in the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; *on the other hand, knowledge of specific facts gained at a prior*

> *representation that are relevant to the matter in question,*
> *ordinarily will preclude such a representation.*

As chairman and general counsel prior to my departure from Judicial Watch to run for the U.S. Senate in Florida, I was not involved in the specific matters which Mrs. Cobas, Mrs. Benson and Mr. Paul now complain. These unethical and tortuous acts culminated and resulted in actionable conduct by Mr. Fitton after I left Judicial Watch -- as the organization was now being run by a non-lawyer with little regard for ethical or legal practices, much less loyalty to employees, supporters or clients who depended on him and Mr. Orfanedes, two directors, to do the right thing and honor their commitments. In fact, Mr. Fitton's complaint does not specify with any detail what specific facts were gained by me in my prior involvement with Judicial Watch relating to the Cobas, Benson and Paul matters which resulted in litigation after I left Judicial Watch.

### III.    D.C. Bar Rules of Professional Conduct 1.6 & 1.9 Relating to Mr. Paul.

Mr. Paul was a former client of Judicial Watch who was being criminally prosecuted for certain alleged actions tied to powerful politicians like Hillary and Bill Clinton. Judicial Watch retained criminal defense counsel to defend Mr. Paul. However, the actions that led to Paul's breach of contract lawsuit occurred after I left the employment of Judicial Watch, as he was abandoned by Fitton and Orfanedes (who became the legal director of Judicial Watch), and thus cut off from access to criminal defense counsel after I left Judicial Watch. Despite being abandoned, Fitton, Orfanedes and Judicial Watch misrepresented to the public that they were still representing Paul to raise money for themselves. The agreement that Paul signed with Judicial Watch was the standard agreement signed by all clients of Judicial Watch. I did not prepare any special provisions or specific details relating to the legal representation or agreement between Paul and Judicial Watch.

Accordingly, the acts complained of by Paul after I left Judicial Watch do not emanate from alleged confidential information during the time I was chairman and general counsel of Judicial Watch. It is thus no surprise that Fitton's complaint does not address any specific information that would be considered privileged, and indeed I have not shared any of this alleged information with Mr. Paul, even were such information privileged or relevant, which it is not.

### IV.    D.C. Bar Rules of Professional Conduct 1.6 & 1.9 Relating to Mrs. Cobas.

The actions that led to Mrs. Cobas' lawsuit against Judicial Watch occurred after I left the employment of Judicial Watch. Mrs. Cobas was a former employee of Judicial Watch, who was defamed, discriminated against, verbally harassed and abused because of her Latin ethnicity and heritage. Mrs. Cobas was forced to leave Judicial Watch because of her perceived closeness and loyalty to me, i.e. Fitton did not want her running Judicial Watch's Miami regional office after I left to run for the U.S. Senate in Florida. The gravamen of Fitton and Judicial Watch's tortuous and unethical actions occurred subsequent to my departure from Judicial Watch. Any information that I obtained from

Cobas during my employment at Judicial Watch was not relevant to the action filed by Cobas against Judicial Watch as the defamation, discrimination and harassment essentially occurred after I left Judicial Watch. Furthermore, any information I obtained from Cobas would not be information for which Judicial Watch may claim a privilege. This is information that only Mrs. Cobas may claim a privilege for.

There is absolutely no specific involvement on my part relating to privileged information in the Cobas matter. I also did not share any confidential information – even if it existed and was relevant – with Mrs.Cobas. And importantly, Mr. Fitton's complaint does not address any specific information that would be considered privileged. This alleged violation of D.C. Rules of Professional Conduct was never raised in the Cobas matter, even though litigation in the Cobas matter lasted for a couple of years and is long since over, unfortunately due to legal errors by her counsel Mr. Ray Reiser, which is why I undertook the appeal of her case. In this regard, I had to deal with evidence already on the record, and did not share any alleged confidential information with Mrs. Cobas. Since Cobas was a former employee of Judicial Watch, I believed I had an obligation as an officer of the court to prevent and or rectify the harm caused to her and her family in the interest of justice. Moreover, as a public interest lawyer, I take very seriously the ethical strictures of the D.C. Rules of Professional Conduct, which regrettably Mr. Fitton believes he is not bound by since he is not a lawyer and licensed to practice in the District of Columbia. This is why when I left Judicial Watch I obtained a commitment, orally, from him and Mr. Orfanedes that they would fill my positions as chairman and general counsel with a distinguished lawyer licensed in the District. To date, almost five years later, Judicial Watch is run by a non-lawyer (there is no chairman or general counsel) who apparently believes he is immune and exempt from the rules of ethics and the rule of law generally, and thus can do as he pleases with regard to employees, supporters and clients like Mrs. Cobas, Mrs. Benson and Mr. Paul, particularly if he perceives that they have loyalty to me and vice versa.

## V.    D.C. Bar Rules of Professional Conduct 1.6 & 1.9 Relating to Mrs. Benson.

The actionable misconduct and illegality that led to Mrs. Benson's lawsuit against Judicial Watch also occurred after I left the employment of Judicial Watch. Benson was a supporter to Judicial Watch who had donated money to raise funds for the purchase of a building for the organization. The receipt of Benson's donation did not involve any privileged information as donation solicitations were submitted to hundreds of thousands of individuals. Therefore, any claimed privilege, even if it existed, was specifically waived by Judicial Watch. Furthermore, the failure on the part of Judicial Watch to purchase a building and the misrepresentation made to Mrs. Benson after I left Judicial Watch resulting in the lawsuit against the organization occurred after I left the employment of Judicial Watch.

In the Benson matter, the issue of my involvement with Judicial Watch was not raised with Bar Counsel until now, even though this matter was settled with Judicial Watch some time ago, but only after it was effectively forced, thanks to the litigation, to

return Benson's money. Mr. Fitton and Judicial Watch did so to try to avoid continued litigation over allegations of fraud, which clearly had occurred after I left Judicial Watch.

In sum, I never shared confidential privileged information with Mrs. Cobas, Mrs. Benson, or Mr. Paul, and the acts which they complained of concern unethical and illegal conduct by Mr. Fitton and Mr. Orfanedes, not by me during my tenure at Judicial Watch.

## VI.    Fitton's and Klayman's Adversarial Relationship.

It is obvious that a very adversarial relationship exists between Mr.Fitton and I as Judicial Watch has breached my severance agreement, converted my funds, defamed and misused my name in a false light, time and time again. Thus, Mr. Fitton is attempting to belatedly use his bar complaint for coercive, tactical purposes in the ongoing litigation between Judicial Watch and me. It is also another attempt to prevent the representation of individuals with valid claims against Judicial Watch who do not have the monetary resources to fund these claims without some assistance from me. I firmly believe that I have an ethical duty to try to rectify these wrongs, as I was the founder of Judicial Watch. I also want the organization which I founded to maintain its ethical reputation, as a beacon of justice and ethics, not a sleazy group run by a non-lawyer who feathers its own nest at the expense of employees, supporters and clients.

## VII.    Application of D.C. Rule of Professional Conduct 1.9.

I have not violated Rule 1.9 of the D.C. Rules of Professional Conduct. Rule 1.9 of the D.C. Rules of Professional Conduct requires that:

> A lawyer who has formerly represented a client in a matter, shall not thereafter represent another person in the same or substantially related matter in which that persons interests are materially adverse to the interests of the former client, unless the former client consents after consultation.

While I was at Judicial Watch, I did not represent Mrs. Cobas, Mrs. Benson or Mr. Paul in the matters for which they have complained. Moreover, I did not receive any information from Judicial Watch that would be considered privileged information regarding the Cobas, Benson and Paul matters. Furthermore, as stated above, Mr. Fitton is incapable of expressing or detailing Judicial Watch's privileged information that was allegedly disclosed to Cobas, Benson or Paul, or any third party for that matter, because it did not happen!

## VIII.    Application of D.C. Rule of Professional Conduct 3.7.

Finally, as far as Fitton's claim that I have violated D.C. Rule of Professional Conduct 3.7 because I am allegedly a necessary fact witness in the Cobas, Benson or Paul matters that have been filed against Judicial Watch is simply wrong. My testimony will

not be required in the Cobas, Benson and Paul matters, as the unethical and illegal conduct by Mr. Fitton, Mr. Orfanedes and Judicial Watch took place after I left the organization to run for the U.S. Senate, and any other relevant evidence can be gleaned from contractural documents that can be authenticated by a records custodian.

D.C. Rule of Professional conduct states, in part:

> (a) A lawyer shall not act as an advocate at a <u>trial</u> in which the lawyer is likely to be a necessary witness except where:
> (1) The testimony relates to an uncontested issue; (2)The testimony relates to the nature and value of legal services rendered in the case; or (3) Disqualification of the lawyer would work substantial hardship on the client.

The Cobas and Benson matters did not go to trial, no depositions were taken, and presently the Paul matter is not at the trial stage, thus, D.C. Rule of Professional Conduct 3.7 does not apply. Moreover, Mr. Fitton's complaint, as stated above, fails to identify what material facts or information I am in possession of that would require me to be a material fact witness in the Paul matter. If there is any material fact information that I am in possession of that would make me a material fact witness in the Paul matter, then Mr. Fitton or Judicial Watch are at liberty to file a motion to have me recused from any involvement or representation in the action by Paul against Judicial Watch. Moreover, the applicable Bar Rule contains exceptions which may become relevant should the Paul matter go to trial, but which have not been "reached" at this point.

## IX.   Conclusion.

In conclusion, I have not breached any ethical duties as they relate to my former tenure at Judicial Watch under Rules 1.6, 1.9 or 3.7 of the D.C. Rules of Professional Conduct. I thus respectfully request that the Office of Bar Counsel summarily dismiss this matter, or hold it in abeyance until Judge Lamberth disposes of identical issues in the Paul litigation, as is Bar Counsel's usual practice. Of course, if the Office of Bar Counsel requires any further information, supporting documentation or evidence in this matter, please feel free to contact my office at (305) 447-1091.

Ironically, Mr. Fitton may have performed a service to Mrs. Cobas, Mrs. Benson and Mr. Paul and the public at large by filing his non-meritorious complaint, as Bar Counsel is respectfully requested to investigate how what is essentially, in practice, a public interest legal organization can ethically function with such a non-lawyer at the helm – who effectively calls "all the shots." The track record concerning Mrs. Cobas, Mrs. Benson and Mr. Paul speaks for itself.

Sincerely,

Larry Klayman

cc: Mr. Thomas Fitton

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LARRY KLAYMAN, et al.,

    Plaintiffs,

    v.

JUDICIAL WATCH, INC., et al.,

    Defandants.

Civil Action No.  1:06-CV-00670
Judge Kolar Kotelly
Magistrate Judge Kay

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL
PLAINTIFF'S RESPONSES TO DEFENDANTS' SUPPLEMENTAL REQUEST
FOR PRODUCTION OF DOCUMENTS AND CROSS MOTION FOR
PROTECTIVE ORDER AND RECONSIDERATION**

**I.  INTRODUCTION AND BACKGROUND.**

**This is a lawsuit which never should have been necessary!**

In the Spring of 2003, Larry Klayman, the founder, chairman and general counsel
of Judicial Watch, about ten years after the creation of the organization, decided
to step down to return to his home  in Florida to run for the U.S. Senate. During
this period, Mr. Klayman was separated from his then wife and undergoing a
divorce, and he felt that it was a good time to do something new and different,
taking advantage of his considerable experience in government and fighting
government corruption. Trying to use Mr. Klayman's divorce to his advantage,
the president of Judicial Watch, Tom Fitton, tried to negotiate ridiculous terms for

1

Mr. Klayman's severance, but in the end the parties agreed voluntarily to sufficient compensation and that Mr. Klayman's departure was voluntary and on good terms; "to pursue other endeavors." Judicial Watch issued a press release praising Mr. Klayman for founding Judicial Watch and building it into the major "watchdog" organization in the United States. See also, National Journal article of June, 2002 (**Exhibit** 1). Importantly, the National Journal, the prestigious legal and political publication, in and around this time, after conducting many interviews in the non-profit and related communities, called Mr. Klayman a major force in Washington and the number one public interest litigator at the time – making a special point of praising him for his non-partisanship.

Just prior to leaving Judicial Watch, Mr. Klayman learned from a major donor that Mr. Fitton, contrary to his representations when Mr. Klayman hired him, and later in written biographies, had never graduated from college. As a result, Mr. Klayman left Judicial Watch on the oral condition and with a gentlemen's agreement that Mr. Fitton and the other directors fill Mr. Klayman's chairmanship with an experienced and well respected lawyer, such as then former Congressman Bob Barr. This was crucial, because Judicial Watch earned its reputation by filing hard hitting public interest lawsuits, not just holding seminars and publishing materials on websites. A non-lawyer, much less a college graduate, was not equipped to successfully lead the organization into the future. Indeed, the Washington Post observed in April of last year, after Mr. Fitton and the other directors had failed and refused for four years to fill the chairmanship position with an experienced and respected lawyer, that:

2

"Judicial Watch earned its reputation in the 1990s for lawsuits..... But it's largely been out of the news since Klayman left Judicial Watch — and filed a lawsuit against it."

Washington Post, April 6, 2007


When Mr. Klayman executed his Severance Agreement with Judicial Watch, Mr. Fitton and one other director on September 19, 2003, he thought that all parties would pursue their respective endeavors in peace. But obviously fearing that Mr. Klayman might not win his Senate race and may one day try to return to Judicial Watch, Mr. Fitton, the dominant director remaining at Judicial Watch, set out to destroy Mr. Klayman and his family, to weaken him to such an extent that he could never pose a threat to this non-lawyer, non-college graduate ever relinquishing control of the organization Mr. Klayman conceived of and founded. Much like Brutus to Caesar, the betrayal, even in the hard and cold world of Washington, D.C., was unprecedented.

First, to harm Mr. Klayman, knowing that he was in the public spotlight by virtue of his Senate run, Mr. Fitton ordered the comptroller of Judicial Watch, Susan Pretherich, to create phony, after the fact invoices, claiming that Mr. Klayman owed the organization large sums of money – obviously as a clever means to try to recoup some of the severance payment. In trying to extort this money, Mr. Fitton threatened to sue Mr. Klayman at the height of his Senate campaign to generate negative publicity, but Plaintiff would not give in to this attempted extortion. But when Klayman refused to be extorted and give in, Mr. Fitton published false notes on Judicial Watch's public income tax returns, displayed widely on the internet, misleadingly suggesting that Mr. Klayman had

3

somehow misappropriated monies from Judicial Watch, and conspiculously failing to list the considerable monies and other property which Judicial Watch owed to Mr. Klayman.

Second, Mr. Fitton, while improperly using, without authorization, Mr. Klayman's, name and signature in fundraising long after Mr. Klayman left to generate large contributions, he disparaged Mr. Klayman with the media, in an attempt to keep him off television and radio, the life blood of a public interest law and policy. See **Exhibit 2.**

Third, employees of Judicial Watch were told not to communicate or help Mr. Klayman in any way, which was their constitutional right under freedom of association and freedom of speech.

Fourth, Mr. Fitton also dishonored the terms of the Severance Agreement by cutting off Mr. Klayman's children, then five and three years old, from medical insurance.

Fifth, Mr. Fitton failed, as required under Judicial Watch's multimillion dollar lease, to remove Mr. Klayman as the personal guarantor, while at the same time reneging with donors on Judicial Watch's commitment to buy the building they were renting. Judicial Watch had raised money to buy this building with the donors' contributions. By honoring this commitment to the donors and buying the building at 501 School Street, S.W., Fitton would have mooted out the need to remove Mr. Klayman as a guarantor of the lease. Despite not buying the building – obviously to hoard this money to guarantee Fitton the other defendants' large salaries well into the future - Fitton, in newsletters and otherwise, gave donors the false impression that the building had been purchased and even published a phony plaque "showing" the naming rights donors had thought they had

4

purchased in the building. Incredibly, to minimize the embarrassment of having been later sued by Mr. Klayman, Fitton has told donors and others that Mr. Klayman was only an "employee" of Judicial Watch, so they should not give much consideration to his lawsuit and the fact that he was no longer with Judicial Watch. **See Exhibit 3**. What he cleverly failed to mention is that "employees" don't guarantee multimillion dollar leases, particularly when Fitton and the director at the time, Paul Orfanedes, refused to do so.

Sixth, after Mr. Klayman lost his Senate bid, and even well before, Mr. Fitton instructed Judicial Watch employees, including the receptionist, to not tell callers where Mr. Klayman could be located, denying him business and other opportunities – not to mention harming the interests of Judicial Watch clients and supporters who wanted to speak with Mr. Klayman. To make matters worse, when callers would ask why Mr. Klayman left, Mr. Fitton instructed the Judicial Watch employees to tell them that "Judicial Watch could not discuss the reasons Mr. Klayman left; that they were confidential," thereby creating false innuendo harming Mr. Klayman's reputation. And, after Mr. Fitton and company were sued, they told callers that Mr. Klayman sued them to avoid income tax issues.

Seventh, the harm to Mr. Klayman continued even after the intitial and amended complaints were filed in this case. Long after the case began, Mr. Fitton caused to be published in LegalTimes a story concerning Mr.Klayman's family and ex wife, from information, long since discredited and retracted, that had been placed under court seal in his divorce case. Mr. Fitton did this without regard to Mr. Klayman's children or innocent third parties, all the while claiming that the reason Mr. Klayman left was because he had no regard for so called family values. Ironically, over the years there had

been comments about Mr. Fitton's life style, which Mr. Klayman never used for advantage against him. Recently, Mr. Fitton and the other defendants have again published false information on Judicial Watch's public tax returns, suggesting the Mr. Klayman made off with a lot of money, but failed to even note the multiple lawsuits against them for the considerable monies and damage owed to Mr. Klayman. Recently, during a period just days after the death of Mr. Klayman's mother on January 24, 2008, Mr. Fitton has even attempted to use the District of Columbia Bar to harass Mr. Klayman, claiming that he did not have the right to protect former employees who were fired after Mr. Klayman left for their allegiance to him and donors and supporters and clients who have been defrauded and harmed through misleading fundraising, abandonment and other tortious acts. **See Exhibit 4** – D.C. Bar Complaint Letter. To top it all off, Mr. Fitton and the other defendants have recently tortiously interfered in Mr. Klayman's claim to be covered by Judicial Watch's "Directors and Officer's Policy" for the non-mertitorious counterclaim they filed against him. And, when Mr. Klayman and his co-counsel asked for the policy name, company and policy number many, many weeks ago, Mr. Fitton, the defendants and their counsel provided false information about the carrier and policy at issue, instead providing the wrong carrier and policy intentionally. This has harmed Mr. Klayman and delayed his right to get the same coverage which is handsomely paying for defendants" defense in this case. **See Exhibit 5.** Yet, Mr. Fitton complains and cries when Mr. Klayman has attempted to raise monies from the public through advertising to support returning Judicial Watch to an ethical foundation. The hypocrisy and misconduct of Fitton and the directors, Mr. Orfanedes and Mr. Farrell, are all harmful not only to Mr. Klayman and his family, but the donors and supporters of Judicial Watch and the

organization itself, which Plaintiff conceived of, created, seeded with his own money and resources, hired key personnel after starting with a group of volunteer lawyers, and then put ten years of "blood, sweat and tears" into. During this period, Mr. Klayman and the organization became so prominent, that the NBC hit drama "West Wing" created a character after him, "Harry Klaypool of Freedom Watch."

Not to let this rest, when Mr. Klayman created a new public interest group, "Freedom Watch" and trademarked the name, Mr. Fitton and the other defendants interfered with the Internal Revenue Serive, opened Mr. Klayman's mail accidentally sent to Judicial Watch for Freedom Watch, and assisted infringers of the trademark Freedom Watch in defending a lawsuit that Mr.Klayman filed against an imposter Republican-Bush administration front group, "Freedom's Watch," which sprung up last summer in time not only to defend General Patreous' Congressional testimony in support of the failed Iraq War, but also in time for the 2008 elections as a so called conservative adversary to the Democrat oriented Moveon.org.

In a show of incredible "chutzpah" and intellectual legal dishonesty, Mr. Fitton and the other defendants, notwithstanding their assisting Republican infringers of the trademark "Freedom Watch," had early on threatened to sue Mr. Klayman as the height of his 2004 Senate campaign, for making any mention of his having founded Judicial Watch – themselves falsely claiming trademark infringement for Plaintiff's even discussing his legal background – fearing that the Senate campaign would compete with the greed of Fitton and the other defendants for monetary contributions. See **Exhibit 6.**

7

The said irony and truth is that at all times, Mr. Klayman had tried to resolve these matters with Mr. Fitton and the other defendants, not wanting to harm the "baby" he had birthed; Judicial Watch, even using a prominent mediator in Washington, D.C. But Fitton and the other defendants did not want to settle, preferring to use their tens of millions of dollars in resources which Mr. Klayman had left behind with Judicial Watch to continue to harm Plaintiff and his family – in order to keep Mr.Klayman "down" and preoccupied so he could never lift his head up and reestablish himself prominently after he lost the Senate bid. But when the abuse and illegality by Fitton and the other defendants grew so rampant, and threatened to destroy Judicial Watch due to Mr. Fitton's fraudulent acts toward clients, donors and others, Mr. Klayman was left no choice but to file suit. In effect, Judicial Watch had been taken hostage and it was time to not recuperate and remedy the damage counsel to Mr. Klayman, his children and his family, but to also reclaim Judicial Watch for the benefit donors who had and were supporting it.

It is in this context that one must view most of Defendants' Supplemental Requests for Production of Documents, which, if not limited and reined in, are intended to be another means to harass, harm and damage Mr. Klayman and his family.

## II. Defendants' Supplemental Document Requests.

At the outset, Plaintiff, Mr. Klayman, does not object to providing relevant documents that fall within the scope of this lawsuit. [1]His responses to defendants' supplemental document requests bear this out. To the contrary, Mr. Klayman has only

---

[1] Contrary to Defendants' claims, Plaintiff's counsel did not waive his objections. In any event, this issue arose before the Magistrate issued his earlier ruling cited in Defendants' motion to compel, so the Magistrate's order was not flouted.

objected where the requests are burdensome, overly broad and irrelevant, and calculated only to conduct a fishing investigation of his personal life and finances – matters off limits in any reasonable discovery endeavor. Given Mr. Fitton's and the other defendants' documented history of harming Mr. Klayman, his children and his family, it is obvious that these documents, which are unnecessary in the context of this litigation, would be used to damage Plaintiff further.

For example, Mr. Fitton's and the other defendants supplemental requests numbers 13, 15, 23, 24, 25, 26, 27, 28, 29, and 30 seek to effectively clean out all of the financial records of Saving Judicial Watch, Freedom Watch and Larry Klayman personally, including his highly personal credit reports, which have no bearing on this lawsuit. Despite general requests that Plaintiff has posed to Mr. Fitton and the other defendants, they have not produced such records to Mr. Klayman, obviously because they are not relevant to the issues at hand, and are highly invasive. Assuming that Mr. Fitton and the other defendants have any claim for damages for Plaintiff's direct mail and advertising supporting this litigation– which they do not – these figures can be derived by an independent certified public accountant, and submitted to the Court under seal, without having to literally dump out all of Plaintiff's financial files and personal information. Moreover, Mr. Klayman is the counterdefendant in this case, not Saving Judicial Watch or Freedom Watch, so the requests are not relevant in any event. Plaintiff, Mr. Klayman, suggests the same procedure with financial information to be submitted by Mr. Fitton and the other defendants with regard to his damage claims – documents and information which has conspicuously not been produced and which will, if not resolved shortly, will be subject to motion practice. This approach is reasonable and appropriate, and will

produce the relevant damage information without invading privacy and other rights --
rights which have already been violated by Mr. Fitton and the other defendants to harm
Mr. Klayman, his children and his family.

To add insult to injury, and coupled with the fishing expedition concerning Mr.
Klayman's financial matters, Mr. Fitton and the other defendants want to also muck
around in his prior divorce from his prior wife Stephanie Luck Klayman. Specifically, at
supplemental request 17 Mr. Fitton and the other defendants demand "Any and all
documents filed in your divorce proceeding with Stephanie Luck Klayman, regardless of
jurisdiction."

Notwithstanding the outrageous and transparent motive for this request – to harass
Mr. Klayman, violate his and his children's and family's privacy, and to use the
information for more press articles in publications like LegalTimes – all of which is
apparent given their prior conduct smearing him in LegalTimes, a trade magazine
concerning his profession – the supplemental request is not even relevant. In this regard,
the Severance Agreement states plainly, by agreement of Mr. Fitton and the other
defendants – that Mr. Klayman left Judicial Watch voluntarily, to pursue other endeavors
and also contains the text of a public statement, later issued as a Judicial Watch press
release, praising Mr. Klayman for his founding and serving as chairman of Judicial
Watch. The smear campaign waged by Mr. Fitton and the other defendants is not only
irrelevant, it defies the "parol evidence rule." Indeed, when Plaintiff sought to bring in
issues involving Mr. Fitton and the other defendants oral promise to hire a chairman of
legal stature, after Mr. Klayman left, outside of the written terms of the Severance
Agreement, this court dismissed these claims. What is good for the goose is good for the

gander and in the unlikely event this supplemental request, or the supplemental requests concerning Denise Underberg Golden (#11) and Rebecca L. Eddy (#12) – two persons Mr.Fitton and the other defendants insinuate Mr. Klayman had some sort of personal relationship with are at issue, Plaintiff moves for reconsideration. This is simply not relevant in the context of this litigation and defies the parol evidence rule, and the Severance Agreement which the parties agreed to and made it clear that the reasons Mr. Klayman was leaving Judicial Watch was to pursue other endeavors, i.e., running as a candidate for the U.S. Senate. And, if Mr. Klayman had had affairs with these persons while married, would he have been so stupid to then run for the U.S. Senate? The insinuation is not only revolting, but not relevant and calculated only to harm Mr. Klayman and his family and to try to extort a settlement in this case, if not ruin Mr. Klayman's reputation so he cannot compete with the current Judicial Watch, run by persons who are milking it dry to the detriment of the donors and supporters, not to mention the harm to Plaintiff, his children and his family.

Then there are Mr. Fitton's and the other defendants' supplemental requests asking for "all" repeat "all documents, no matter what, concerning direct mail fundraising, his prior Senate campaign, Saving Judicial Watch, Freedom Watch and only God knows what else. See supplemental requests 2,3,4,7,8,9,10,13 19,23 24,25, 26,27,28,29, and 30. This is clearly overly broad and not relevant or calculated to lead to relevant evidence, notwithstanding the other legitimate issues and objections raised above.

Mr. Fitton and the other defendants also demand all documents that refer or relate in any way to former employees Sandra Cobas (#34), Russ Verney (#39), Mike

11

Pendleton (#40), Jane Chastain (#41), John Vincent (#42), Connie Ruffley (#43), and employee Janice Rorup (#45). Not only is this highly invasive of their privacy rights, but there is no showing of any relevancy to the request whatsoever and they are clearly overly broad. When Mr. Klayman sought to negotiate a reasonable limit to these and other supplemental requests, he was met with a repeated mantra by Mr. Fitton's and the other defendants' counsel that the requests were fine, without explanation. The same is true of the requests concerning Mrs. Louise Benson (#38) and Mr. Peter Paul (#37). Mrs. Benson is like a mother to Mr. Klayman and indeed has corresponded with Mr. Klayman and his children on personal matters. Mr.Paul is a former client of Mr.Fitton and the other defendants and has been forced to sue them -- a lawsuit which is going forward before the Honorable Royce C. Lamberth in this court, for defendants having abandoned him, violated his contract, and other tortious acts. These issues are not involved in the instant litigation, except for the pattern and practice of Mr. Fitton and the other defendants making false representations to donors and supporters about representing Mr. Paul to raise money, when indeed they had already abandoned Mr. Paul. Thus, the supplemental requests are overly broad, largely irrelevant and objectionable.

### III.CONCLUSION.

Mr. Fitton's and the other defendants' supplemental document requests are largely designed to harass Mr. Klayman, innocent third parties and anyone else who has any past or present association with Plaintiff, including his former wife and his children. The defendants and their counsel have already demonstrated their intent to smear Mr. Klayman, increase the cost of litigation with bogus filings, and keep him down -- a sole

practitioner – in any way that will curtail his professional career and personal interests. Mr. Klayman wishes that he never would have had to file this and other lawsuits that are pending before the courts, after Mr. Fitton's and the other defendants' unsuccessful attempts to have them dismissed. For five years, the disputes with Mr. Fitton and the other defendants have caused great damage and prevented Mr. Klayman from being as effective public advocate as he could otherwise be.

Plaintiff, Mr. Klayman, therefore respectfully requests that this honorable court reign in the abusive and unnecessary and harassing supplemental document requests of Mr. Fitton and the other defendants and if necessary issue a protective order. Plaintiff, Mr. Klayman, also requests a ruling that Mr. Klayman's children, family and prior divorce are not relevant to the causes of action in this case, as they are barred by the parol evidence rule, rights of privacy and common decency.

WHEREFORE, Plaintiff, Mr. Klayman, respectfully requests that Mr. Fitton and the other defendants' motion to compel be denied and that Plaintiffs' cross motions be granted.

Respectfully submitted,

s/Larry Klayman
Larry Klayman, Esq.
D.C. Bar No.: 334581
The Klayman Law Firm, P.A.
3415 SW 24th Street
Miami, FL 33145
Tel: 305-447-1091
Fax: 305-447-1548

Daniel J. Dugan, Esquire

13

Spector Gadon & Rosen, P.C.
1635 Market Street 7th Floor
Philadelphia, PA 19103
Tel: 215-241-8872
Fax: 215.241.8844


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of March 2008, a true copy of the foregoing

Motion to Compel Plaintiffs' Response to Defendants' Supplemental request for

Production of Documents and Cross Motion for Protective Order and Reconsideration

was served via electronic means to:

Richard W. Driscoll, Esquire
Driscoll & Seltzer, PLLC
600 Cameron Street
Alexandria, VA 22314


By: s/Larry Klayman_____
Larry Klayman, Esq.
D.C. Bar No.: 334581
The Klayman Law Firm, P.A.
3415 SW 24th Street
Miami, FL 33145
Tel: 305-447-1091
Fax: 305-447-1548

# EXHIBIT 1

JUNE 29, 2002 NUMBER 26

# National Journal

THE WEEKLY
ON POLITICS AND
GOVERNMENT

# Our Porous Ports

**Security experts warn that the most glaring gap in America's defenses may be its seaports. Is enough being done to protect them? BY JAMES KITFIELD**

LEGAL AFFAIRS

**CLINTON CRITIC:** During the 1990s, Larry Klayman's Judicial Watch filed a blizzard of lawsuits against members of the administration.

# Turning the Tables

### BY LOUIS JACOBSON

LARRY KLAYMAN, ONCE LABELED A RIGHT-WING OPERATIVE, HAS BEEN SUING REPUBLICANS, RAISING MONEY, AND PRYING OPEN SOME GOVERNMENT SECRETS.

Walk into the offices of Judicial Watch—located on two floors of a building that is squeezed amid the hulking bureaucratic fortresses of Southwest Washington—and you enter a universe in disarray. The elevator opens onto a workspace undergoing major renovation; wires dangle from the ceiling, bunched-up carpets lie limply on the floor, fat bags of fiberglass await installation, and various types of piping bulge from half-built walls.

The setting, as it happens, is uncannily appropriate. Judicial Watch—an aggressively litigious watchdog group founded in 1994 by onetime international-trade lawyer Larry Klayman—is itself something of a work in progress. With a staff of 50 and a budget of roughly $15 million, Judicial Watch recently announced the opening of a Chicago office, adding to those already operating in Washington, Dallas, Los Angeles, and Miami. More outposts, both domestic and foreign, are on the drawing board.

And it's not just the office that's being renovated. Until recently, the public image of Klayman, the group's chairman, was that of a Clinton-hating zealot—a charter member, as it were, of the "vast right-wing conspiracy." Klayman and Judicial Watch came to public attention in the 1990s for filing a blizzard of lawsuits against members of the Clinton administration. Almost everyone who was anyone in the administration—and almost anyone who had a grudge against Clinton and his team—became a party to a Judicial Watch lawsuit, on one side or the other.

Klayman found a cooperative partner in U.S. District Court Judge Royce Lamberth, a jurist noted for his irascible,

no-nonsense approach to government oversight, who happened to be assigned a number of Judicial Watch's Clinton-era lawsuits. Some of the group's suits bore fruit, often in the release of documents embarrassing to the administration. But each case, regardless of outcome, has affected the lives of Washington officials, as measured in depositions taken and billable hours charged by their attorneys.

The president's backers ripped Klayman as a man with an insatiable desire for harassing public officials with legal fishing expeditions. And many did not mince words. Clinton strategist James Carville once called Klayman "a little twerp," a slur that only prompted more legal challenges by Klayman.

Klayman consistently denied any partisan motivation and argued that he just wanted to root out government dishonesty. But Judicial Watch's lopsided ratio of Democratic-to-Republican targets throughout the 1990s made its opponents' claims plausible. Many anti-Clinton conservatives gleefully supported Judicial Watch's efforts, at least from a distance. And now, David Schippers, who headed the House Judiciary Committee's Republican inquiry into President Clinton's impeachment, will join the group's new Chicago office.

But these days, Klayman seems to be proving out his long-held claim of nonpartisanship. Beginning in 2001, he filed complaints against the National Republican Congressional Committee and House Majority Whip Tom DeLay, R-Texas, alleging that they had given big donors special access. He demanded that the Senate probe for links between President Bush's then-nominee for Labor secretary, Elaine Chao, and controversial Clinton fundraiser John Huang. Klayman also joined the legal maelstrom over the Enron bankruptcy, calling the company that was once close to GOP leaders a "gargantuan fraud." He filed an ethics complaint against former Whitewater Independent Counsel Robert Ray, a Republican, for allegedly laying the groundwork for a Senate run while still serving as special prosecutor. (Many of these actions are still pending.)

Most notably, Judicial Watch filed suit—parallel to actions filed by environmental groups and the General Accounting Office—to force access to the records of Vice President Cheney's energy task force. On May 23, Klayman and the other plaintiffs won a major victory when a federal judge refused to dismiss the suit and ruled that Cheney must turn over relevant documents for discovery.

Such recent cases against Republican targets have forced partisans to hastily rejigger their views of Klayman to fit their current political needs. "Larry Klayman believes the government is accountable not to the people but to Judicial Watch," griped one Republican who has been threatened with a lawsuit. In an interview with *National Journal,* Grover G. Norquist, who heads Americans for Tax Reform, echoed the feelings expressed by many of his conservative peers. "Before, if he'd called me, I would have accepted lunch, and I would have been interested in what he was doing," Norquist said. "I don't think I'd take that call today."

Not surprisingly, a few liberals and Democrats have warmed to Klayman recently. "I felt he was a Republican



LARRY KLAYMAN: "I don't care what people think, because most of them are not up to the standards of what I believe in."

stooge all these years," said one lawyer who has faced off against Klayman on behalf of Democratic clients. "Now I think maybe he's onto something."

"He's helpful to us," added one Democrat. "Our guys in the Senate are loath to go after documents the way the Republicans did. Klayman actually ends up getting some real work done for us. He's able to pry the information out."

Some politicos go further, suggesting that Klayman is now making a tangible impact in Washington. At a time when the executive branch seems especially interested in keeping secrets from the public, activists in the small community of Freedom of Information Act experts say that Klayman has become a leading, albeit maverick, figure in challenging secrecy rules. "He appears to be the major public interest litigator at this time," said Harry Hammitt, editor and publisher of *Access Reports,* an FOIA newsletter based in Lynchburg, Va.

Indeed, one recurring theme emerged from the two dozen interviews conducted for this story: The main reason Larry Klayman is exasperating to many people across the political spectrum is that he ignores the rules of partisan combat that define Washington. Many political operatives have come to realize that Klayman is impossible to sway, because he seeks no Establishment credentials, and has none to protect.

"At the end of the day, it's like devoting your life to the eradication of a mosquito," said one Republican. "Klayman is proof positive that in this country, you can sue anyone for any reason any day of the week."

Without prompting, former Clinton spokesman Joe Lockhart used a similar metaphor in referring to Klayman. "I guess there's a place for annoying insects in every system," Lockhart said. "It's not worth the effort to squash him."

### DIFFICULT TO DEAL WITH

In a town that cheers self-made men and women, Larry Klayman, 50, is about as self-made as they come. Born in Philadelphia and educated at Duke University and Emory School of Law, he served from 1979 to 1981 as an attorney in the Justice Department's Antitrust Division, then founded his own firm, Klayman & Associates, in 1988, to practice international trade law. When Klayman established Judicial

Watch in Washington in July 1994, few people in the nation's capital had ever heard of him.

Klayman said he came up with the name because "Judicial Watch" has a double meaning: The group would be a watchdog over judicial practices *and* use the judiciary as a watchdog over the rest of government. After 17 years in the legal profession, "I'd seen a lot of dishonesty among lawyers," Klayman said in an interview. "Judges' decisions were made not on the merits but because of what kind of special interest you represented. I saw that in government, too."

Monitoring judges is still one of Judicial Watch's main activities. In Los Angeles, for instance, the group watches and reports on judges in action, "to praise the good ones and criticize the bad ones," Klayman said. But what got Klayman's adrenaline rushing—and drew the most media attention—was the chance to battle the big names.

Klayman's operating style is widely considered sui generis. Several judges have sanctioned him for filing frivolous motions or for other misconduct; one barred Klayman from his courtroom permanently. In legal proceedings, said one lawyer who has dealt with him, Klayman "is utterly humorless and without the normal give-and-take. It's not even a question of whether you'd want to go have drinks with him after a court appearance. It's that if you tell him your daughter has a ballet rehearsal in two days and you want to postpone a deposition, he'll probably say no."

Klayman admits he's "guilty" of the charge that he's difficult to get along with. "I get impatient with dissembling and lying, and forgetting when people should be able to remember," he said. "Like when [Clinton adviser] Harold Ickes came in, and I asked what school he had gone to. He said, 'I don't remember.'"

This humorlessness is one cornerstone of the antagonism toward Klayman. Critics also tend to bring up the story that he once sued his mother, though Klayman insists that the episode has been grossly misunderstood. "My grandmother was the closest person in my life," he said, motioning to her photograph in his office. "She raised me. My stepdad induced her to turn over her life savings. When my grandmother broke her hip and was on her deathbed, she needed money to care for herself. I brought the case to get her money back, as any good son would have done. I love my mother [but] she was suffering from dementia. She was controlled by my stepfather. The money was in her name, so I technically had to sue her."

Interestingly, Klayman doesn't appear to mind the confusion spawned by the more popular version of the story. "I think people thought if I would sue my mother, I would sue anybody, and that may have had a deterrent effect," he said.

Klayman also disagrees with critics who dismiss him as a headline hound. He calls the media "the most powerful entity in the world"—considering it such an important tool that he not only cultivates media sources but also airs his own television and radio shows. Yet he adds that he has taken steps to lower his own profile in favor of Thomas J. Fitton,

the group's president, noting that 95 percent of respondents in a recent Judicial Watch survey said they'd continue to support the group even without Klayman. "I don't care what people think, because most of them are not up to the standards of what I believe in."

So what does Klayman believe in? He describes his group's orientation as "fiercely nonpartisan, but conservative. We have a healthy skepticism about government. Unless it's watched and scrutinized, it becomes corrupt."

What Klayman calls ethical watchdogging his critics deride as conspiracy-mongering. In 1997, Judicial Watch helped the conservative group Accuracy in Media file lawsuits seeking documents related to the suicide of Vince Foster, Clinton's deputy White House counsel. Last March, Klayman filed a suit on behalf of more than a dozen survivors of the Oklahoma City bombing, claiming that Iraq was behind the attack. Judicial Watch even filed one case in the mid-1990s that asked the Armed Forces Institute of Pathology to investigate whether Clinton Commerce Secretary Ron Brown had been shot in the head before his plane crashed, killing all aboard.

To be sure, some of Klayman's other efforts have generated more mainstream support. One was a bid to extract information from the Commerce Department about how companies were tapped to take part in Brown's foreign-trade missions. Even *The Washington Post*—whose columnists have repeatedly, and gleefully, ridiculed Klayman's litigation excesses—conceded in a 1999 editorial that Klayman had a point with this suit. While the editorial called Klayman's litigation habits "distasteful," it added that such behavior "does not make him less entitled to information from the government under FOIA. The irony is that in so badly mishandling his FOIA requests, the Commerce Department has given Mr. Klayman a legitimate issue."

Some observers—even those with no ties to the conservative movement—say that Klayman's Clinton-era suits were a public service. Bill Allison, the managing editor of the Center for Public Integrity, a government watchdog group that has taken on both Republicans and Democrats, calls Klayman "consistent in trying to force government agencies to release information, and for that, I have to take my hat off to him."



**BILL ALLISON:** Klayman is "consistent in trying to force government agencies to release information."

Experts in FOIA law credit Klayman with finding a previously empty niche. "My impression is that he is one of the first people with an avowedly conservative point of view who has really jumped into using FOIA in a big way," Hammitt said. "Beforehand, most of the usual FOIA suspects were people on the left." In the years since Klayman showed the way, the GOP and conservative groups have used information derived from FOIA with growing frequency, said David Burnham, co-director of the Transactional Records Access Clearinghouse, a nonpartisan FOIA research operation at Syracuse University.

"Probably the worst decision the Bush Administration made was to make Klayman an outcast," added Mark Zaid, a lawyer who represents both whistle-blowers and media outlets and who heads the nonprofit James Madison Project. "I commend Larry's tenacity in standing up for what he believes is the right thing."

The most important single break for Klayman and Judicial

Watch may have been the chance assignment of Lamberth to one of his Clinton-era cases—an assignment that caused other, related cases to be assigned to Lamberth as well. By all accounts, Lamberth is exactly the kind of judge who would be open to Klayman's arguments—iconoclastic and devoted to rigorous government oversight. Although legal experts say that Lamberth has not given Judicial Watch free rein, they agree that he has lent Klayman an unusually sympathetic ear. "In almost any other place in the world, he probably would have been long since put out of business," said a lawyer who has faced off against Klayman.

Still, some say that Klayman's results have come more from good fortune—and sheer exertion—than from legal brilliance. One lawyer who has battled Klayman called him "a terrible lawyer—someone whose skills at cross-examination and brief-writing are, on any objective basis, well below average."

Suing the federal government, this lawyer added, "offers endless possibilities even for lousy lawyers to be onto something."

Klayman defends his legal skills, but concedes that the quality of Judicial Watch's filings might improve if it chose to pursue fewer cases. Still, he said, that's unlikely to happen anytime soon. "Because a lot of cases are dismissed by judges appointed by politicians, we try to be a little like a [multiwarhead] missile. Not a lot of our efforts will get through."

## WHO ARE THE FUNDERS?

Over the years, Klayman has taken pride in his record of building his organization from scratch.

In creating Judicial Watch, Klayman said, he emulated consumer advocate Ralph Nader. "I talked with Nader's people" when setting up Judicial Watch, Klayman said. "I wanted to see how they were structured. They were nice. They showed me some of their corporate documents." (Nader—someone else who has inspired plenty of angst in the political establishment in recent years—said he didn't know enough about Klayman to comment.)

In the early years, Klayman often subsidized Judicial Watch's operations out of his own pocket, but he no longer needs to. The organization's most recent public tax documents, filed for 2000, list revenues of $26.5 million and expenses of $21.2 million, including $250,000 in compensation for Klayman. Revenues have since fallen to around $15 million, Klayman said, but even that is equal to or more than the revenues reported by the American Civil Liberties Union, the American Israel Public Affairs Committee, the Brady Campaign to Prevent Gun Violence, Common Cause, and the NAACP Legal Defense & Educational Fund.

The IRS does not require nonprofit groups to divulge the names of major contributors, and Klayman says today—as he has in the past—that the source of Judicial Watch's funding "is mainly small donations from the public." Judicial Watch, which claims 300,000 "supporters," collects contributions through direct-mail appeals and "contribute" buttons on his Web site. The group's 2000 IRS form lists $1.8 million in payments to American Target Advertising in Manassas, Va., for direct-mail services. Calls to Judicial Watch's toll-free line—the only number for the Washington

office listed on the Web site—are answered by an operator located elsewhere, whose first question is whether the caller would like to make a contribution.

The only large contributor that Klayman would confirm was Richard Mellon Scaife, the Pittsburgh industrial heir who has funded myriad conservative institutions. To Klayman's critics, Scaife's backing seems to suggest a smoking-gun link to the vast right-wing conspiracy. On the other hand, Scaife's political orientation has always been considered one of the quirkiest of any conservative funder. He has been widely reported to take a special interest in topics that make other conservatives squirm, such as probing the circumstances of Vince Foster's death.

Klayman said he's "very proud" of Scaife's funding—and adds that Scaife approves of Judicial Watch's suits against Republicans. "He has been unfairly demonized," Klayman said. "He is a fine man."

Judicial Watch's silence about its own big-ticket con-



**GROVER NORQUIST:** "I don't know anyone who hates him, because I don't know anyone who cares enough to hate him."

tributors troubles many outsiders—even those who praise its work. "We put our donors' names on our Web site, in part because we don't see how we can avoid it if we're also screaming and hollering about the government keeping things out of the public eye," said Allison of the Center for Public Integrity. "He's right that government should be more transparent than the private sector. But the flip side is that it's hard to take seriously someone who doesn't reveal fuller details about his own group's funding patterns."

## COURTING CONSERVATIVES

Klayman is usually up front about his conservatism, but he faults some journalists for not recognizing the difference between ideology and partisanship. Klayman notes that he was one of the first to call for then–House Speaker Newt Gingrich, R-Ga., to resign, and he also pursued then-Mayor Rudolph W. Giuliani, of New York City, for such matters as improper use of public parking spaces. "But nobody ever wanted to give us any credit for it, because it's a better story if we were some right-wing group," he said.

Klayman acknowledges that his docket was a bit one-sided during the 1990s, but justifies it by noting that Congress, which was controlled by the GOP for the last half-decade, typically exempts itself from scrutiny when it passes laws. By contrast, the executive branch offers wide opportunity for public oversight—and to Judicial Watch, the prevailing ethical standards within the Clinton administration offered endless grist for lawsuits. "The term 'anti-Clinton' should not be pejorative," said Judicial Watch President Fitton. "He was the most corrupt person ever to sit in that office. We didn't file *enough* against him!"

Despite Klayman's claims of evenhandedness, he did court conservatives during the Clinton years, and they eagerly returned the interest. Klayman was invited to appear at conferences of the Leadership Institute and other conservative groups. He addressed a rally of pro-gun women that countered the anti-gun Million Mom March in 2000. And he joined the Council for National Policy, a low-profile, mem-

bers only conservative club modeled on the Council on Foreign Relations. Klayman's link to CNP wasn't just for show, conservatives say; it also helped him raise money. "At the height of the Monica situation, people were throwing money at him" at CNP events, said one conservative who was there.

Even so, the alliance between Klayman and the conservative movement seems to have been much more arm's-length than his critics assumed at the time. Indeed, if you talk to veteran conservatives, many will say they barely know Klayman. "I never saw him at someone's surprise 40th birthday party," a conservative activist said. "Larry Klayman's always had better relationships with the bookers at Rivera Live than with the players in the conservative movement."

Norquist—who for years has hosted a weekly strategy meeting for conservatives—said he doesn't remember having been in a room with Klayman. "I don't know anyone who hates him, because I don't know anyone who cares enough to hate him," Norquist said.

Klayman also appears to have worked independently of the Republican investigatory machinery on Capitol Hill. "It's true that a lot of what he's been involved in, we've been involved in too, because they are important issues," said one source on the House Government Reform Committee, chaired by Rep. Dan Burton, R-Ind. "But there was absolutely no coordination between us."

To some observers, Klayman's attacks on Bush administration officials suggest an element of self-preservation. "Necessity is the mother of invention," said Stanley M. Brand, a Washington lawyer who has faced off against Klayman. "You can pursue the Democrats in one house of Congress, or you can transition into a more nonpartisan organization."

Klayman, however, insists that such explanations are wrong. To him, Bush abandoned his campaign pledge to run a more ethical administration even before he took office. And Klayman expresses irritation at what he considers a brush-off by Attorney General John D. Ashcroft, who declined to meet with him in early 2001. A series of letters got Klayman no more satisfaction, leading him to conclude that while the personnel had changed, the attitude toward government ethics had not. "The same people are litigating, and the same positions are being held," he said.

Klayman says that his grassroots supporters approve of the decision to target Bush, Cheney, and other Republicans and that "we've gotten very, very few e-mails questioning our activities." The membership survey showed that "92 percent liked George W. Bush, but only 16 percent were happy with his performance," Klayman explained. "That means that 84 percent were unhappy with the Bush administration. We fill a void for them."

**STILL ALOOF**

Feelings on the left are substantially more mixed. "I'm sure there are some Democrats who take some secret pleasure in watching what he's doing now," said Joel Johnson, a former strategist in the Clinton White House. "But this all seems to be more about Larry Klayman than anything

else. In my opinion, the enemy of my enemy is still a jerk."

Former White House Counsel Lanny Davis—who once sat through a Klayman deposition only to see him pass a tape of it, within hours, to television host Geraldo Rivera—agrees. "Regardless of whether his target is the Clinton White House, the Bush White House, or anybody else, Mr. Klayman has demonstrated a willingness to abuse the judicial process," Davis said. "I take little comfort from the fact that he's now directing his abusive tactics toward Republicans rather than Democrats."

But such reactions are not universal. Some groups that are generally characterized as liberal have begun cooperating with Judicial Watch, at least loosely. The most obvious example involves the multifront effort to force open the records of the Cheney energy task force to public scrutiny. The Natural Resources Defense Council, the Sierra Club, and Judicial Watch have all filed suits. NRDC senior attorney Sharon Buccino said that while her suit and Judicial Watch's are "proceeding separately," the two organizations have been "cordial" and have "tried to keep each other apprised" of developments. Given Klayman's past lawsuits against Clinton—a pro-environment president—Buccino acknowledged that the tandem suits make for "an interesting marriage. We're glad to see that Larry's on the right side of this issue."

Operationally, though, Klayman tends to run things independently of his co-plaintiffs. And Zaid added that Judicial Watch has remained aloof from the rest of the small community of FOIA litigators. "I've invited them to events, but for whatever reason, they haven't decided to participate," he said.

Stephen Hess, a senior fellow at the Brookings Institution, said that Judicial Watch's actions against the Bush administration have convinced him that Klayman is "an honorable guy" rather than "a bug-eyed conservative Republican stalking-horse." But, Hess adds, Klayman also deserves criticism for worsening government in certain ways, even as he has sought to improve it.

Klayman's litigiousness, Hess said, has helped create an environment in which public servants must constantly defend themselves from lawsuits, often at their own expense, thus discouraging many from serving in the first place. Klayman's legal assault on the Clinton White House, he added, also helped force judges to draw firm boundaries on such government prerogatives as executive privilege. Such rulings tend to "eat away at some of the ambiguity and flexibility that really help the system and the Constitution work," Hess said.

Klayman, naturally, disagrees, and as he relishes Judicial Watch's new momentum from the Cheney task force decision, he's also turning to new horizons. He intends to open more offices across the country so that Judicial Watch can introduce its brand of justice at the state and local level—operating much as the American Civil Liberties Union does today. From there, Klayman says, it's on to "Judicial Watch Europe, Latin America, Asia, and maybe Judicial Watch Africa."

Looking notably fitter and a bit grayer than in his Clinton-era file photos, Klayman offers a vision. "Government corruption is vast and growing," he says. "It's a growth industry." ■

*Louis Jacobson can be reached at ljacobson@nationaljournal.com.*

> **STEPHEN HESS:** Rulings on Klayman's suits tend to "eat away at some of the ambiguity and flexibility" that the political system needs.

# EXHIBIT 2

Page 1 of 1

# CONFIDENTIAL

David E. Johnson

From:     "David E. Johnson" <djohnson@strategicvision.biz>
To:       "Larry Klayman" <lklayman@klaymansenate.com>
Sent:     Tuesday, April 27, 2004 4:20 PM
Subject:  Fw: Larry Klayman


----- Original Message -----
From: BURDICK, LESLIE
To: 'David E. Johnson'
Sent: Tuesday, April 27, 2004 10:07 AM
Subject: RE: Larry Klayman

David,
   Tom Fitton of Judicial Watch is going to be on C-SPAN for 45 minutes talking about the case. He asked that we don't schedule Larry on anything related to the case. So we won't need to talk with Larry Klayman on Washington Journal, too. But thank you for getting in touch and keep in touch

Leslie Burdick
C-SPAN


4/28/2004

DEF 0000253
Protective Order

# EXHIBIT 3

## If Note

*Rep. Conyers should not be allowed to slip through the cracks by the Justice Department. The evidence against him seems strong. He and all other politicians must be held accountable for their misdeeds and, as the House Committee on Standards of Official Conduct appears to have failed to do its duty, it is up to the Justice Department to follow through.*

*—JW President Tom Fitton in a statement to the press concerning the Conyers allegations.*

Conyers continued from previous page.

new details concerning misconduct on the part of Conyers. The evidence is compelling. Unfortunately, Conyers' influence as Chairman of the House Judiciary Committee may be preventing a full investigation.

As the new Chairman of the House Judiciary Committee, Conyers has oversight over Justice Department and FBI matters (and budgets). Moreover, Conyers has been sharply critical of the Attorney General's office for its dismissal of several U.S. Attorneys.

"We are…aware of the pressure and scrutiny you have been subjected to recently concerning the removal of certain U.S. Attorneys," Fitton wrote Attorney General Gonzales. "None of this should be any impediment to the department's conducting a full investigation of Rep. Conyers' activities… Serious claims of criminal conduct remain unresolved… Frankly, the 'ball is in your court.'"

# Comments Regarding Judicial Watch and Mr. Larry Klayman

It is unfortunate that we have to write about the matter of Mr. Klayman and the allegations he has made against Judicial Watch along with his personal attacks aimed at Judicial Watch employees. Judicial Watch denies each and every allegation made by Mr. Klayman and, together with its attorneys, is preparing to demonstrate that such allegations are simply not true. Under normal circumstances, matters of difference are handled quietly between parties. However, as Mr. Klayman has sent mail and email to many Judicial Watch members and purchased advertising promoting his allegations, we felt we had no choice but to address the matter. Please note that we must be careful to address this issue in a way that prevents further baseless litigation.

In our opinion, the litigation filed by Mr. Klayman against Judicial Watch and its directors is baseless — in fact, before the discovery phase even commenced, a federal court dismissed core elements of his claims. (Another related lawsuit pursued by Mr. Klayman against Judicial Watch was dismissed completely — with prejudice — a few months ago.) Of course, any issues raised in litigation against

Judicial Watch are taken seriously. Along with our attorneys, we filed claims of our own against Mr. Klayman to protect Judicial Watch from his allegations and other misconduct.

It is sad that Mr. Klayman has gone to such lengths to attack Judicial Watch and its hard-working employees. The time, money and energy spent by him attacking us could be put to better use. Mr. Klayman is a former employee of Judicial Watch and has been gone for nearly four years. Mr. Klayman is no longer affiliated with Judicial Watch in any capacity.

Regardless, you can be sure his actions have not slowed our work as we continue to carry out our corruption-fighting mission. Of course, if you have any questions, please write, email or call our offices at:

Judicial Watch
501 School Street, S.W., Suite 500
Washington, D.C. 20024
1-888-593-8442
info@judicialwatch.org

We appreciate your understanding and your continued support.

# EXHIBIT 4

# OFFICE OF BAR COUNSEL

January 31, 2008

*CONFIDENTIAL*

Larry E. Klayman, Esquire
The Klayman Law Firm
601 Brickell Key Drive
Suite 404
Miami, FL 33131

*Serving the District
of Columbia Court
of Appeals and its Board
on Professional
Responsibility*

Wallace E. Shipp, Jr.
*Bar Counsel*

*Deputy Bar Counsel*
Elizabeth A. Herman

*Senior Assistant Bar Counsel*
Julia L. Porter
Judith Hetherton

*Assistant Bar Counsel*
Joseph N. Bowman
Ross T. Dicker
Gayle Marie Brown Driver
Catherine L. Kello
Becky Neal
William Ross
H. Clay Smith, III
Traci M. Tait

*Staff Attorney*
Lawrence K. Bloom
Dolores Dorsainvil



Re:    Klayman/Fitton
       Bar Docket No. 2008-D048
       *Your response is due: 02/14/08*

Dear Mr. Klayman:

The enclosed material contains allegations about your conduct which require Bar Counsel to obtain information pursuant to D.C. Bar Rule XI, § 8.

This inquiry is routine under the policy of the Board on Professional Responsibility and follows the disciplinary standards recommended by the American Bar Association. It may be based on a complaint which is neither signed nor corroborated, a media or other report, or information that has otherwise come to the attention of Bar Counsel.

Bar Counsel's decision to investigate this complaint is based upon D.C. Bar Rule XI, § 6(a)(2), which provides:

> Bar Counsel shall have the power and duty . . . [t]o investigate all matters involving alleged misconduct by an attorney subject to the disciplinary jurisdiction of this Court which may come to the attention of Bar Counsel or the Board from any source whatsoever, where the apparent facts, if true, may warrant discipline. Except in matters requiring dismissal because the complaint is clearly unfounded on its face or falls outside the disciplinary jurisdiction of the Court, no dispositions shall be recommended or undertaken by Bar Counsel until the accused attorney shall have been afforded an opportunity to respond to the allegations.

At this stage, Bar Counsel has not taken any position regarding the validity of the allegations.

Larry E. Klayman, Esquire
Bar Docket No. 2008-D048
Page 2

Please provide a substantive, written response, **in duplicate,** to each allegation of misconduct by *February 14, 2008,* so that we can make an appropriate disposition as soon as possible. If you have a question, please contact the undersigned at (202) 638-1501. Please use the above docket number in all correspondence with this office.

This matter is confidential at this stage except for necessary disclosures in the course of our investigation. A necessary disclosure includes sending a copy of your response to the complainant for comment. You, however, have the right to make the information public. *See* D.C. Bar Rule XI, § 17.

Please be aware that the District of Columbia Court of Appeals has approved discipline based in part on a violation of Rule 8.4(d) of the D.C. Rules of Professional Conduct (conduct that seriously interferes with the administration of justice) where the attorney failed to comply with Bar Counsel's request for information. Moreover, your cooperation will contribute to the resolution of this matter in a manner which safeguards the rights of the public and protects attorneys from unfounded complaints.

We have enclosed information regarding the District of Columbia Bar's Office of Regulation Counsel, which endeavors to assist attorneys with practice and personal-related issues. If you believe that you could benefit from the Bar's programs, they are available to you, separate and apart from this office's investigation.

Sincerely,

Elizabeth A. Herman
Deputy Bar Counsel

Enclosures:    Complaint dated January 23, 2008
              Regulation Counsel Information

EAH/jnb

# OFFICE OF BAR COUNSEL

THE BOARD ON PROFESSIONAL RESPONSIBILITY OFFICE OF BAR COUNSEL
DISTRICT OF COLUMBIA COURT OF APPEALS

515 5th Street, NW
Building A, Room 117
Washington, D.C. 20001
(202)638-1501   Fax (202)638-0862

JAN 2 3 2008

# RECEIVED

*(Please print or type.)*

Date:  01/23/08

A. Your Name:  (Dr.)
              (Mr.)
              (Ms.)
              (Mrs.)   Thomas J. Fitton
                       (First)          (Initial)          (Last)
   Address:   Judicial Watch, Inc., 501 School Street, S.W., Suite 500
              (Street)                                    (Apt. #)
              Washington, DC   20024
              (City)                (State)          (Zip)
   Business Telephone:  (202) 646-5172   Home Telephone: _____ Cell: _____
   (NOTE: It is very important that we have your telephone number(s) and that you inform our office if you have a change of address.)

B. Attorney Complained Of:

   Name:   Larry E. Klayman
           (First)          (Initial)          (Last)
   Address:  540 Brickell Key Drive, #732
             (Street)                              (Apt. #)
             Miami, FL   33131
             (City)                (State)          (Zip)
   Telephone No. :  (305) 579-3455          Attorney's Bar No., if known:  334851

C. Have you filed a complaint about this matter anywhere else? If yes, please give details. _____

       No.

D. Do you have a written retainer agreement with the attorney? If yes, please attach a copy.

       No.  See attachment.

E. Where applicable, state the name of the court where the underlying case was filed, and the case name and number.

       See attachment.

F. Do you have other documents that are relevant? If yes, please give details and provide copies. _____
       See attachment.

## SEE REVERSE SIDE FOR REQUIRED DETAILS & SIGNATURE

G. DETAILS OF COMPLAINT: _____

       See attachment.

The Undersigned hereby certifies to the Office of Bar Counsel
that the statements in the foregoing Complaint are
true and correct to the best of my knowledge.

_____
SIGNATURE

# EXHIBIT 5

## Larry Klayman

| | |
|---|---|
| From: | Larry Klayman [leklayman@bellsouth.net] |
| Sent: | Monday, March 03, 2008 12:15 PM |
| To: | 'Dick Sacchetti' |
| Cc: | 'Daniel Dugan'; 'Susan Prytherch'; 'Larry Klayman' |
| Subject: | RE: Klayman v. Judicial Watch - D&O Coverage |

Please provide immediately the name, address, email address, fax and phone number of the
contact person and claims rep, and policy number of the policy of AIG, so we don't lose time
and I am damaged further, particularly since Judicial Watch, its current directors and
officers, Ms. Prytherich and its counsel among others, have already tortiously interfered
with my rights to coverage. I have documents confirming that I am covered by the D&O policy,
which I had written at Judicial Watch through your agency. I did not keep the policy
information when I left so that is why my counsel and I inquired many weeks ago and asked for
this information, which was required to be produced timely.

Thank you for your belated cooperation,


Larry


From: Dick Sacchetti [mailto:dsacchetti@cimaworld.com]
Sent: Monday, March 03, 2008 9:05 AM
To: Larry Klayman
Cc: Daniel Dugan; Susan Prytherch
Subject: RE: Klayman v. Judicial Watch - D&O Coverage


Mr. Klayman:


I will send a copy of this message, taking it as a request for coverage under the AIG
insurance policy, to the claim handler at AIG with a request that she respond to you or Mr.
Dugan directly, copying me in on her reply. She will review the policy to determine whether
it is appropriate, under the terms of that insurance policy, to provide coverage for your
claim.


Richard Sacchetti

---

From: Larry Klayman [mailto:leklayman@bellsouth.net]

1

# EXHIBIT 6

MINTZ LEVIN
COHN FERRIS
GLOVSKY AND
POPEO PC

Boston
Washington
Reston
New York
New Haven
Los Angeles
London

12010 Sunset Hills Road
Suite 900
Reston, Virginia 20190-5839
703 464 4800
703 464 4895 fax
www.mintz.com

David Barmak

Direct dial 703-464-8189
dbarmak@mintz.com

December 2, 2003

CONFIDENTIAL

VIA FEDERAL EXPRESS

Lissette Tortora
Treasurer
Friends of Larry Klayman
7380 and Lake Road, Suite 500
Orlando, Florida 32819

Re:     Unlawful Conduct By Friends of Larry Klayman

Dear Ms. Tortora:

This firm represents Judicial Watch, Inc. I am writing to demand that Friends of Larry Klayman immediately cease and desist from any conduct that violates Judicial Watch's rights under federal trademark and copyright laws in order to avoid a lawsuit in which Judicial Watch will seek an injunction and substantial compensatory and other damages against Friends of Larry Klayman.

Judicial Watch is the owner of federal trademark registrations and/or pending federal trademark applications for the marks:

JUDICIAL WATCH
JUDICIAL WATCH WASHINGTON D.C.
BECAUSE NO ONE IS ABOVE THE LAW

These marks are used for a variety of services, all involving promoting public awareness of the need for integrity in government. These services have been provided by Judicial Watch for many years under these various marks, during which time the marks have become nationally known and associated exclusively with Judicial Watch. The organization also owns common law rights in a variety of other marks currently in use.

DEF 0000133
Protective Order

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

Lissette Tortora
December 2, 2003
Page 2

Judicial Watch also owns copyrights in virtually every tangible work of original authorship that has been created on its behalf. It has obtained US copyright registrations, as the author and owner, for a number of these works, including:

"Judicial Watch Interim Report on Crimes and Other Offense Committed by President Bill Clinton Warranting His Impeachment and Removal from Elected Office," copyright 1998, Reg. No. TX-4-895-175

"The Attacks of September 11 and the US Government Accountability," copyright 2002, Reg. No Txu-1-046-518

"Fatal Neglect: The US Government's Continuing Failure to Protect American Citizens from Terrorists: A Special Report," copyright 2002, Reg. No. Txu-1-060-646

It has come to our attention that Friends of Larry Klayman has engaged in and is continuing to engage in conduct that infringes upon Judicial Watch's intellectual property rights under applicable federal trademark and copyright law. Federal trademark law prohibits the use of a third party's trademarks in a manner which causes confusion as to the source or sponsorship of the goods or services provided under each party's marks, or any use of a trademark which suggests a false designation of origin or otherwise falsely suggests or implies that there is a relationship, association or affiliation between, or sponsorship or approval of a third party by a trademark owner. See 15 USC §1125(a). Friends of Larry Klayman's repeated references to Judicial Watch and various of its trademarks, cases, programs and accomplishments in campaign solicitations, mailings, press releases, statements, on its Klayman for Senate web site and otherwise clearly create the false and illegal impression that Mr. Klayman continues to be associated with Judicial Watch or that Judicial Watch sponsors or otherwise endorses him, his activities, and his candidacy. Such misuse of Judicial Watch's intellectual property by Friends of Larry Klayman is unlawful, places Judicial Watch's tax-exempt status in jeopardy, and must cease immediately.

The campaign materials and information disseminated by Friends of Larry Klayman also falsely suggest that Mr. Klayman is the author of copyrighted material, including the "Fatal Neglect" report referenced above, for which Judicial Watch is the legal author and in which it owns the exclusive copyright. As the copyright owner, Judicial Watch has the exclusive right to reproduce its copyright material in whole or in part, and to create derivative works based upon those works. See 17 USC §106. The overall appearance of campaign solicitation materials of Friends of Larry Klayman, and other distributed publications, including the layout, design, tone, and appearance of these materials, is substantially similar to and an infringement of the copyright which Judicial Watch owns in its own solicitation materials, which it has distributed for many years. Moreover, these similarities are causing actual public confusion as to the source of Friends of Larry Klayman's mailings, solicitations, and distributions, and have resulted in

DEF 0000134
Protective Order

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

Lissette Tortora
December 2, 2003
Page 3

misdirected mailings, contributions, and inquiries. The repeated explicit references to Judicial
Watch and to its trademarks, programs, cases and accomplishments contained in these materials
exacerbates the public confusion. This conduct, likewise, infringes upon Judicial Watch's
federally protected property rights, and cannot continue.

Judicial Watch is entitled to and will seek all equitable and financial relief available to it
under federal trademark and copyright law, including, but not limited to, preliminary and
permanent injunctive relief against further infringing conduct, impoundment and destruction of
all infringing materials and the means used to create them, its actual or, as appropriate, statutory
damages caused by the infringement, which we will ask the court to treble due to the willful
circumstances of this matter, all profits attributed to the use and distribution of the infringing
materials, and all costs and attorneys' fees incurred by Judicial Watch in this matter. See 15 USC
§1116-18 and 17 USC §502-05.

At this juncture, Judicial Watch expects that Friends of Larry Klayman will carefully
assess and evaluate the consequences of its conduct in light of its legal obligations to Judicial
Watch, and immediately cease and desist from further infringements of Judicial Watch's
intellectual property rights under federal law. To avoid instituting a public lawsuit against
Friends of Larry Klayman and its undertaking other measures aimed at preserving and protecting
its good name, reputation, rights and interests, Judicial Watch hereby demands the following
written assurances and actions from Friends of Larry Klayman:

1.        That Friends of Larry Klayman will immediately cease all improper
          references to Judicial Watch, its cases, programs and accomplishments and all
          improper uses of its trademarks and copyrighted works, and will immediately
          cease all use and distribution of any tangible materials that infringe upon its
          various trademarks and copyrights.

2.        That Friends of Larry Klayman will promptly take steps to "cure" any
          breaches of its obligations to Judicial Watch and that it will not engage in any
          conduct from this point forward that would constitute a further infringement or
          violation of Judicial Watch's legal rights.

If I do not receive from Friends of Larry Klayman the foregoing written assurances (and
concomitant action) by close of business on December 17, 2003, my client will pursue
vigorously all of its legal options, including an action for injunctive relief and damages, against
Friends of Larry Klayman based upon its infringement of Judicial Watch's legal rights. We

DEF 0000135
Protective Order

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

Lissette Tortora
December 2, 2003
Page 4

expect to hear from Friends of Larry Klayman or its representatives immediately.  In the
meantime, Judicial Watch reserves all rights against Friends of Larry Klayman and Mr.
Klayman.

Sincerely yours,

David Barmak

DB:jbj

cc:     Thomas Fitton
        Paul Orfandes
        Susan Weller, Esquire

WDC 342022v1

DEF 0000136
Protective Order

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LARRY KLAYMAN, et al.,

      Plaintiffs,

      v.

JUDICIAL WATCH, INC., et al.,

      Defendants.

Civil Action No. 1:06-CV-00670
Judge Kolar Kotelly
Magistrate Judge Kay

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL PLAINTIFF'S RESPONSES TO DEFENDANTS' SUPPLEMENTAL REQUEST FOR PRODUCTION OF DOCUMENTS AND CROSS MOTION FOR PROTECTIVE ORDER AND RECONSIDERATION

## I.  INTRODUCTION AND BACKGROUND.

**This is a lawsuit which never should have been necessary!**

In the Spring of 2003, Larry Klayman, the founder, chairman and general counsel of Judicial Watch, about ten years after the creation of the organization, decided to step down to return to his home in Florida to run for the U.S. Senate. During this period, Mr. Klayman was separated from his then wife and undergoing a divorce, and he felt that it was a good time to do something new and different, taking advantage of his considerable experience in government and fighting government corruption. Trying to use Mr. Klayman's divorce to his advantage, the president of Judicial Watch, Tom Fitton, tried to negotiate ridiculous terms for

Mr. Klayman's severance, but in the end the parties agreed voluntarily to sufficient compensation and that Mr. Klayman's departure was voluntary and on good terms; "to pursue other endeavors." Judicial Watch issued a press release praising Mr. Klayman for founding Judicial Watch and building it into the major "watchdog" organization in the United States. See also, National Journal article of June, 2002 **(Exhibit 1).** Importantly, the National Journal, the prestigious legal and political publication, in and around this time, after conducting many interviews in the non-profit and related communities, called Mr. Klayman a major force in Washington and the number one public interest litigator at the time – making a special point of praising him for his non-partisanship.

Just prior to leaving Judicial Watch, Mr. Klayman learned from a major donor that Mr. Fitton, contrary to his representations when Mr. Klayman hired him, and later in written biographies, had never graduated from college. As a result, Mr. Klayman left Judicial Watch on the oral condition and with a gentlemen's agreement that Mr. Fitton and the other directors fill Mr. Klayman's chairmanship with an experienced and well respected lawyer, such as then former Congressman Bob Barr. This was crucial, because Judicial Watch earned its reputation by filing hard hitting public interest lawsuits, not just holding seminars and publishing materials on websites. A non-lawyer, much less a college graduate, was not equipped to successfully lead the organization into the future. Indeed, the Washington Post observed in April of last year, after Mr. Fitton and the other directors had failed and refused for four years to fill the chairmanship position with an experienced and respected lawyer, that:

"Judicial Watch earned its reputation in the 1990s for lawsuits..... But it's largely been out of the news since Klayman left Judicial Watch — and filed a lawsuit against it."

Washington Post, April 6, 2007

When Mr. Klayman executed his Severance Agreement with Judicial Watch, Mr. Fitton and one other director on September 19, 2003, he thought that all parties would pursue their respective endeavors in peace. But obviously fearing that Mr. Klayman might not win his Senate race and may one day try to return to Judicial Watch, Mr. Fitton, the dominant director remaining at Judicial Watch, set out to destroy Mr. Klayman and his family, to weaken him to such an extent that he could never pose a threat to this non-lawyer, non-college graduate ever relinquishing control of the organization Mr. Klayman conceived of and founded. Much like Brutus to Caesar, the betrayal, even in the hard and cold world of Washington, D.C., was unprecedented.

First, to harm Mr. Klayman, knowing that he was in the public spotlight by virtue of his Senate run, Mr. Fitton ordered the comptroller of Judicial Watch, Susan Pretherich, to create phony, after the fact invoices, claiming that Mr. Klayman owed the organization large sums of money – obviously as a clever means to try to recoup some of the severance payment. In trying to extort this money, Mr. Fitton threatened to sue Mr. Klayman at the height of his Senate campaign to generate negative publicity, but Plaintiff would not give in to this attempted extortion. But when Klayman refused to be extorted and give in, Mr. Fitton published false notes on Judicial Watch's public income tax returns, displayed widely on the internet, misleadingly suggesting that Mr. Klayman had

somehow misappropriated monies from Judicial Watch, and conspicuously failing to list the considerable monies and other property which Judicial Watch owed to Mr. Klayman.

Second, Mr. Fitton, while improperly using, without authorization, Mr. Klayman's, name and signature in fundraising long after Mr. Klayman left to generate large contributions, he disparaged Mr. Klayman with the media, in an attempt to keep him off television and radio, the life blood of a public interest law and policy. See **Exhibit 2.**

Third, employees of Judicial Watch were told not to communicate or help Mr. Klayman in any way, which was their constitutional right under freedom of association and freedom of speech.

Fourth, Mr. Fitton also dishonored the terms of the Severance Agreement by cutting off Mr. Klayman's children, then five and three years old, from medical insurance.

Fifth, Mr. Fitton failed, as required under Judicial Watch's multimillion dollar lease, to remove Mr. Klayman as the personal guarantor, while at the same time reneging with donors on Judicial Watch's commitment to buy the building they were renting. Judicial Watch had raised money to buy this building with the donors' contributions. By honoring this commitment to the donors and buying the building at 501 School Street, S.W., Fitton would have mooted out the need to remove Mr. Klayman as a guarantor of the lease. Despite not buying the building – obviously to hoard this money to guarantee Fitton the other defendants' large salaries well into the future - Fitton, in newsletters and otherwise, gave donors the false impression that the building had been purchased and even published a phony plaque "showing" the naming rights donors had thought they had

purchased in the building. Incredibly, to minimize the embarrassment of having been later sued by Mr. Klayman, Fitton has told donors and others that Mr. Klayman was only an "employee" of Judicial Watch, so they should not give much consideration to his lawsuit and the fact that he was no longer with Judicial Watch. **See Exhibit 3**. What he cleverly failed to mention is that "employees" don't guarantee multimillion dollar leases, particularly when Fitton and the director at the time, Paul Orfanedes, refused to do so.

Sixth, after Mr. Klayman lost his Senate bid, and even well before, Mr. Fitton instructed Judicial Watch employees, including the receptionist, to not tell callers where Mr. Klayman could be located, denying him business and other opportunities -- not to mention harming the interests of Judicial Watch clients and supporters who wanted to speak with Mr. Klayman. To make matters worse, when callers would ask why Mr. Klayman left, Mr. Fitton instructed the Judicial Watch employees to tell them that "Judicial Watch could not discuss the reasons Mr. Klayman left; that they were confidential," thereby creating false innuendo harming Mr. Klayman's reputation. And, after Mr. Fitton and company were sued, they told callers that Mr. Klayman sued them to avoid income tax issues.

Seventh, the harm to Mr. Klayman continued even after the intitial and amended complaints were filed in this case. Long after the case began, Mr. Fitton caused to be published in LegalTimes a story concerning Mr.Klayman's family and ex wife, from information, long since discredited and retracted, that had been placed under court seal in his divorce case. Mr. Fitton did this without regard to Mr. Klayman's children or innocent third parties, all the while claiming that the reason Mr. Klayman left was because he had no regard for so called family values. Ironically, over the years there had

been comments about Mr. Fitton's life style, which Mr. Klayman never used for advantage against him. Recently, Mr. Fitton and the other defendants have again published false information on Judicial Watch's public tax returns, suggesting the Mr. Klayman made off with a lot of money, but failed to even note the multiple lawsuits against them for the considerable monies and damage owed to Mr. Klayman. Recently, during a period just days after the death of Mr. Klayman's mother on January 24, 2008, Mr. Fitton has even attempted to use the District of Columbia Bar to harass Mr. Klayman, claiming that he did not have the right to protect former employees who were fired after Mr. Klayman left for their allegiance to him and donors and supporters and clients who have been defrauded and harmed through misleading fundraising, abandonment and other tortious acts. **See Exhibit 4** – D.C. Bar Complaint Letter. To top it all off, Mr. Fitton and the other defendants have recently tortiously interfered in Mr. Klayman's claim to be covered by Judicial Watch's "Directors and Officer's Policy" for the non-mertitorious counterclaim they filed against him. And, when Mr. Klayman and his co-counsel asked for the policy name, company and policy number many, many weeks ago, Mr. Fitton, the defendants and their counsel provided false information about the carrier and policy at issue, instead providing the wrong carrier and policy intentionally. This has harmed Mr. Klayman and delayed his right to get the same coverage which is handsomely paying for defendants" defense in this case. **See Exhibit 5.** Yet, Mr. Fitton complains and cries when Mr. Klayman has attempted to raise monies from the public through advertising to support returning Judicial Watch to an ethical foundation. The hypocrisy and misconduct of Fitton and the directors, Mr. Orfanedes and Mr. Farrell, are all harmful not only to Mr. Klayman and his family, but the donors and supporters of Judicial Watch and the

organization itself, which Plaintiff conceived of, created, seeded with his own money and resources, hired key personnel after starting with a group of volunteer lawyers, and then put ten years of "blood, sweat and tears" into. During this period, Mr. Klayman and the organization became so prominent, that the NBC hit drama "West Wing" created a character after him, "Harry Klaypool of Freedom Watch."

Not to let this rest, when Mr. Klayman created a new public interest group, "Freedom Watch" and trademarked the name, Mr. Fitton and the other defendants interfered with the Internal Revenue Serive, opened Mr. Klayman's mail accidentally sent to Judicial Watch for Freedom Watch, and assisted infringers of the trademark Freedom Watch in defending a lawsuit that Mr.Klayman filed against an imposter Republican-Bush administration front group, "Freedom's Watch," which sprung up last summer in time not only to defend General Patreous' Congressional testimony in support of the failed Iraq War, but also in time for the 2008 elections as a so called conservative adversary to the Democrat oriented Moveon.org.

In a show of incredible "chutzpah" and intellectual legal dishonesty, Mr. Fitton and the other defendants, notwithstanding their assisting Republican infringers of the trademark "Freedom Watch," had early on threatened to sue Mr. Klayman as the height of his 2004 Senate campaign, for making any mention of his having founded Judicial Watch – themselves falsely claiming trademark infringement for Plaintiff's even discussing his legal background – fearing that the Senate campaign would compete with the greed of Fitton and the other defendants for monetary contributions. See **Exhibit 6.**

The said irony and truth is that at all times, Mr. Klayman had tried to resolve these matters with Mr. Fitton and the other defendants, not wanting to harm the "baby" he had birthed; Judicial Watch, even using a prominent mediator in Washington, D.C. But Fitton and the other defendants did not want to settle, preferring to use their tens of millions of dollars in resources which Mr. Klayman had left behind with Judicial Watch to continue to harm Plaintiff and his family – in order to keep Mr.Klayman "down" and preoccupied so he could never lift his head up and reestablish himself prominently after he lost the Senate bid. But when the abuse and illegality by Fitton and the other defendants grew so rampant, and threatened to destroy Judicial Watch due to Mr. Fitton's fraudulent acts toward clients, donors and others, Mr. Klayman was left no choice but to file suit. In effect, Judicial Watch had been taken hostage and it was time to not recuperate and remedy the damage counsel to Mr. Klayman, his children and his family, but to also reclaim Judicial Watch for the benefit donors who had and were supporting it.

It is in this context that one must view most of Defendants' Supplemental Requests for Production of Documents, which, if not limited and reined in, are intended to be another means to harass, harm and damage Mr. Klayman and his family.

## II. Defendants' Supplemental Document Requests.

At the outset, Plaintiff, Mr. Klayman, does not object to providing relevant documents that fall within the scope of this lawsuit. [1]His responses to defendants' supplemental document requests bear this out. To the contrary, Mr. Klayman has only

---

[1] Contrary to Defendants' claims, Plaintiff's counsel did not waive his objections. In any event, this issue arose before the Magistrate issued his earlier ruling cited in Defendants' motion to compel, so the Magistrate's order was not flouted.

objected where the requests are burdensome, overly broad and irrelevant, and calculated only to conduct a fishing investigation of his personal life and finances – matters off limits in any reasonable discovery endeavor. Given Mr. Fitton's and the other defendants' documented history of harming Mr. Klayman, his children and his family, it is obvious that these documents, which are unnecessary in the context of this litigation, would be used to damage Plaintiff further.

For example, Mr. Fitton's and the other defendants supplemental requests numbers 13, 15, 23, 24, 25, 26, 27, 28, 29, and 30 seek to effectively clean out all of the financial records of Saving Judicial Watch, Freedom Watch and Larry Klayman personally, including his highly personal credit reports, which have no bearing on this lawsuit. Despite general requests that Plaintiff has posed to Mr. Fitton and the other defendants, they have not produced such records to Mr. Klayman, obviously because they are not relevant to the issues at hand, and are highly invasive. Assuming that Mr. Fitton and the other defendants have any claim for damages for Plaintiff's direct mail and advertising supporting this litigation– which they do not – these figures can be derived by an independent certified public accountant, and submitted to the Court under seal, without having to literally dump out all of Plaintiff's financial files and personal information. Moreover, Mr. Klayman is the counterdefendant in this case, not Saving Judicial Watch or Freedom Watch, so the requests are not relevant in any event. Plaintiff, Mr. Klayman, suggests the same procedure with financial information to be submitted by Mr. Fitton and the other defendants with regard to his damage claims – documents and information which has conspicuously not been produced and which will, if not resolved shortly, will be subject to motion practice. This approach is reasonable and appropriate, and will

produce the relevant damage information without invading privacy and other rights – rights which have already been violated by Mr. Fitton and the other defendants to harm Mr. Klayman, his children and his family.

To add insult to injury, and coupled with the fishing expedition concerning Mr. Klayman's financial matters, Mr. Fitton and the other defendants want to also muck around in his prior divorce from his prior wife Stephanie Luck Klayman. Specifically, at supplemental request 17 Mr. Fitton and the other defendants demand "Any and all documents filed in your divorce proceeding with Stephanie Luck Klayman, regardless of jurisdiction."

Notwithstanding the outrageous and transparent motive for this request – to harass Mr. Klayman, violate his and his children's and family's privacy, and to use the information for more press articles in publications like LegalTimes – all of which is apparent given their prior conduct smearing him in LegalTimes, a trade magazine concerning his profession – the supplemental request is not even relevant. In this regard, the Severance Agreement states plainly, by agreement of Mr. Fitton and the other defendants – that Mr. Klayman left Judicial Watch voluntarily, to pursue other endeavors and also contains the text of a public statement, later issued as a Judicial Watch press release, praising Mr. Klayman for his founding and serving as chairman of Judicial Watch. The smear campaign waged by Mr. Fitton and the other defendants is not only irrelevant, it defies the "parol evidence rule." Indeed, when Plaintiff sought to bring in issues involving Mr. Fitton and the other defendants oral promise to hire a chairman of legal stature, after Mr. Klayman left, outside of the written terms of the Severance Agreement, this court dismissed these claims. What is good for the goose is good for the

gander and in the unlikely event this supplemental request, or the supplemental requests concerning Denise Underberg Golden (#11) and Rebecca L. Eddy (#12) – two persons Mr.Fitton and the other defendants insinuate Mr. Klayman had some sort of personal relationship with are at issue, Plaintiff moves for reconsideration. This is simply not relevant in the context of this litigation and defies the parol evidence rule, and the Severance Agreement which the parties agreed to and made it clear that the reasons Mr. Klayman was leaving Judicial Watch was to pursue other endeavors, i.e., running as a candidate for the U.S. Senate. And, if Mr. Klayman had had affairs with these persons while married, would he have been so stupid to then run for the U.S. Senate? The insinuation is not only revolting, but not relevant and calculated only to harm Mr. Klayman and his family and to try to extort a settlement in this case, if not ruin Mr. Klayman's reputation so he cannot compete with the current Judicial Watch, run by persons who are milking it dry to the detriment of the donors and supporters, not to mention the harm to Plaintiff, his children and his family.

Then there are Mr. Fitton's and the other defendants' supplemental requests asking for "all" repeat "all documents, no matter what, concerning direct mail fundraising, his prior Senate campaign, Saving Judicial Watch, Freedom Watch and only God knows what else. See supplemental requests 2,3,4,7,8,9,10,13 19,23 24,25, 26,27,28,29, and 30. This is clearly overly broad and not relevant or calculated to lead to relevant evidence, notwithstanding the other legitimate issues and objections raised above.

Mr. Fitton and the other defendants also demand all documents that refer or relate in any way to former employees Sandra Cobas (#34), Russ Verney (#39), Mike

Pendleton (#40), Jane Chastain (#41), John Vincent (#42), Connie Ruffley (#43), and employee Janice Rorup (#45). Not only is this highly invasive of their privacy rights, but there is no showing of any relevancy to the request whatsoever and they are clearly overly broad. When Mr. Klayman sought to negotiate a reasonable limit to these and other supplemental requests, he was met with a repeated mantra by Mr. Fitton's and the other defendants' counsel that the requests were fine, without explanation. The same is true of the requests concerning Mrs. Louise Benson (#38) and Mr. Peter Paul (#37). Mrs. Benson is like a mother to Mr. Klayman and indeed has corresponded with Mr. Klayman and his children on personal matters. Mr.Paul is a former client of Mr.Fitton and the other defendants and has been forced to sue them – a lawsuit which is going forward before the Honorable Royce C. Lamberth in this court, for defendants having abandoned him, violated his contract, and other tortious acts. These issues are not involved in the instant litigation, except for the pattern and practice of Mr. Fitton and the other defendants making false representations to donors and supporters about representing Mr. Paul to raise money, when indeed they had already abandoned Mr. Paul. Thus, the supplemental requests are overly broad, largely irrelevant and objectionable.

### III. CONCLUSION.

Mr. Fitton's and the other defendants' supplemental document requests are largely designed to harass Mr. Klayman, innocent third parties and anyone else who has any past or present association with Plaintiff, including his former wife and his children. The defendants and their counsel have already demonstrated their intent to smear Mr. Klayman, increase the cost of litigation with bogus filings, and keep him down -- a sole

practitioner -- in any way that will curtail his professional career and personal interests. Mr. Klayman wishes that he never would have had to file this and other lawsuits that are pending before the courts, after Mr. Fitton's and the other defendants' unsuccessful attempts to have them dismissed. For five years, the disputes with Mr. Fitton and the other defendants have caused great damage and prevented Mr. Klayman from being as effective public advocate as he could otherwise be.

Plaintiff, Mr. Klayman, therefore respectfully requests that this honorable court reign in the abusive and unnecessary and harassing supplemental document requests of Mr. Fitton and the other defendants and if necessary issue a protective order. Plaintiff, Mr. Klayman, also requests a ruling that Mr. Klayman's children, family and prior divorce are not relevant to the causes of action in this case, as they are barred by the parol evidence rule, rights of privacy and common decency.

WHEREFORE, Plaintiff, Mr. Klayman, respectfully requests that Mr. Fitton and the other defendants' motion to compel be denied and that Plaintiffs' cross motions be granted.

Respectfully submitted,

s/Larry Klayman
Larry Klayman, Esq.
D.C. Bar No.: 334581
The Klayman Law Firm, P.A.
3415 SW 24th Street
Miami, FL 33145
Tel: 305-447-1091
Fax: 305-447-1548

Daniel J. Dugan, Esquire

13

Spector Gadon & Rosen, P.C.
1635 Market Street 7th Floor
Philadelphia, PA 19103
Tel: 215-241-8872
Fax: 215.241.8844

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of March 2008, a true copy of the foregoing

Motion to Compel Plaintiffs' Response to Defendants' Supplemental request for

Production of Documents and Cross Motion for Protective Order and Reconsideration

was served via electronic means to:

Richard W. Driscoll, Esquire
Driscoll & Seltzer, PLLC
600 Cameron Street
Alexandria, VA 22314

By: s/Larry Klayman
Larry Klayman, Esq.
D.C. Bar No.: 334581
The Klayman Law Firm, P.A.
3415 SW 24th Street
Miami, FL 33145
Tel: 305-447-1091
Fax: 305-447-1548

14

# EXHIBIT 1